Terri Wood, OSB #883325
Law Office of Terri Wood, P.C.
730 Van Buren Street
Eugene, Oregon 97402
541-484-4171
Fax: 541-485-5923
Email: contact@terriwoodlawoffice.com

Attorney for Jon Ritzheimer


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>-VS-<br><br>JON RITZHEIMER,<br><br>     Defendant | Case No. 3:16-CR-00051-02-BR<br><br>DEFENSE REQUEST FOR DOWNWARD VARIANCE WITH SUPPORTING MEMORANDUM |


COMES NOW the Defendant, Jon Ritzheimer, by and through undersigned counsel, and requests a downward variance from the advisory guideline range, as further supported by the sentencing memorandum that is part of this pleading. The defense reserves the right to submit a supplemental memorandum by the November 20, 2017,

Defense Request for Downward Variance                                    Page 1

filing deadline set by the Court, should that be necessary to address issues in the Final

Presentence Report which has not yet issued, or otherwise supplement the record.


RESPECTFULLY SUBMITTED this 3rd day of November, 2017


/s/ Terri Wood
_____
TERRI WOOD  OSB  883325
Attorney for Ritzheimer

## Table of Contents

*Summary Of Mitigation Evidence And Departure/Variance Grounds*…………………………...1

I.    **Mr. Ritzheimer's Military Service And Combat-Related Injuries
      Contributed Substantially To His Commission Of The Offense.**……………………7

      A.    **Mr. Ritzheimer's Behavior Is A Product Of Military Culture.** ……………14

            *Brief Overview of the Military Total Institution
            And Marine Corps Values*…………………………………………………...15

            *Mr. Ritzheimer's Post-Deployment and
            Post-Discharge Reintegration Efforts*…………………………………..…19

            *Brief Summary of Mr. Ritzheimer's Offense Conduct*………………………...24

            *Mr. Ritzheimer's Offense Behavior As A Product of Military Culture*……..…29

      B.    **The Influence Of Combat-Related PTSD, mTBI And Moral Injury On
            Mr. Ritzheimer's Behavior**………………………………………………32

            *Combat-related PTSD*……………………………………………………..33

                  **A. The Physiological Basis of PTSD**…………………………………..34

                  **B. The Diagnostic Symptoms of PTSD**………………………………..36

                  **C. Mr. Ritzheimer's Experience with PTSD leading up to the
                  Occupation**..………………………………………………………39

            *Combat-related mild Traumatic Brain Injury (mTBI)*…………………….....43

                  **A. The Mechanics of mTBI**……………………………………………46

                  **B. The symptoms of combat mTBI**……………………………………46

                  **C. Distinguishing mTBI from PTSD**………………………………….48

            *Combat-related Moral Injury*…………………………………………………50

            *The impact of PTSD, Moral Injury and  mTBI on Mr. Ritzheimer's Offense
            Behavior* ..………………………………………………………………59

      C.    **Mr. Ritzheimer's Offense Behavior Is Not Attributable To His
            Pre-Military History, Pre-Existing Conditions, Or Substance Abuse**……....63

II.     **Mr. Ritzheimer's Extraordinary Post-Offense Rehabilitation Efforts,
        Along With Other Factors, Evince A Very Low Risk Of Recidivism;
        His Substantial Progress In Reintegration Will Be Undermined By
        Incarceration**..................................................................................**66**

        *Mr. Ritzheimer's Post-Plea Treatment Progress*.............................**68**

        *Mr. Ritzheimer's Strong Support Network Of Family And Friends*............**72**

        *Mr. Ritzheimer's Efforts To Become Self-Sufficient And
        Contribute To His Community*..............................................**74**

        *Mr. Ritzheimer's Pre-Approval To Enter The Veteran's Program
        In Arizona US District Court*................................................**74**

        *Mr. Ritzheimer's Extraordinary Post-Offense Rehabilitation Efforts
         And Other Factors Establish A Low Risk Of Recidivism*.....................**76**

III.    **Legal And Policy Grounds Supporting Downward Departure
        Or Variance.**................................................................**79**

        *Military Service As A Departure/Variance Ground*.........................**80**

        *Mental And Emotional Conditions As A
        Departure/Variance Ground*..............................................**86**

        *Extraordinary Post-Offense Rehabilitation*...............................**95**

        *Departure Or Variance To Provide Effective Rehabilitation*............**97**

IV.     **A Sentence Of Continued Community Supervision Is "Sufficient But Not
        Greater Than Necessary" To Achieve Justice In Mr. Ritzheimer's Case.**...........**101**

        *The Kinds Of Sentences Available*........................................**102**

        *The Advisory Sentencing Guidelines Range*..............................**104**

        *Relevant Policy Statements By The Guidelines Commission*...............**107**

        *The Need To Avoid Unwarranted Sentence Disparities*....................**107**

        *The Need To Provide Restitution To Any Victim*..........................**109**

        *The Goals Of Sentencing*................................................**110**

**A. Retribution**………………………………………….………110

**B. Deterrence**………………………….…...……….…………112

**C. Incapacitation**……………………….....………….…………113

**D. Rehabilitation**……………………....………………….………114

**Conclusion**……………………………………………………….…………115

## *Summary Of Mitigation Evidence And Departure/Variance Grounds*

> *"Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as [petitioner] did. Moreover, the relevance of [petitioner's] extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on [petitioner]."*
> *Porter v. McCollum,* 558 US 30, 130 S Ct 447, 456 (2009) (internal citations omitted).

Mr. Ritzheimer repeatedly risked his life for our country in the aftermath of 9-11, serving two tours of duty in Iraq before his honorable discharge at the rank of Marine Staff Sergeant. Until this case, his record was impeccable: No prior arrests, convictions, or disciplinary actions, but rather a host of awards, decorations and commendations from his 11 years of military service.

Military records document that on his first tour in 2005, with the II Marine Expeditionary Force in support of Operation Iraqi Freedom, Mr. Ritzheimer's platoon completed over 60 convoy escort missions that totaled over 30,000 miles, often exposing him to IEDs (improvised explosive devise) attacks, RPG (rocket propelled grenade) ambushes, as well as gunfire exchanges with insurgents. As a Lance Corporal, his primary duty was serving as a machine gunner during convoy security operations, based in Ar Ramadi. He also participated in searching and clearing homes. Ar Ramadi was a hotbed of violence after the 2004 battle of Fallujah had driven the insurgency there. Mr. Ritzheimer personally killed and participated in the killing of insurgents; he witnessed grievous injuries to and deaths of his fellow soldiers; and saw Iraqi civilian casualties, including children. He was 21-years-old.

During his second tour in 2008, with the Marines 4th Tank Battalion, he conducted over 160 resupply convoys as a MRAP (Mine Resistant Ambush Protected vehicle) driver, among

1

other combat support duties, and received a field promotion to Sergeant. He knew of enemy and civilian casualties, as well as American soldiers who were injured or killed, although his unit was "lucky" this time.

Veterans Administration (VA) records attest that Mr. Ritzheimer also sustained combat-related injuries from his two tours in Iraq: Mild Traumatic Brain Injury (mTBI), tinnitus, and migraines, all likely resulting from numerous head traumas to include multiple IED explosions and a Humvee crash, and prolonged combat noise exposure without hearing protection equipment; upper thoracic spine strain, cervical spine strain and left shoulder impingement, all secondary to the 2005 Humvee accident, that still cause him pain and varying degrees of disability; and psychic injuries far more devastating, that continue to plague his daily life, diagnosed as moderately severe Posttraumatic Stress Disorder (PTSD), Depression, and Moral Injury.

> *Nobody who deploys to a combat zone is ever quite the same afterwards. . . . There are, of course, those who suffer, from shot and shrapnel, bomb burst and booby trap, the physical wounds of war. There are as well many who are afflicted with so-called invisible wounds of war, the not so obvious wounds that invade a veteran's consciousness, ripping away peace of mind, infusing nights and days with the lingering legacy of his — and as more and more women troops experience combat, her — often haunting experiences.*

Department of Justice, National Institute of Corrections, *Veterans Treatment Courts: A Second Chance For Vets Who Have Lost Their Way* (May 2016).

The defense mitigation evidence proves Mr. Ritzheimer's exemplary military service and combat-related injuries substantially contributed to his commission of the offense: He spent most of his adult life in the Marines, from age 20 to nearly 31. Over those formative years, his highly successful indoctrination into military culture and values—measured objectively by his rise in rank, performance evaluations, and commendations—dramatically shaped his behavior and

2

beliefs, and continued to govern his conduct upon his ejection into civilian culture.[1] Our government recognizes this impact of military service on human behavior, and expends resources to train civilian mental health providers to become competent in military culture so that they can better understand and treat service members.[2] Like many veterans, Mr. Ritzheimer struggled to "return to normal" back in civilian culture, but the military has not prepared them to do so.

Honorably discharged in July 2014, it should not be surprising that his military-ingrained behavior and beliefs remained in control of his interactions with the Bundys and their followers starting in December 2015. Furthermore, his combat-related injuries of PTSD, Depression and Moral Injury are "mental and emotional conditions" with a well-documented correlation to risk-taking behaviors and law violations when left untreated.[3] VA records show Mr. Ritzheimer was not actively engaged in treatment nor taking VA prescribed medications to suppress symptoms

---

[1] The VA recognizes "The Military has a rich and distinct culture, made up of unique values, symbols, and a shared history. . . . As in other cultural contexts, service in the military can influence a person's values, beliefs, expectations and behaviors." www.mentalhealth.va.gov/communityproviders/military.asp .

[2] *Id.* ("Community Provider Toolkit" webpages); see also, the Department of Defense "After Deployment" website, http://afterdeployment.dcoe.mil/home, with resources including "Free Military Culture Training for Educators".

[3] See, e.g., Evan R. Seamone, *Attorneys as First Responders: Recognizing the Destructive Nature of Posttraumatic Stress Disorder on the Combat Veteran's Legal Decision-Making Process*, 22 Military Law Review 144, 153 (2009)("When left untreated, PTSD can lead veterans to behave irresponsibly, impulsively, violently, and self-destructively, which has created significant concern for their own well-being and the well-being of others."); Department of Justice, National Institute of Corrections, *Justice-Involved Veterans*, nicic.gov/veterans (noting many veterans suffer from combat-related PTSD, TBI, depression and anxiety, and that "on any given day, veterans account for nine of every hundred individuals in U.S. jails and prisons" despite that "most combat veterans had no involvement in the criminal justice system before their engagement in military service").

during the months leading up to and during his participation in the Occupation.[4] In addition, his combat-related mild Traumatic Brain Injury (mTBI) has substantial symptom overlap with PTSD; and chronic PTSD, with its stress-induced changes to a person's neurobiological systems, can impede recovery from mTBI.[5] Thus, there was an untreated, organic component impacting Mr. Ritzheimer's behavior.

Collectively, PTSD, mTBI and Moral Injury are often referred to as "invisible injuries" of war. We as a society have proven both generally ignorant and miserly in responding: We see a veteran who has lost an arm or a leg, and respond appropriately; the opposite frequently occurs in society's response to a veteran with invisible injuries.[6] It is also well-documented that veterans themselves are loath to acknowledge experiencing these debilitating mental and emotional conditions—viewed as a sign of weakness and thus contrary to core military values—resulting in them not seeking or dropping out of treatment.[7]

The advisory guidelines encourage a downward departure in cases such as Mr. Ritzheimer's, where mental and emotional conditions contributed substantially to the commission of the offense, based on diminished capacity. USSG §5K2.13.

---

[4] Barriers to necessary treatment have been a long-standing, widespread problem for veterans with PTSD, due to a chronic combination of lack of VA and community-based resources as well as the stigma military culture assigns to any perceived weakness that encourages veterans to resist help. *PTSD Treatment for Verterans: What's Working, What's New, and What's Next,* Miriam Resiman, P&T, Vol. 41 No. 10 (October 2016).

[5] *Returning Home from Iraq and Afghanistan: Assessment of Readjustment Needs of Veterans, Service Members, and Their Families,* Institute of Medicine, National Academy of Science (2013), available at www.nap.edu/read/13499/chapter/1.

[6] *See, e.g., Invisible Wounds of War: Psychological and Cognitive Injuries, Their Consequences, and Service to Assist Recovery,* T. Tanielian & L. Jaycox, editors (Rand Corporation, 2008), available at www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG720.pdf ; *Understanding the Context of Military Culture in Treating the Veteran with PTSD,* Dr. Patricia Wilson, U.S. Dept. of Veterans Affairs, National Center for PTSD (2017)("Studies show that because of the lack of cultural competence among providers, service members and veterans may drop out of care, are misdiagnosed, or see care only when their illness is at an advanced stage.").

[7] *E.g., Returning Home from Iraq and Afghanistan, supra* n.5.

4

The advisory guidelines also note a downward departure may be warranted based on military service, USSG §5H1.11, as well as on mental and emotional conditions, USSG §5H.13, if present to an unusual degree that takes the case outside the heartland. The mitigation evidence proves Mr. Ritzheimer had no pre-service mental health disorders (including no drug or alcohol abuse), nor any propensity to break the law before or during his military service.  The direct correlation between his military service, invisible injuries and offense conduct make his case exceptional and deserving of leniency. *See, Porter v. McCollum, supra.*

The defense mitigation evidence further proves that Mr. Ritzheimer has engaged in extraordinary post-offense rehabilitation efforts, which combined with other factors detailed below, place him at a very low risk of recidivism. Simply put, he is now a much-changed man from who he was at the time of the Occupation, and even a year after that. Additional incarceration is not necessary to protect society. His efforts include intensive, on-going mental health treatment, and related pro-social reintegration into civilian culture, that would be undermined by incarceration.[8] A downward departure is supported under Ninth Circuit case law based on extraordinary post-offense rehabilitation, as well as to accomplish a specific treatment purpose, USSG §5C1.1, Application Note 6.

Clearly, Mr. Ritzheimer's meritorious military service, combat-related mental and emotional conditions, and physical injuries resulting in disability and chronic pain, as well as his post-offense rehabilitation and low risk of recidivism, are all relevant offender characteristics for

---

[8] See, e.g., Quil Lawrence, NPR, "Behind Bars, Vets With PTSD Face A New War Zone, With Little Support" (11/5/2015), available at http://www.npr.org/2015/11/05/454292031/behind-bars-vets-with-ptsd-face-a-new-war-zone-with-little-support (last accessed 3/31/17); Saxon, Davis, Sloan, McKnight, McFall & Kivlahan, "Trauma, Symptoms of Posttraumatic Stress Disorder, and Associated Problems Among Incarcerated Veterans," Psychiatry Online (July 2001), available at http://ps.psychiatryonline.org/doi/abs/10.1176/appi.ps.52.7.959 (last accessed 3/31/17).

purposes of variance under 18 USC §3553(a), even should the Court determine that none of these factors are "present to an unusual degree" or make his case "extraordinary" for purposes of a downward departure.

Finally, as a first offender convicted of a non-violent crime that carries a maximum 6 years imprisonment, Mr. Ritzheimer fits squarely within the category of offenders that Congress directed should ordinarily be spared a prison sentence, apart from other mitigation factors. 28 USC §994(j)("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

This memorandum will both explain and summarize the mitigating evidence, before further discussing the law and additional public policy grounds that support the defense recommendation that Mr. Ritzheimer not be sent to prison. The defense seeks a sentence of time served (2 months), and a term of supervised release that may include a period of house arrest, and his participation in the Arizona Veteran Program of the U.S. District Court in Arizona where Mr. Ritzheimer resides and has been pre-approved for admission. As a less-favored alternative, should the Court decide that some additional incarceration is warranted, the defense recommends a term not exceeding six months, to be served in a Residential Re-entry Center, as an additional condition of supervised release.

6

I.    **Mr. Ritzheimer's Military Service And Combat-Related Injuries Contributed Substantially To His Commission Of The Offense.**

> *"There is disconnection between everything human and what has to be done in combat. Imagine being in an unimaginable situation and having to do the unthinkable."[9]*

Mr. Ritzheimer grew from "just a kid" to a man while serving in the United States Marines. He graduated high school in 2002, and enlisted in early 2003, upon taking the induction oath to defend the Constitution against all enemies, foreign and domestic. He went through Boot Camp in San Diego, CA, where he was indoctrinated by drill instructors to defend the Constitution, obey all orders, kill the enemy, and embrace his rifle as his closest, most intimate friend—primarily for the safety and security of him and his Marine "buddies"—all without question or hesitation. As part of that indoctrination, he memorized, repeated over and over, and soon believed to his core the Marine Corps Rifleman's Creed:

> *This is my rifle.  There are many like it, but this one is mine.  It is my life.  I must master it as I must master my life.  Without me my rifle is useless.  Without my rifle, I am useless.  I must fire my rifle true.  I must shoot straighter than the enemy who is trying to kill me.  I must shoot him before he shoots me.  I will.  My rifle and I know that what counts in war is not the rounds we fire, the noise of our burst, or the smoke we make.  We know that it is the hits that count.  We will hit. My rifle is human, even as I am human, because it is my life.  Thus, I will learn it as a brother.  I will learn its weaknesses, its strengths, its parts, its accessories, its sights and its barrel.  I will keep my rifle clean and ready, even as I am clean and ready.  We will become part of each other.  Before God I swear this creed.  My rifle and I are the defenders of my country.  We are the masters of our enemy.  We are the saviors of my life.  So be it, until victory is America's and there is no enemy.*

After successfully completing Boot Camp in May 2003, Mr. Ritzheimer went through Marine Combat Training, a basic infantry program focused on tactical as well as the technical aspects of weaponry, followed by Advanced Individual Training at Ft. Leonard Wood, MO,

---

[9]       Scott       Lee,       PTSD:       A       Soldier's       Perspective, http://ptsdasoldiersperspective.blogspot.com/2009/02/quotes-from-within.html.  (blog cited in *Bringing Baghdad into the Courtroom,* 24 Crim. Just. 4 (Summer 2009)).

where he began his military occupation training in Vehicle Operations. While the primary focus of these trainings was technical, instructors continued the indoctrination of Boot Camp values to develop Mr. Ritzheimer's ability to kill the enemy, and further instill the obligation to protect one's "buddies" at all costs, including self-sacrifice.[10] Following graduation from advanced training, Mr. Ritzheimer reported for duty with the 4th Tank Battalion at San Diego, as a motor truck operator. He left that unit for further training for his 2005 combat deployment to Iraq. In his own words:

> I remember the first day we flew in to Iraq and the unit that we were relieving came to pick us up from Al Asad air base. I was a scared kid only knowing stories about Viet Nam. The guys from the unit we relieved all had the 1000 yard stare. You could see their long deployment on their faces. Even though they were all about to be relieved, it wasn't good enough to make them smile again. They were dirty and weathered Combat Veterans now. I stayed close to a Sergeant that was my friend. Nandy Hernandez. He had already deployed in 2003 during the initial invasion of Iraq and his experience and confidence comforted me. We rode in the back of 7 ton trucks with sand bags for protection. Rifles aimed out because that's how we trained for the past 3 months leading up to this. I remember the driver laughing at us and asking us if we were gonna shoot the IEDs? Then it sunk in that our greatest threat wasn't going to be some random guy shooting at us but rather IEDs that we were borderline defenseless against at the time. We pulled our rifles in and turned inboard and just hoped for the best on that first trip. Occasionally curiosity kicked in and I wanted to see the foreign county we were in. But after we would get caught peeking we were quickly yelled at to get down and reminded that curiosity killed the cat.
>
> Fast forward to the end of our deployment when it was now our turn to pick up the unit relieving us. It was almost identical. I remember being happy on the

---

[10] "Over the years since WW II, the military has improved its combat training methods to produce troops who will kill the enemy without hesitation: from an average of only 15-20 % of soldiers in WW II who would fire at the enemy, to 95% who would do so by the time of Vietnam. Modern training methods include simulated combat calculated to cause severe stress and thereby train the recruit to fight as the instinctive reaction, versus flight or freeze. Marching cadences resound with *kill, kill, kill* and *blood will spill*." Brockton Hunter & Ryan Else, <u>The Attorney's Guide To Defending Veterans In Criminal Court</u>, at 473-76 (2014 Veterans Defense Project)(hereafter referred to as Hunter & Else, <u>Defending Veterans</u>) (frequently citing Dave Grossman, *On Killing 3* (1st Paperback Ed., Back Bay Books, 1995), available for free download at <u>https://archive.org/details/On_Killing</u> (last accessed 4/1/17)). Success in military culture is largely measured by one's proficiency in mortal combat.

8

> *inside but unable to show it because I knew we still had a few missions to go and it could all end during any of them. There were guys from other units on the base that were killed by mortars during their first week in country and there were guys that got killed a week before they were scheduled to go home. Ar Ramadi was a hot bed in 2005 because the Fallujah battle of 2004 drove the insurgency to Ar Ramadi. The everyday uncertainty for 7 months straight is what messes you up along with fellow Marines getting injured and your own platoon sergeant freaking out after a Marine lost his leg and screaming to the whole platoon that "it's personal now".*

Mr. Ritzheimer returned stateside in late 2005, and sought to redeploy with his unit in the summer of 2006. On his "Pre-Deployment Health Assessment" he reported being in "very good" physical and mental health. However, while in training to deploy, commanding officers referred him to medical for "evaluation of nightmares, flashbacks, mood swings, etc.," and his unit deployed without him. In late September 2006, Medical assessed him as having Chronic Post-Traumatic Stress Disorder, delayed onset, but noted, "He has not had any civilian or military legal problems and wants to stay in the Corps for 20 years. . . . He is stabilizing and can redeploy [with a different unit] subject to reevaluation after about one month." Following reevaluation, he was held back again and prescribed Prozac and Paxil for mood stabilization. Meeting with a military therapist in December 2006, "he discussed guilt over not deploying and how to balance the reality of putting his fellow Marines at danger by being overwhelmed by his symptoms and 'being there' for them. . . . His mood was described as 'I lose my temper easily.'"

On his medical history report in March 2007, Mr. Ritzheimer acknowledged taking Prozac but denied experiencing all symptoms related to PTSD;  that failed to get  him cleared for

return to combat. He stopped taking Prozac, and continued to fight for deployment.[11]    Mr. Ritzheimer gained approval to redeploy in December 2007, and began training for the mission. In mid-March 2008, he received trigger point injections for pain relief from injuries to his back and shoulder sustained on his first tour, and aggravated by current participation in the Marine martial arts combat program. A few weeks later, on his Pre-Deployment Health Assessment, he reported his health as "Excellent," denied having any medical problems, denied having sought any mental health care during the past year, and received medical clearance to deploy with the 4th Tank Battalion to Al Anbar province.

His unit encountered a rocket attack during their first week there, but remained lucky after that. They spent much of his tour "outside the wire"—military jargon for being beyond the relative safety and comforts of a base camp: Assigned to drive a 4-person truck in resupply convoys for tanks patrolling hostile territory, perpetually on guard for insurgent attacks, Mr. Ritzheimer and his crew lived for months out of their vehicle, without showers (only baby wipes for cleansing), and consuming mostly MREs ("Meal, Ready-to-Eat" field rations). In addition to resupplying the tanks that were sweeping the region—seeking to engage any remaining combatants before returning control to the Iraqis—his unit was charged with methodically searching for IEDs and weapon caches, and interviewing villagers about the locations of insurgents. All told, his unit conducted over 100 combat patrols during Operation Defeat Al Qaeda. Mr. Ritzheimer suppressed PTSD-induced fears by staying very focused on his duties,

---

[11] Dr. William Nash, head of psychological health for the Marine Corps, is reported recently in the New York Times stating that during the first years of the Iraq war, the military did not have enough psychologists to meet the needs of troops experiencing PTSD, and that quick consultations just long enough to prescribe medication became the default treatment. To this day, "No one has figured out how to make their access to care not be damaging to their self-esteem, their career, their identity." Dave Phillips, *A Marine Attacked an Iraqi Restaurant. But Was It a Hate Crime or PTSD?,* nytimes.com/2017/10/18.

and received a combat field promotion to Sergeant E-5. He shared the responsibilities as the Sergeant of the Guard for two Tactical Assembly Areas where he set up and supervised the Combat Operations Center watch, perimeter security and police calls.

Mr. Ritzheimer's 2008 Post-Deployment Health Assessment notes his back and joint pain got worse during this tour; and possible exposure to toxins while camped for a month at a partially demolished chemical weapons facility. He again denied experiencing any PTSD symptoms, but soon resumed taking Prozac. His diagnosis of chronic PTSD remained unchanged over the ensuing years, and he was prescribed various medications for symptom management.

Following his last tour in Iraq, Mr. Ritzheimer continued to advance his military career in the Marine Reserves: His duty assignment changed from Motor Transport Operator to Motor Transport Platoon Squad Leader in April 2009, "responsible for the morale, welfare, training and discipline of all Marines assigned to his squad." In October 2009, his duty assignment advanced to Motor Transportation Platoon Sergeant, responsible for the 45 junior Marines assigned to the platoon, and he was recommended for promotion. In August 2010, he attended the Sergeants Course at Quantico, VA, where he passed all performance and comprehensive evaluations in Military Studies, Leadership Studies, and War Fighting, with a cumulative grade point average of 85%. Upon return to base he was assigned to Motor Transportation Platoon Training for all 61 Marines in the platoon, and to stand in for the Platoon Sergeant as needed. He maintained this assignment for the next few years with increasing responsibilities, and promotion to Staff Sergeant E-6.[12]

---

[12] His Company Commander at that time writes that "Jon was assigned as the platoon sergeant for the Headquarters and Service Company. This position is a highly respected billet and is reserved for the most competent and responsible members of the unit. He was accountable for the actions, training, safety, leadership, discipline, education, physical and mental development and well being of the 25(+) members of his platoon. He was always making time to mentor and guide the

In June 2013, he attended the Staff Noncommissioned Officer Academy at Quantico, VA, where he mastered courses "with emphasis on war fighting and leadership skills to effectively lead Marines in combat and develop subordinates to ensure mission success," with a cumulative grade point average of 93%. In September 2013, he transferred units to be closer to special operations, from 4th Tank Battalion to the 6th ANGLICO (Air Naval Gunfire Liaison Company) where his primary assignment was Motor Transportation Chief, until honorable discharge in 2014. To this day, Mr. Ritzheimer's fellow Marines recall and attest to his extraordinarily high standards of honor, courage, and commitment to do what is right, defend the Constitution, and standup for those who need assistance, demonstrated throughout his years of service. Some who know him assume that those same characteristics forged in military culture explain his participation in the Malheur Refuge occupation. While partly true, the full explanation demands recognition of his invisible injuries of PTSD, mTBI and Moral Injury—untreated at the time of those events—and how those afflictions both hampered his efforts to reintegrate to civilian culture and adversely affected his behavior in that culture.[13]

---

troops under his command and care for them on a deep level. . . . When his team was undergoing challenges or be given tough missions, he would take it upon himself to make sure each man was fed and given as much sleep as possible, he treated them more like brothers than troops. . . . I've known Jon as a Marine, a friend and most of all a patriot. His dedication and devotion to our nation and way of life is second to none."

[13] "The reality of trauma is that it frequently changes how the individual defines him or herself. As one combat veteran said, 'War made me have to deal with who am I really—a decent person who had to engage in some terrible actions to stay alive or some kind of animal that only *thought* he was civilized and decent.' These types of questions strike at the heart of identity, value, and worth. . . . Trauma survivors must, however, try to construct coping mechanisms to deal with these effects and lingering doubts about who they are, what costs they believe they paid to survive, guilt over what they did or failed to do, and what it means about themselves." Daniel Dossa & Ernest Boswell, *Post-Traumatic Stress Disorder: A Brief Overview*, Chpt. 6, p. 163-64, (hereafter referred to as Dossa & Boswell),published in Hunter & Else, <u>Defending Veterans</u>, *supra n.10.*

12

According to a New York Times article published in 2013, "Less than 0.5 percent of the [American] population serves in the armed forces, compared with more than 12 percent during World War II."[14] Unless you have served or have otherwise acquired specialized knowledge of military culture, to fairly evaluate the mitigating evidence in Mr. Ritzheimer's case will require becoming competent in that culture's values and its indoctrination processes: To understand at least the basics of how military culture shapes and defines human behavior; and the stark differences between military and civilian culture in modern America. Those cultural conflicts— as well as the invisible injuries from military service that manifest in symptoms of PTSD and other maladies of the psyche—make post-service reintegration difficult for many veterans, including Mr. Ritzheimer, and have caused more than a few to run afoul of the law.[15]

A working knowledge of military culture is fundamental to analyzing Mr. Ritzheimer's culpability under the law for sentencing purposes. Basic information is summarized below, and treated in greater depth in Dr. William Brown's report. Dr. Brown is a sociologist and nationally-recognized expert who has researched and published extensively on veterans' issues, including the role of military culture in shaping veterans' behaviors and beliefs. A Vietnam combat veteran, Dr. Brown later served as a Drill Sergeant, and as a Platoon Leader in B Company 75th Rangers. His sociological evaluation of Mr. Ritzheimer in 2016 focused "on the influence of the

---

[14]    Available    at    http://www.nytimes.com/2013/05/27/opinion/americans-and-their-military-drifting-apart.html?_r=0

[15]    *See, e.g.,* Brock Hunter, *Echoes of War: The Combat Veteran in Criminal Court*. *See also,* Alyson Sincavage, *The War Comes Home: How Congress' Failure to Address Veterans' Mental Health Has Led to Violence in America*, 33 Nova. L. Rev. 481 (2009), http://nsuworks.nova.edu/cgi/viewcontent.cgi?article=1144&context=nlr (last accessed 4/3/17).

Military Total Institution, also referred to as military culture, on Mr. Ritzheimer's post-military behavior."[16]

### A. Mr. Ritzheimer's Behavior Is A Product Of Military Culture.

*But I fear they do not know us. I fear they do not comprehend the full weight of the burden we carry or the price we pay when we return from battle. This is important, because a people uninformed about what they are asking the military to endure is a people inevitably unable to fully grasp the scope of the responsibilities our Constitution levies upon them.*
— Admiral Michael Mullen, (then) Chairman of the Joint Chiefs of Staff, United States Military Academy, West Point, NY (May 21, 2011).

Mr. Ritzheimer's behaviors and beliefs relevant to this criminal case are largely a product of "his complete and highly successful indoctrination into military culture, and as shaped by his military service," according to the comprehensive evaluation conducted by Dr. Brown. "Highly successful indoctrination" is documented by his military service and performance records analyzed in Brown's report, as well as many hours of structured interviews of Mr. Ritzheimer summarized in the report: He rose in rank to Staff Sergeant E-6, and his Performance Evaluations show high marks. His numerous awards, decorations, commendations, and certificates further demonstrate that he was an exceptional Marine. Interviews with fellow service members conducted by Dr. Brown, as well as later interviews by the defense, supply corroboration beyond the military records of Mr. Ritzheimer's dedication to Marine Corps values.

A brief overview of the influence of military culture on the conduct of veteran defendants, condensed but taken mostly verbatim from Dr. Brown's report, is included here to

---

[16] The VA recognizes "Even after separation from the military service, military ideals and values often continue to be deeply held by Veterans," and offers a host of on-line "Military Culture Resources" to assist civilian mental health providers to better understand and work with service members. www.mentalhealth.va.gov/communityproviders/military_resources.asp .

assist in better understanding the mitigating evidence summarized in this memorandum.[17]

### *Brief Overview of the Military Total Institution And Marine Corps Values*

The basic characteristics germane to any total institution include:

- All components of an individual's life occur in the same place or setting.

- Large numbers of people are treated nearly or exactly the same.

- All stages of the individual's day and night are tightly scheduled and monitored.

- All participants are required to accept and adapt to the total institutions' cultural expectations and standards. [18]

These characteristics are prevalent in all military institutions throughout the world. Military Total Institutions require complete control of the recruit's entire being, and replacement of the recruit's civilian cultural beliefs and responses with those of the military. The recruit is first stripped of civilian values and habits, and through rigorous training, ingrained in military values and routines.  This is necessary to produce soldiers who will respond to orders without question, carry out the mission, and kill the enemy.[19] Recruits are placed in stressful situations where they are forced to make decisions. The punishment is generally more severe for those recruits who cannot or will not make a decision. The logic is that a bad decision is better than no decision.  In other words, a trainee is likely to be punished more severely for not reacting

---

[17] Additional resources for becoming competent in military culture are cited in Dr. Brown's report, and others are accessible through the Center for Deployment Psychology, http://deploymentpsych.org/military-culture.

[18] Criminal justice system players are familiar with "prison culture" and how defendants who have spent significant time in prisons become indoctrinated to that value system and find it difficult to reintegrate to civilian culture. While military culture is clearly distinct, the similarity is that both share the defining attributes of a "total institution".

[19] *See, e.g.,* Zurcher, L.A., *The Naval Recruit Training Center: A Study of Role Assimilation in a Total Institution*, Sociological Inquiry, 1967, 37:1: 85-98 ("The day–to–day conduct of a civilian, guided as it is by relative freedom of decision, cannot be tolerated in a total institution if it is to remain total. Therefore, the first and major task of the training center [also known as "Boot Camp"] is to 'de-civilianize', to role-dispossess, the entering individual.").

instantaneously as opposed to making a bad decision but reacting instantly. Trainees are conditioned to select the fight option, as opposed to the flight option, when confronted with dangerous or stressful circumstances.  Recruits are trained to respond instantaneously and aggressively to any and all perceived or real dangerous circumstances or confrontations without hesitation. Failure to comply typically results in punishment ranging from individual humiliation to physical exploitation. Hesitation in firing a weapon or responding physically to a threat, real or perceived, can result in the loss of life and the demise of the MTI's reason for existence—to defeat the enemy.[20]

The military operates on a completely different set of expectations than civilian culture, and subscribes to a different set of values and morals. Furthermore, part of the process for stripping the recruit of his civilian values and habits is to disparage civilians: Recruits are taught that civilians are lazy, uncaring, unconcerned, undisciplined, undependable, and unwilling to exercise their responsibility to protect their freedom and democracy. Many veterans have little respect for civilians due to the differences in military versus civilian cultural values.  For many veterans, their military culture indoctrination will contaminate their return to civilian culture: Veterans will be forced to make daily decisions.  Which software program will they rely on to make their decisions? The military software program provides a particular set of options, while

---

[20] *See, e.g.,* Joseph Collins, Thomas Jacobs, Walter Ulmer, *American Military Culture in the Twenty-first Century: A Report of the CSIS,* Introduction at 3("A direct link exists between military culture and effectiveness. The underlying culture of U.S. military forces is the foundation from which arise standards of behavior such as discipline, teamwork, loyalty, and selfless duty.")(hereafter referred to as *CSIS Report*), available at csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/121022_Collins_AmericanMilCulture_Web.pdf.

their displaced civilian software program provides a completely different set of options, and they are frequently in conflict.[21]

Four core values ingrained in military culture are obedience, discipline, survival, and sacrifice. Deployment, particularly to combat zones, further ingrains the core values which are then put to practice in real life, not training exercises.

Those four indispensable factors—obedience, discipline, survival, and sacrifice—maintain the foundation of the MTI:

(1) Obedience requires military personnel to accept the command of authority without hesitation or question.

(2) Discipline is crucial to the perfection of the recruit's mental faculties and moral character. High levels of discipline are obtained through repetitive training whereby the trainee's reaction to situations becomes second nature.

(3) Survival is the means and individual commitment to insure the continuation of life—for fellow soldiers as well as self—to carry out the mission.

(4) Finally, there is sacrifice, which requires the soldier to surrender something of value to ensure that something else of value is maintained or secured.[22]  As recruits are integrated into the MTI, they are required to sacrifice their own individuality.  During the training process, sacrificing one's own life is portrayed as an honorable act.  This segment of training and

---

[21] For a more comprehensive discussion of military culture and its significance to veterans entangled in our criminal justice system, see William Brown, Robert Stanulis, Misty Weitzel and Kyle Rodgers, *You probably don't know who are what you are talking about: Cultural and Moral Incompetence in Evaluating the Veteran in the Criminal Justice System,* Justice Policy Journal, Volume 12:1 (Spring 2015)(hereafter referred to as *Cultural Incompetence*), available at http://www.cjcj.org/uploads/cjcj/documents/jpj_brown_et_al_spring_2015.pdf .

[22] "Numerous studies have concluded that men in combat are usually motivated to fight not by ideology or hate or fear, but by group pressures and processes involving (1) regard for their comrades, (2) respect for their leaders, (3) concern for their own reputation with both, and (4) an urge to contribute to the success of the group." Grossman, *On Killing, supra n.10,* at 89-90.

17

indoctrination prepares soldiers, who may later be confronted with life or death situations, to willingly make this ultimate sacrifice.

The U.S. Marine Corps specifically emphasizes the values Honor, Courage, and Commitment when conducting performance evaluations[23]:

(1) Honor is perceived as the bedrock of a Marine's character, and demands ethical and moral behavior. It includes honesty, an uncompromising code of integrity, respect for human dignity, and respect and concern for each other.

(2) Courage is viewed as the heart of the Marine Corps' core values. Courage is perceived as the mental, moral, and physical strength that allows Marines to confront the challenges of combat and control of fear. Courage also allows Marines to do that which is right, adhere to a higher standard of conduct, make difficult decisions, and lead by example.

(3) Commitment is depicted as the essence of determination and dedication among members of the Marine Corps. Commitment enhances professionalism, learning the "Art of War," and discipline for both self and unit.[24]

For many veterans, particularly those veterans who have participated in combat, their MTI experiences are embedded for life.[25] The experiences become part of the "baggage"[26] many veterans carry as they navigate through their transition process back into the civilian culture.

---

[23] "The Marine Corps is a unique service and marines have the strongest service culture." *CSIS Report*, *supra n.20*, p. 13.

[24] Based on a comprehensive review of Mr. Ritzheimer's Marine performance evaluations ("Fitness Reports," available from July 2008 through May 2013), Dr. Brown found his ratings in each category clearly met the expectations for a non-commissioned officer (NCO), and generally exhibit improved performance over time.

[25] *See, e.g.,* R.J. Westphal, Sean P. Convoy, (January 31, 2015), *Military Culture Implications for Mental Health and Nursing Care,* OJIN, Vol. 20, No. 1 (Military culture "reinforces and rewards selflessness, courage, loyalty, stoicism, and commitments to moral excellence, living by a moral code, and defending the social order. For some service members, the military and warrior ethos becomes a permanent part of their self-identity and worldview."), available on-line.

[26] Artifacts from military culture and the recollection of experiences acquired while serving.

Many veterans are not aware of that baggage until they become homeless, involved in a domestic violence situation at home, or a defendant in the criminal justice system.

Indoctrination into military culture not only changes the veteran's behavior because it changes the beliefs and values that motivate behavior; it also changes behavior through conditioned responses to situations the veteran is likely to encounter during service. For example, veterans are conditioned through repetitive drills and exercises—as well as psychological indoctrination—to react immediately to any perceived threat by eliminating the threat. They are conditioned to be expendable in pursuit of the mission. This phenomenon is oft referred to as "muscle memory."[27] Veterans are also conditioned to remain externally calm and regimented in the face of danger, by controlling strong natural emotions of fear and distress; but suppression of emotions does not eliminate the internal psychological force of those emotions on the individual's physical and mental health.

Following release from the military the veteran does not experience extraction or deprogramming of the military-installed "mental software." Some veterans are successful in deprogramming and re-integration to civilian culture.  Others are not so successful.

### Mr. Ritzheimer's Post-Deployment and Post-Discharge Reintegration Efforts.

> *Asked whether his experiences in the military culture ever played a significant role in the way in which he behaved in the civilian culture, Jon said yes. Asked whether he still carried any of the baggage acquired during his military training and service, he said yes. He identified irritation in the company of civilians, feeling comfortable only with veterans, being highly suspicious of strangers, and being quite hyper vigilant as the most notable changes he perceived in his behavior. . . . Jon said he does not feel that he is a part of the civilian community since he was discharged from the Marines. Jon noted that if he doesn't fit in anywhere, he doesn't have much of a future anywhere.*
> —Dr. William Brown, (July 2016).

---

[27]    *See, e.g., Muscle Memory helps corpsmen save lives,* available at https://health.mil/News/Articles/2015/11/12/Muscle-memory-helps-corpsmen-save-lives.

As documented in Dr. Brown's report, when Mr. Ritzheimer returned home from deployments, his family was always happy to have him back, but he described his feelings most of the time as "numb," and at times "uncomfortable," although he deeply loves his family. He frequently experienced difficulties falling asleep, only to be suddenly awakened by nightmares related to combat exposure, finding himself exhausted and often sweating as if he'd been running. Experiencing sudden or loud noises, being in crowded areas, having strangers approach him, and sometimes driving, could trigger recollections of combat trauma, causing great stress, irritation and anger. He preferred to be alone and felt uncomfortable in the company of civilians who did not share his military experiences. He severed relationships with most of his former friends, who he felt did not share the same interests he now embraced and had different priorities. He developed new friends, but they were almost all Marines or other veterans.

While in the Marine Reserves, and post-discharge, he had good experiences developing and maintaining relationships with other Marines, but poor experiences doing the same with civilians. He attended community college a couple of years after his 2008 deployment and while serving in the Reserves, but he had difficulties relating to his fellow classmates; they were much younger, disrespectful towards instructors, and also did not share his values. His college experience proved upsetting for him, and included some verbal confrontations with other students. True to his military values, he nonetheless completed that mission, graduating with an Associate degree, but would go no further.

As detailed earlier, Mr. Ritzheimer remained committed to the Marines during post-deployments while serving in the Reserves, and was immersed in military culture through the time of his honorable discharge in July 2014. He felt comfortable there and did not experience the same difficulties in that world:

> *It was easier to cope with things in a military setting where it's ok to be angry. Anger equals productivity in the Marine Corps. Your superiors are all angry, you're angry, and you're always kept in a state of "it's not good enough and it can be better". People were always getting ass chewings. I was able to motivate my junior Marines and lead more by example, but if someone needed an ass chewing, I would give it. Sleep issues were less because you work your ass off till 2 a.m. and then it's time to wake up at 5:30 to get ready for chow. As a senior Marine I would get to take a cat nap here and there but for the most part I was always coordinating logistics and keeping the rest of the platoon busy.*

Mr. Ritzheimer never wanted to leave the Marines, and had pursued plans to return to active duty with greater opportunities for combat deployment, by transferring from the 4th Tank Battalion to ANGLICO, a Marine Corps elite Special Operations force, in 2013. When it was time to for him to re-enlist in 2014, the commander rejected Mr. Ritzheimer's application due to him having a tattoo that violated the Marine Corps' recently revised tattoo policy. At least that—and not his chronic PTSD—was the official reason.[28] Mr. Ritzheimer had no choice but to take an honorable discharge, and found himself now completely adrift in civilian culture, and in need of a new career path.

Having decided against college, he sought vocational training and became a certified motorcycle mechanic in 2014. While living in Arizona to attend the trade school, and apart from his family (who remained home in California), Mr. Ritzheimer joined two motorcycle clubs. The first was the Marine Riders Club, which he joined to be with fellow Marines. According to Mr. Ritzheimer, two of the leaders were badly injured later in motorcycle accidents, and the club

---

[28] *See, e.g.,* Madeline McGrane, *Post-Traumatic Stress Disorder in the Military: The Need for Legislative Improvement of Mental Health Care for Veterans of Operation Iraqi Freedom and Operation Enduring Freedom,* 24 J.L. & Health 183, 191 (2010)("Within the military, PTSD is often 'equated with cowardice or lack of resilience or, even worse, with malingering to escape service or to receive unmerited compensation.' When the branches of the military flaunt slogans such as 'The Marines, The Few. The Proud' and 'There's Strong, and then There's Army Strong,' it is unsurprising that a stigma of weakness might attach to an intangible mental wound. In addition to stigma, some veterans fear diagnosis will lead to their discharge.")(internal citations omitted).

fizzled. He was recruited to the local chapter of the Peckerwoods motorcycle club, but they parted ways after a few months. Once his family relocated with him to Arizona, he found companionship with them and ceased searching elsewhere.

After he got his mechanic certificate, Mr. Ritzheimer worked at a couple of motorcycle repair shops in Phoenix, but those jobs did not last due to his disabilities, and other military "baggage": Even though he was able to find employment, he felt that the job was beneath him when compared to the level of responsibility he held while serving in the Marines. He often felt that if he was doing something he considered worthless, it meant that he too was worthless. To fill that void, he became extremely committed to political activism. That pursuit allowed him to do one of the things he liked most about being out of the military—exercise free speech—and the opportunity to engage in service, by rallying others to take responsibility for insuring their own freedom in this country. As a political activist, he felt alive—passionate instead of numb—and noble, as he had found a way outside of the military to continue defending the Constitution. He felt obligated to activate and apply his Marine training to help others realize that the Constitution is more than a piece of paper, and to protect the rights of others who he perceived as being oppressed, consistent with the conduct expected of a Marine Staff Seargent.[29]

---

[29] Dr. Brown notes that veterans' involvement in political activism critical of the government has a long history in America, often linked to feelings of betrayal both by the government and the military. More recently, "Militia organizations such as the Oath Keepers have emerged.  Oath Keepers target both active-duty members of the military and veterans for the purpose of being prepared to defend the Constitution. Mr. Ritzheimer is a former member of the Oath Keepers. There are other veteran organizations that also criticize the government, but they are more inclined to use a different platform: The Veterans of Foreign Wars (VFW), the American Legion, and the Vietnam Veterans of America (VVA).  Most of the participants in these organizations are made up of earlier generations of veterans, which means they have had more time to re-acculturate back into the civilian culture.  Jon is a lifetime member in the VFW and also belongs to the American Legion."

Notwithstanding Mr. Ritzheimer's flamboyant social media persona as a political activist, his career as an organizer of protests was short lived: It started in May 2015, when he organized an anti-Islam, "Rally for Free Speech," that drew hundreds to protest at a Phoenix mosque. Mr. Ritzheimer told news media at the time he was inspired to take action after learning the two gunmen who had opened fire against officers guarding a Mohammad cartoon-drawing contest in Texas earlier that month were from Phoenix and had attended the mosque. No violence erupted.[30] He took considerable backlash, including death threats allegedly from ISIS, and condemnation by pro-Muslim civil rights groups. By August he announced plans to network with others to organize a global protest against Islamic extremists, his idea being for attendees to protest outside mosques while armed, to spur "everybody to utilize your Second Amendment [rights] in case we come under that much anticipated attack."[31] The "Global Rally for Humanity" failed to materialize outside a handful of U.S. cities, and no violence was reported. Mr. Ritzheimer organized the Phoenix demonstration, that attracted fewer participants than the May rally, and told news media, "We're just exercising our first amendment rights. We are all about peace and love."[32] His next and last political activist venture was the Hammond rally and ill-fated Occupation at Malheur Refuge, a few months later.

With his judgment impaired by largely untreated PTSD, mTBI and Moral Injury (to be explained in great detail later), Mr. Ritzheimer failed to realize that this was not only a poor

---

[30] Miriam Wassert, *Hundreds Attend Phoenix Mosque Protest,* phoenixnewtimes.com (May 30, 2015).

[31] David Neiwert, Southern Poverty Law Center (Oct. 9, 2015), *Militiamen Plan to Bring Guns to Mosques Around Nation in 'Global' Protest of Islam.*

[32] Tom Dart, *Protesters decry Islam outside Phoenix mosque: 'They want to take over',* the guardian.com (Oct. 10, 2015). Mr. Ritzheimer has since publicly apologized for his "Fuck Islam" t-shirts and banners, admitting they were the wrong way to convey his intended message as well as distasteful.

23

reintegration strategy; it would prove to be an "anti-reintegration" strategy. [33] His pursuit of political activism embraced his military values, employed his military training, and enabled him to redeploy on risky missions "outside the wire," leaving family behind, and often in the company of other veterans. At that time in his life, Mr. Ritzheimer could only find relief from his invisible injuries by remaining "still at war." As Dr. Brown observed:

> *Mr. Ritzheimer appears, as have many other veteran participants in my research, locked into the past: Failing at re-acculturation to civilian society, they want to continue their assigned mission to defend America, defeat the enemy, and defend the U.S. Constitution.  Many of the vets I have interviewed including Mr. Ritzheimer now feel empty. Many feel betrayed. Fourth of July parades do little to fill that hole. Mr. Ritzheimer's commitment to political activism embraced a mission similar to the missions he had in the Marines, and it gave him purpose and self-worth in a civilian culture where he struggles to reintegrate.*

Fighting in that theatre, Mr. Ritzheimer suffered arrest, imprisonment, and a felony conviction, the penal consequences for which this Court must determine. But those disastrous events would set in motion a path for his redemption.

### *Brief Summary of Mr. Ritzheimer's Offense Conduct*

As noted in the Government's September 2016 Trial Memorandum, "Defendants' speech constitutes a significant amount of the evidence in this case," (#958, p. 18), a statement that applies equally to Mr. Ritzheimer's offense conduct. Before turning to his words, it is important to note his actions: He never personally engaged in a physical confrontation or heated exchange with any citizen, federal employee or law enforcement officer in Harney County. He never brandished a firearm in the presence of a federal employee or law enforcement officer—nor in his videos during these events. He voluntarily self-surrendered upon being advised of the federal arrest warrant.

---

[33] Dr. Brown noted, "When asked to rate his actual performance transitioning back into the civilian culture, Jon rated this 2, on a scale of 1 to 10 (1 being "very difficult" and 10 being "not difficult at all")," and that it had proved to be much more difficult than he anticipated.

Mr. Ritzheimer's history is one of civility and the spirit of cooperation with law enforcement. In a video posted January 21st, he said, "I don't think there's bad people in the FBI or bad people in law enforcement. It's just a lack of education. . . . It shouldn't be just me and us in here defending the Constitution. We should be doing this with sheriff deputies by our side . . . federal agents by our side," MNWR_0058067. In the fall of 2015, Mr. Ritzheimer maintained communications with Peoria, Arizona, Police Detective Michael Griffin and FBI SA Steve Denney, emailing them that he was headed north to protest injustices to the Hammonds in late December. Prior to leaving Arizona, Ritzheimer met with Denney and other FBI agents at his home; their purpose was to evaluate him as a possible CHS. MNWR_0024242. These facts indicate the FBI did not view him as a terrorist threat, and Mr. Ritzheimer had no plans to knowingly violate the law while protesting in Burns.

He was a "newbie" to Operation Mutual Defense (OMD), recruited by another veteran, Ryan Payne, and it was there in November 2015 that he learned of the Hammonds' plight.[34] The Hammonds' situation as described to him—being treated as terrorists and resentenced to 5-years-imprisonment—struck a chord with Mr. Ritzheimer. That chord sounded about the same time as his involvement in protesting what he viewed as the heavy-handed federal prosecution of a fellow Marine, Schuyler Barbeau, in Washington state. He decided to combine his trip to Seattle, where he engaged in lawful public protest on Barbeau's behalf, with participation in the still-evolving protest action being planned in support of the Hammonds, on his way back to Arizona; and the rest is history. Simply stated, he unlike the majority of his co-defendants, was neither a

---

[34] His application to OMD is dated 10/25/15; on the blank for "What do you have to offer [this organization], he wrote: "I can offer loyalty and dedication. I can implement leadership and training where it is needed. . ." MNWR_62514. Discovery revealed that a government informant was active in OMD prior to Mr. Ritzheimer joining, and that he participated in the Advisory Board conference calls only on 6 occasions, from November 5th through December 27, 2015.

follower of the Bundys nor a member of the Bundys' inner circle; and he had no involvement in the 2014 episode at Bundy Ranch. He joined an assembling group of protestors in late December, arriving in Burns on the night of December 22, 2015.

When Mr. Ritzheimer appeared in videos on December 26th and 31st calling for patriots to come to Burns to support the Hammonds, he did not envision invading the Refuge. Mr. Ritzheimer was unaware of Ammon Bundy's plan to occupy the Refuge until hearing it at a meeting at a Burns restaurant the morning of January 2nd. The Government confirms it lacks evidence to prove otherwise. Although there was testimony at the first trial about a meeting on December 29th involving Ammon Bundy and others where the plan was discussed, Mr. Ritzheimer was not in attendance.[35]

When Ammon Bundy revealed his plans to Mr. Ritzheimer and a large group assembled at the Burns restaurant on January 2nd—prior to the start of the Hammond rally that day—and asked for volunteers to reconnoiter the Refuge in advance of him leading protestors there from the rally, Mr. Ritzheimer agreed to go. He recalls:

> When I saw LaVoy and Ryan Bundy volunteer without hesitation and a few others, I decided to participate in the protest. The only advance notice I had was the fact that the [restaurant] meeting happened the morning of January 2nd before the protest in town and we left to the refuge during the protest. If I knew of the takeover before January 2nd, then why would I have needed to go and pack my bags after the January 2nd announcement? I was originally on board for the protest in town and then being able to return to my family. That's more my style. It was a split-second decision [for me] to go to the refuge.

---

[35] Mr. Ritzheimer was present at an earlier meeting on December 29th at a Burns restaurant with Ammon Bundy and others, including Sheriff Dave Ward. The later meeting on the 29th, where according to trial testimony by Blaine Cooper, Ammon Bundy and several others discussed taking over the Refuge, occurred at a local resident's home. Cooper did not identify Ritzheimer as being present at that meeting, based on news reports of his trial testimony. Mr. Ritzheimer maintains he was not privy to those discussions, "perhaps because I was not 100% vetted or trusted yet. All the other guys had history together from the 2014 stand-off."

A CHS in contact with Ritzheimer on January 4th reported that "he and other occupiers want a peaceful resolution and are trying to bring attention to injustice being done to the Hammond family and all ranchers out west. . . . Ritzheimer wants to go home to his family and does not want any bloodshed. He is concerned that this will turn into the next Waco." MNWR_0059466. Mr. Ritzheimer publically voiced the same sentiments repeatedly in videos posted to social media throughout his time there. He believed that the more people who came to the Refuge—"armed or unarmed"—the less likely that they would be attacked by law enforcement.

As days passed following the January 2nd takeover, Mr. Ritzheimer witnessed the increasing militarization of law enforcement in response to the Occupation:

> *The first few days I slept at the top of the refuge just outside the main entrance. I wanted to be a buffer as you know, and I put out a video showing that I was at the top and wanted to be a voice of reason if anyone came to assault the refuge and the occupiers. Then I went in town and saw a lot more law enforcement had begun to gather there. The fact that they were not willing to have an open dialogue with Ammon scared me. We were trying to be transparent but they wanted no part in that. It made me feel sub-human. Like we didn't matter and they were not going to deal with us because in their minds we were the peasants and they were the superiors. Then it was rumored that a bearcat (military style vehicle) was spotted in town so I had to go and see it for myself. I also went to see the build up at the airport and saw military-style tents set up there with lots of equipment like generators and other field equipment we used in the military. They even had what looked like a sat-comm set up, which is a large satellite dish for communications. I went to the compound that was set up in the town and it was 100% like a military base. Cement barriers and armed guards in full tactical gear standing guard 24-7. It was so crazy to see such an escalation of force. You would have thought Russia or North Korea invaded. It was beyond overkill and I felt compelled to continue to try and deescalate the situation. Overtime I went into town and was always sure to leave my side arm in my truck and use tact when speaking to the officers. I know that disrespect won't get you far when conversing with these guys who were just following orders. Some of the sheriff deputies seemed competent enough to know we were no threat, and they weren't all high strung when meeting with me. But the FBI agents and the State Troopers were very militant and treated us as if we were terrorists and they weren't going to negotiate with us. Even though I saw all this build up, as time passed and nothing*

27

*bad happened, the fact that it was going on for so long made me feel like it was going to end peacefully.*

Mr. Ritzheimer and others stood guard duty while armed at the front entry to the Refuge, but denied no one access unless they appeared likely to incite trouble. Locals, school children, and news media regularly came and went. No known law enforcement attempted entry so none were knowingly turned away, but for sure no BLM employees who came were turned away. E.g., MNWR_0040656. Mr. Ritzheimer frequently left the Refuge, traveling to town on errands, to meet with other citizens, and to engage law enforcement officers at the courthouse compound in conversation about the Constitution.[36] He reports being stopped or approached several times by law enforcement as well, without incident. An FBI Event log documents a traffic stop on January 11th near the Silver Spur hotel, MNWR_0054129. A police video documents a friendly encounter with him near the Burns post office. MNWR_0043258 (date unknown). Such encounters reinforced Mr. Ritzheimer's belief that he and other occupiers were viewed by the authorities as engaged in peaceful protest, or at worst, civil disobedience.

While at the Refuge, Mr. Ritzheimer helped with the Occupation by organizing security teams, but he was not alone in those efforts. Mr. Ritzheimer's efforts were consistent with his military training and intended to build teamwork and prevent violence from erupting from people otherwise inclined to act on their own and with less restraint. Other persons reportedly participated in different aspects of security training: John Killman (later identified as a CHS) provided hand-to-hand combat training of occupiers, MNWR_003804; Payne was in charge of the shooting range and wanted to conduct live-fire training so he can judge their shooting and tactical abilities, MNWR_0059461; Ryan Bundy was in charge of most of the tactical training,

---

[36] There are striking similarities between his activities involving the Occupation and his duties during combat deployments, as discussed *infra*.

MNWR_00001690; Ritzheimer wasn't involved in tactical training and sometimes worked as a "gopher," picking up mail and taking meals to the men who were otherwise disposed, MNWR_00001508.

Mr. Ritzheimer had seen news reports by Danny Coulson, a former special-agent-in-charge of the FBI in Oregon, providing his assessment: "We don't have a violent act here. Again, it's just protestors. . . . We've still got a trespass situation. It's certainly not worth a firefight. . . . They're exercising their First Amendment rights. If they want to make a statement, let them. Let them have a forum."[37] Those sentiments resonated with his perspective of his conduct—that he was engaged in peaceful protest at worse amounting to trespass, and certainly not felonious conduct that his government would later characterize as domestic terrorism.

### *Mr. Ritzheimer's Offense Behavior As A Product of Military Culture*

> *When the veteran, who was carefully selected pre-enlistment to not have experienced legal problems or anti-social values, runs afoul the law inside the [civilian] environment and becomes targeted for criminal prosecution, we ignore how the military culture and moral injuries sustained by the veteran contributed to or caused the criminal problems he or she became trapped in. Instead, the criminal act(s) of the veteran was/were freely chosen and that the war experience is unrelated.[38]*

Dr. Brown's July 2016 report includes the following findings:

Mr. Ritzheimer post-discharge has continued to behave largely as dictated by the four core military values (Obedience, Discipline, Survival, and Sacrifice):

- Obedience, in military terms, requires unquestionable compliance with orders from superiors, and the oath taken to uphold and defend the U.S. Constitution. Mr. Ritzheimer's military training during Boot Camp taught him to view the Constitution as

---

[37] http://www.oregonlive.com/oregon-standoff/2016/01/why_dont_feds_try_to_oust_oreg.html.

[38] *Cultural Incompetence, supra n. 33*, at 3.

a set of "black or white" rules.[39] At that time he was a high school graduate. He was not taught by the military that legal scholars and the courts often have conflicting interpretations of the Constitution's content and meanings. He continues to respond to situations involving the Constitution in civilian culture with the same literal interpretation and same commitment to uphold and defend it.

• Discipline in the military is associated with instantaneous responses to orders given by superiors, and contributes to the development of a cohesive military unit. Mr. Ritzheimer continues to show discipline in his commitment to form a strong coalition that will defend and protect the Constitution. He would naturally employ the leadership skills and methods he acquired during military service, for coalition building.[40]

• Survival requires a commitment to continue the pursuit of the mission. Mr. Ritzheimer has not yet successfully reintegrated into civilian culture; he has found no place (work, college, motorcycle clubs, the company of former civilian friends) where he fit in, or felt a sense of purpose. As noted, he has considered committing suicide post-discharge, directly related to problems with his reintegration. His commitment to political activism filled that void, and he has survived thus far through his pursuit of making people aware of their rights, and trying to convince others to accept responsibility for defending the Constitution.

---

[39] *See, e.g., CSIS Report, supra n.20,* Introduction at 3 ("The values and philosophies that have evolved as central to U.S. military culture have emerged from both the noble basic tenets of the U.S. Constitution and the harsh lessons of the battlefield.").

[40] Dr. Brown noted that Mr. Ritzheimer's military experience significantly increased his ability to exercise loyalty, and that he rated his level of loyalty to others before enlisting at 4 on a scale of 1 (low) to 10 (high). During service his level of loyalty increased to 10. "He rated his level of loyalty to civilians after discharge from the Marines at 8, explaining that while he does not particularly care for civilians, when he makes a commitment to civilians he follows through with it."

- Sacrifice in the military ranges from giving up one's right of privacy to the ultimate sacrifice of giving one's life. Mr. Ritzheimer has demonstrated his willingness to sacrifice himself to be at the forefront of a movement to defend the Constitution, and has expressed a strong sense of obligation to make these sacrifices for the sake of his children and all Americans. Like many veterans, Mr. Ritzheimer disbelieves that he preserved freedom in American by fighting in Iraq. He views his efforts to educate others about the Constitution and the need to fight (in the figurative sense, using the First and Second Amendments) to defend their freedom as truly serving his country.

- Mr. Ritzheimer's devotion to a literal reading of the Second Amendment is consistent with his military indoctrination, including the Marine Corps Rifleman's Creed. Carrying a firearm for the safety and security of himself and his "buddies" is a predictable, ingrained behavior from military culture. He has routinely carried a firearm while engaged in various protest activities, and that could certainly be an artifact of his military indoctrination, rather than a sign of aggression.[41]

- Many of Mr. Ritzheimer's  post-discharge criticisms of government appear directly related to his military values and service. Mr. Ritzheimer went to Iraq to defend America, defeat the enemy, and insure that the U.S. Constitution would be protected.  He completed everything he was asked to do during two deployments.  He had comrades who were injured or killed during his deployments, and still feels angry, frustrated and saddened by those events even though most were not related to anything he did or didn't do. He sustained physical injuries including TBI, and suffers from PTSD. His military service altered his life's course and his future in the myriad of ways documented in this

---

[41] Having weapons at hand at all times is also a classic behavior of combat veterans with PTSD, and serves as a maladaptive coping strategy for the ensuing stress and anxiety, as discussed *infra.*

31

report. Mr. Ritzheimer (and the public in general) has come to recognize the motives behind the rationale to invade Iraq have proved to be false. Feelings of betrayal invariably result.

### B.    The Influence Of Combat-Related PTSD, mTBI And Moral Injury On Mr. Ritzheimer's Behavior.

*For too many soldiers, after a year away from home, consumed by the grit of combat duty, adjusting to family and garrison duty is much too hard. . . . These soldiers say that they are just not the same. They don't know why, but they feel changed, and the important stuff around them has changed. Combat will do that to almost anyone—everyone is changed, for better or worse, and sometimes both better and worse. These are not the great traumas of the war, but much more corrosive micro-traumas: an inability to relate in comforting and familiar ways and the tendency to feel like an alien when doing the most ordinary things.[42]*

Dr. Brown's report traced Mr. Ritzheimer's progression of generally unsuccessful attempts to reintegrate into civilian culture culminating with his arrest in January 2016.[43] The later psychological evaluation conducted by Dr. Robert Stanulis provides crucial insights about that time period in Mr. Ritzheimer's life. His efforts to reintegrate were undertaken while suffering from the disabling, combined effects of PTSD, mTBI, and Moral Injury, all largely untreated. Dr. Stanulis, a forensic neuropsychologist with extensive experience working with veterans, conducted an evaluation of Mr. Ritzheimer starting in November 2016 and concluding in July 2017, with an addendum in October that discuss Mr. Ritzheimer's subsequent progress in treatment and issues related to sentencing. Before discussing his findings, further explanation of

---

[42]  S. Xenakis, *PBS's This Emotional Life: What the Hurt Locker Got Right*, www.huffingtonpost.com/brigadier-general-stephen-n-xenakis-md/pbss-this-emotional-life_b_491853.html

[43]  A 2011 Pew Center Research study of 1,853 veterans found 44% of those who served after 9/11 reported a difficult time re-entering civilian life. Military experiences with adverse impact on reintegration included experiencing a traumatic event, serving in a combat zone, and serving with someone who was killed or injured. Mr. Ritzheimer experienced all of those factors, and none of the factors identified as making re-entry less difficult, e.g., being a college graduate, commissioned officer, or devoutly religious before the trauma. (*The Difficult Transition from Military to Civilian Life*).

these invisible injuries, taken from Dr. Stanulis' report and additional authorities, along with a summary of Mr. Ritzheimer's VA medical records pre-dating his offense, provide necessary context.

### Combat-related PTSD

> *"PTSD is a major life-threatening mental illness that can stem from any type of traumatic experience. Much of our current knowledge about PTSD comes from the military for the obvious reason: War causes trauma on a massive scale."*[44]

PTSD is the result of exposure to severe trauma(s) that leads to intrusive re-living of the trauma and flashbacks, coupled with avoidance symptoms that occur to prevent intrusive re-living of the traumatic event. Combat veterans who, like Mr. Ritzheimer, "have been viscerally exposed to the devastation and degradation of warfare, the blood and gore and death, the incessant, wrenching fear wrought by the agencies of combat," sustain repeated exposures to severe trauma.[45]

People with PTSD "can suffer from a wide array of symptoms, including intrusive memories, flashbacks, hyper-vigilance, sleep disturbance, avoidance of traumatic stimuli, numbing of emotions, social dysfunction, and physiological hyper-responsivity," and "[t]hese symptoms are believed to reflect stress-induced changes in neurobiological systems".[46] While some individuals exposed to a traumatic event do not develop PTSD, others manifest all of its symptoms, or some combination of them. A significant number do not immediately manifest symptoms of PTSD, instead demonstrating a "progressive escalation of distress or a later

---

[44] Thomas J. Berger, Executive Director of the Veterans Health Counsel, U.S. Dept. of Justice, National Institute of Corrections, *Veterans Treatment Courts: A Second Chance For Vets Who Have Lost Their Way,* Section 3 (May 2016)(available at nicic.gov/veterans).

[45] *Id.*

[46] Betsy Gray, *Neuroscience, PTSD, and Sentencing Mitigation,* 34 Cardozo L.Rev. 53 (Oct. 2012)(hereafter referenced as Gray, *Neuroscience*). Gray is a law professor and faculty fellow at the Center for Law, Science & Innovation, Sandra Day O'Connor College of Law, ASU.

emergence of [the] symptoms."[47] Regarding the course of PTSD, the DSM-5 text summarizes available evidence stating that symptoms vary over time, with "recurrence and intensification . . . in response to reminders of the original trauma, ongoing life stressors, or newly experienced traumatic events." (*Development and Course,* p. 277). Simply put, PTSD is a chronic condition that waxes and wanes, and some individuals remain symptomatic for more than 50 years. *Id.*

### A. The Physiological Basis of PTSD

PTSD symptoms in veterans start as an adaptive neurobiological response to combat: Hyper-arousal and hyper-vigilance are adaptive in combat, but these responses are not adaptive in non-combat, civilian situations. PTSD also changes the structure and function of brain and the autonomic nervous system of those affected, to include chronic hyperarousal of the "fight or flight" functions of the brain.

Key structures of our brains operate when trauma and stress are experienced, acting either to stimulate the "arousal system" or keep our emotions in check. When the brain is functioning properly, new neuron connections are created that override the traumatic memory, a process known as "extinction." When this system becomes maladaptive, the retention of traumatic material in the brain can result in emotional disorders, including PTSD. Properly functioning brains have biological processes that allow an individual to adapt and overcome traumatic events, while brains affected by PTSD or similar disorders do not, causing previously neutral stimuli in the environment, such as sights, sounds, and smells, to become linked with the traumatic event.[48] Thus, the traumatic event(s) remain in their perceptions as an active, not past, event. Simply put, PTSD literally "rewires" the brain.

---

[47] *Id.*
[48] *Id.,* at 87.

There are biochemical processes associated with PTSD. Our brains are flooded with stress hormones during and after a stressful event, to facilitate fear processing. Traumatic stress can induce fear, which triggers an alarm system known as the "fight or flight" response in our neurocircuitry. PTSD involves the dysregulation of several neurotransmitter and hormonal systems, that lead to changes in the structure and function of the brain. Persons with PTSD experience increased levels of cortisol and adrenaline, which further activate fear responses. Prolonged release of these hormones can enhance the functioning of the amygdala and impair the cognitive function of the medial prefrontal cortex; prolonged release of cortisol causes long-lasting neurological changes in the hippocampus, associated with the intrusive memories of PTSD.[49]

The amygdala is integral to the generation and maintenance of emotional responses, including fear and threat assessment. The medial prefrontal cortex is largely responsible for judgment, cognition, behavior, personality expression, and decision-making. In persons with PTSD, the amygdala is hyperactive while the controlling mechanisms in the prefrontal cortex fail to dampen fear arousal, and the prefrontal cortex may sustain reduced volume and interconnections with other brain regions. This malfunction leads to hyperarousal, distress, and avoidance behaviors to stimuli that objectively would be seen as neutral or only mildly stressful or threatening. The hippocampus plays a central role in learning and the formation of episodic, declarative, and working memory. Several structural MRI studies have reported decreased

---

[49] *Id.,* at 89-90. In addition, persons with PTSD display "abnormal regulation of catecholamine, serotonin, amino acid, peptide, and opioid neurotransmitters, each of which is found in brain circuits that regulate/integrate stress and fear responses," and some of these core neurochemical dysregulation is also found in persons with TBI, "presumably the result of diffuse axonal injury." Sherin & Nemeroff, *Post-traumatic stress disorder: the neurobiological impact of psychological trauma,* Dialogues in Clin. Neurosci. 13(3): 263-78 (2011), available at www.ncbi.nlm.nih.gov/pmc/articles/PMC3182008/ .

hippocampus volumes in individuals with PTSD. A deficit in the hippocampus may "impair the individual's appreciation of safety cues and is partly responsible for an inappropriate physiological response to stress." Because of this deficit, the "fear response" may fail to turn off.[50] To simplify, persons with PTSD cannot inhibit a fear response when exposed to reminders of traumatic events; the autonomic nervous system hyperactively responds.[51]

### B. The Diagnostic Symptoms of PTSD

The *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) categorizes the symptoms that accompany PTSD into four "clusters":

• Intrusion—spontaneous memories of the traumatic event, recurrent dreams related to it, flashbacks, other intense or prolonged psychological distress upon exposure to internal or external clues that symbolize or resemble an aspect of the traumatic event, or marked physiological reactions to such clues.

• Avoidance—avoidance or efforts to avoid distressing memories, thoughts, feelings, or external reminders of the event.

• Negative Cognitions and Mood—myriad feelings including a distorted sense of blame of self or others for the cause or consequences of the traumatic event; persistent negative emotions (e.g., fear, anger guilt, shame), feelings of detachment or alienation, or persistent inability to experience positive emotions (e.g., happiness, satisfaction, love).

• Arousal—irritable behavior and angry outbursts with little or no provocation, reckless or self-destructive behavior, problems with concentration, sleep disturbances, hypervigilance or exaggerated startle response.

---

[50] Gray, *Neuroscience, supra n.46,* at 88-89 (citations omitted).
[51] *Id.,* at 90.

The phenomenon of "reckless or self-destructive behavior," in the marked alterations in the Arousal cluster of symptoms, was first included as a PTSD symptom in the DSM-V (2013), and "reflects the tendency of those with PTSD to engage in risky behaviors that give them a "rush," thereby serving as a means of adaptation to a disturbed and unmodulated [neurophysiological] arousal system."[52] Moreover, research has shown that veterans with PTSD are more likely to engage in risky and impulsive behaviors when in a depressed state; and that veterans suffering from a combination of PTSD and depression may experience an intensification of anger.[53]

A PTSD diagnosis requires identification of one or more symptoms of Intrusion and Avoidance, and two or more symptoms of Negative Cognitions and Mood, and Arousal; duration of the symptoms for more than one month; and resulting causation of clinically significant distress or impairment in social, occupational or other important areas of functioning.

Military culture shapes the symptoms of PTSD in veterans. Combat-related PTSD is tilted strongly towards symptoms of avoidance, isolation and denial. Ownership and proximity to weapons become an effective means to lower anxiety. Clearly, PTSD can adversely impact veterans' reintegration to civilian culture:

> Numerous psychosocial conditions have been found to be associated with PTSD, for example, violence and aggression, relationship problems, decreased quality of life, legal problems, and homelessness. Research demonstrates that PTSD can cause substantial distress and functional impairment. The various effects and the

---

[52] Suzzane Best, *Impact of Warzone Deployment,* Chapter 7, p. 7-2, (hereafter referred to as Best (2017)), published in Still at War A guide for defenders, prosecutors & judges dealing with Oregon's Veteran Defendant Crisis (2017 OCDLA)(hereafter Still at War). Dr. Best is a clinical psychologist specializing in evaluation and treatment of PTSD and trauma-related conditions, and co-author of Courage After Fire: Coping Strategies for Returning Iraq and Afghanistan Veterans and Their Families. Dr. Best notes that TBI "also can lead to impulsivity, aggression, and impaired decision making." *Id.*

[53] *Id.,* at 7-3. As previously noted, VA records include a diagnosis of Depression for Mr. Ritzheimer.

interconnections of PTSD with other physical, mental, and social outcomes can interfere with readjustment into one's previous life.[54]

"Moreover, after repeatedly responding to and, at times, themselves giving orders carrying life or death consequences, veterans may have difficulty adhering to what they see as meaningless laws or respecting local representatives of domestic authority who they deem weak and even contemptible."[55]

Many veterans, including Mr. Ritzheimer, experience a pervasive sense of guilt, shame, and self-blame. While PTSD is most often perceived as a fear-based condition arising from a life-threatening event, it may also develop in reaction to traumatic events for which the veteran feels responsible.[56] In the later instance, the military cultural values of self-sacrifice without hesitation to protect ones "buddies", and drive to successfully complete all missions, would necessarily heighten feelings guilt, shame and self-blame. "Because guilt reactions negatively impact mood, veterans with PTSD are at significant risk for associated major depression, a combination which results in more severe symptoms and resistance to treatment."[57]

The symptoms of PTSD have been categorized into three typologies: dissociative reactions, sensation-seeking syndrome, and depression-suicidal syndrome. Not all individuals with PTSD experience all three typologies. A dissociative reaction includes altered states of consciousness or flashbacks, in which a veteran may regress into "survival mode" and commit an act responsive to reliving a past traumatic event. Manifestations of the sensation-seeking

---

[54] *Returning Home from Iraq and Afghanistan, supra n.5.*

[55] Best (2017), *supra n.52,* p. 7-1.

[56] *Id.,* p. 7-3

[57] *Id.* In that article, Dr. Best discussed one client, an Army Ranger officer who endured many life-threatening experiences in combat that were highly distressing to him, but reported his most traumatic experience was when he sent a platoon on a mission where eight were killed, and he was not with them. *Compare,* Mr. Ritzheimer's extreme distress over not redeploying with his unit in 2006, thus not being able to protect them from injury or death.

syndrome include seeking out dangerous activities to recreate the excitement of combat. This may be an attempt to feel alive again, rather than "numb," in civilian life; or an unconscious attempt to relive and control the trauma experienced in combat. The depression-suicide syndrome includes intense feelings of guilt, hopelessness, betrayal, and deep depression. Combat veterans often feel survivors' guilt and experience depression; they may feel hopelessness when unable to reintegrate to civilian life, or betrayed by the government that sent them to fight a controversial war. These individuals may commit suicide, subconsciously act out their anger through criminal acts, or commit criminal acts with the goal of "passive" suicide or "suicide by cop."[58]

### C. Mr. Ritzheimer's Experience with PTSD leading up to the Occupation.

*"Combat alters the way we think about ourselves. . . . It challenges our common assumptions about who we are and what we and others are capable of. The illusions of safety, civility, and civilization are forever shattered in those who have witnessed otherwise. After going through such experiences, the world does not feel the same and many veterans feel unable to rejoin the mainstream of society and put their experiences behind them. As one combat veteran sagely noted, 'My wife and friends tell me to let it go . . . it all happened so long ago. I get that. It was only 30 minutes out of my entire life. But, for me, those thirty minutes have cast a shadow thirty years long.'"[59]*

Mr. Ritzheimer served as a gunner on convoys during his first deployment to Iraq, and described many experiences that are known to give rise to PTSD. These included being attacked and ambushed, being responsible for the death of the enemy, witnessing dead bodies and human remains, seeing dead and seriously injured American troops, knowing personally an American who was killed, having close calls where protective gear prevented death or injury, and clearing homes in combat areas. In 2005, his convoy was ambushed and the truck in front was hit with

---

[58] Daniel Burgess, Nicole Stockey & Kara Coen, *Reviving the "Vietnam Defense": Post-Traumatic Stress Disorder and Criminal Responsibility in a Post-Iraq/Afghanistan World,* 29 Dev. Mental Health L. 59, 65-68 (2010).

[59] Dossa & Boswell, *Post-Traumatic Stress Disorder: A Brief Overview*, at 163-64, *supra n. 13.*

RPGs (Rocket propelled Grenade). This resulted in his truck being stuck in the "kill zone" with insurgents attempting to place an IED (Improvised Explosive Device) next to his truck. In that firefight, he shot and killed multiple insurgents. His truck remained separated by the "kill zone" from the rest of the convoy for a period. During his 2005 deployment, he sustained multiple IED and RPG attacks as well as gunfire attacks.

VA records document Mr. Ritzheimer's PTSD, Traumatic Brain Injury (TBI), Depression and Moral Injury diagnoses and treatment. While training to redeploy with his unit in 2006, he began experiencing "nightmares, poor sleep, flashbacks, mood swings, fear, anger, sadness/depression fatigue, low motivation, and irritability," and was diagnosed with PTSD. During follow-up medical appointments, "anxiety, depression with pessimism about the future, or brooding about the past, and loss of interest in friends and family" was noted. Medications were prescribed, and he was referred to outpatient treatment. There he discussed guilt over not redeploying with his unit. He remained on medications for PTSD in 2007. He was allowed to re-deploy in 2008.

According to Dr. Stanulis, one of the most important psychological aspects of Mr. Ritzheimer's military experience occurred when, due to PTSD, he was not allowed to re-deploy with his unit in 2006. To the civilian eye, not being deployed to a combat zone would appear less stressful than being deployed. However, the opposite holds true within military culture where soldiers are indoctrinated to complete the mission to kill the enemy at all costs, with sacrifice of one's life in that pursuit portrayed as the ultimate heroic act. This failure to be fit to deploy is far more stressful to combat veterans, and it affected Mr. Ritzheimer in a very profound and negative manner: He reports feelings of guilt, shame and a corresponding strong need to make-

up for his failure, and find some other way to leave a "legacy" for his children after his 2014, unexpected discharge—when he was once again on a path to deploy to a combat zone.

When Mr. Ritzheimer re-deployed in 2008, his unit escaped direct enemy attack, other than rocket fire when they first arrived, during that tour. When he returned stateside, he sought mental health services for PTSD, and was again prescribed medication. His symptoms as documented in late 2009 were reported as "sleep disturbance most nights, nightmares about once a week, intrusive thoughts daily, irritability that comes and goes, anxiety daily, and vigilance daily. . . . He is avoidant of other people. He does not really have much of a social life. He is vigilant and he is armed with a loaded gun at all times be it at home or out and about. He has road rage when he drives and he has heightened physiologic arousal with loud noises." Symptoms including "mood swings, anxiety and depression" were rated moderately severe, on-going, pretty much daily for four years.

Notwithstanding sporadic participation in VA mental health services and periodic use of prescribed medications for symptom management, Mr. Ritzheimer's PTSD symptoms did not go into remission as the years passed. A few months after his honorable discharge in 2014, VA examiners found that he suffered from "depressed mood, anxiety, chronic sleep impairment, mild memory loss, flattened affect, disturbances of motivation and mood, difficulty in establishing and maintain effective work and social relationships, difficulty in adapting to stressful circumstances, including work, and impaired impulse control, such as unprovoked irritability with periods of violence." During 2014-2015, he took prescribed medications for management of depression/anxiety and insomnia, but decreased use of those and began using medical marijuana in March 2015. The counseling records during this time period repeatedly noted he had "low

41

motivation," and "[c]hronic passive suicidal thoughts with no current plan or intent," as well as "Chronic Pain."

Mr. Ritzheimer's symptoms had not improved when assessed again in April 2015, with records noting PTSD and Depression.  His counseling group facilitator at the Vet Center was retiring, causing concerns. For a short time he engaged in more intensive out-patient treatment with the VA PTSD Clinic (weekly, 90-minute group sessions focused on PTSD coping strategies), but by then was involved in political activism; he started missing sessions.[60] In June he reported being under increased stress after receiving death threats and other negative fallout as the organizer of the May protest at the Phoenix mosque. He reported more anxiety, little interest in things, some anger but able to avoid confrontations, denied feeling hopeless, but more guilt feelings, hypervigilant, some intrusive thoughts—at times feels he has blood on his hands. He was to be referred for individual therapy for EMDR (Eye Movement Desensitization and Reprocessing), a therapy used to treat PTSD, but no provider was available in the area. In July Mr. Ritzheimer ceased participation in the PTSD Clinic program, intending to attend group sessions at the Vet Center closer to his home. He found the new group facilitator to be unhelpful, and stopped going. He did continue to see his VA psychiatrist every six weeks or so, until shortly before leaving home in December 2015.

His psychiatrist's progress notes from his last appointment, mid-December 2015, prior to the Occupation reflect:

Mood has been up and down. He remains mostly isolated. Little interest in things. Spends much of the day watching the news, He has some friends he spends time with. Tries to spend more time with his daughters. Continues to have baseline

---

[60] VA counseling records document that after his return from the 2017, in-patient PTSD program, he acknowledged that around May 2015, when he became a political activist, "life started going hay wire," first with backlash from his anti-Islam protests and then his involvement in the "Oregon take over."

PTSD symptoms. Hypervigilant, some intrusive thoughts. Set off easily with crowds. Avoids shopping. Worried constantly about his safety. Using CBD oil to manage anxiety. Can get angry easily—will go walk to manage tension. Sleep is fair. May sleep 5-6 hours. Some restlessness. He is avoiding taking sleeping medication because he does not want to sleep too deeply. No recent suicidal thoughts. No intent or plans to harm himself. . . . [B]aseline symptoms exacerbated by stresses. Mood is fair, Motivation low. Wife is supportive. Managing anger. Infrequently drinking alcohol. . . . Return in 6 weeks.

### *Combat-related mild Traumatic Brain Injury (mTBI)*

*Despite their frequency, the acute and long-term effects of mTBI have been a relatively unexplored area of medical inquiry until very recently. Undoubtedly, the "invisible" nature of mTBI, notably the lack of any external physical evidence of damage to the head or brain, has been a major factor contributing to the impression of inconsequentiality. However, there is accumulating evidence that some individuals develop persistent cognitive and behavioral changes after mild neurotrauma.[61]*

Mild Traumatic Brain Injury (mTBI) has become known as the "signature injury" of veterans who fought in the Iraq and Afghanistan wars, primarily caused by exposure to IED blasts. Although resolution of symptoms often occurs within 3 months, as many as 25 percent of veterans with mTBI experience chronic physical, cognitive and behavioral changes. [62] Veterans who have sustained a mTBI are also at increased risk of comorbid psychiatric disorders including

---

[61] Ann C. McKee, Meghan E. Robinson, *Military-related traumatic brain injury and neurodegeneration*, Alzheimers Dement (2014 June), available at *www.ncbi.nlm.nih.gov/pmc/articles/PMC4255273/* (hereafter McKee & Robinson (2014)) Experts have concluded that any soldier who was within 50 meters of a blast or who was in a vehicle behind or ahead of one struck by a blast is at risk for TBI. Robert Worth, *What if PTSD Is More Physical Than Psychological,* The New York Times Magazine (June 10, 2016), available at mobile.nytimes.com/2016/06/12/magazine/what-if-ptsd-is-more-physical-than-psychological.html (last accessed 10-25-2017).

[62] Jeffrey B. Ware, MD, Rosette C. Biester, PhD, Elizabeth Whipple, MS, Keith M. Robinson, MD, Richard J. Ross, MD, PhD, Paolo G. Nucifora, MD, PhD, *Combat-related Mild Traumatic Brain Injury: Association between Baseline Diffusion-Tensor Imaging Findings and Long-term Outcomes* (July 2016), available at http://pubs.rsna.org/doi/full/10.1148/radiol.2016151013.

PTSD, and occupational impairment.[63] Standard CT scans or MRI procedures will not detect mTBI. "The new gold standard is diffusion tensor imaging (DTI), a superior type of MRI whereby actual nerve tracks are visualized, along with areas of injury and areas where new nerve growth has occurred," but DTI was not routinely available within the VA system as of 2013.[64] Mr. Ritzheimer was diagnosed with mTBI by the VA in 2009, based on history of blast exposures and concussion sustained in 2005, with persistent symptoms, and has never been examined using DTI.

Repetitive mTBIs can provoke the development of chronic traumatic encephalopathy (CTE). CTE is clinically characterized by mood and behavioral disturbances, progressive decline of memory and executive functioning, and cognitive deficits that eventually progress to dementia over the course of several decades. Mood and behavioral disturbances typically include depression, apathy, impulsivity, anger, aggression, irritability, and suicidal behavior. CTE has been documented in boxers, football players, and other contact-sports participants, as well as combat veterans from World War II forward. As with many neurodegenerative diseases, CTE can only be diagnosed definitively through postmortem examination.[65] Unlike mTBI from conventional sports, military-related mTBI occurs in a myriad of ways, including during physical training, falls, and vehicle accidents, as well as blast exposure. Injury from blast exposure varies

---

[63] *Id.*

[64] Dr. Chrisanne Gordon, M.D., and Dr. Ronald Glasser, M.D., *Traumatic Brain Injury—The Invisible Injury,* 212-13, (hereafter referred to as Gordon & Glasser, *Traumatic Brain Injury*), published in Hunter & Else, Defending Veterans, *supra n.10*.

[65] However, science continues to progress on methods to diagnose CTE in the living, through identification of protein biomarkers associated with the disease. See, e.g., Nadia Kounang, *Researchers identify CTE biomarker that may lead to diagnosis while alive* (Sept. 27, 2017), available at http://www.cnn.com/2017/09/26/health/researchers-identify-cte-biomarker-that-may-lead-to-diagnosis-while-alive/index.html .

44

based on external factors (e.g., strength, proximity, location), and an individual's combined exposure to blasts and impacts.[66]

There is increasing recognition and on-going studies of the frequent association of mTBI and PTSD in combat veterans from our recent military conflicts in the Middle East. One study of 2525 U.S. Army infantry soldiers surveyed after deployment to Iraq for 1 year, 44% of the soldiers with mTBI and subsequent loss of consciousness met criteria for PTSD.[67] There is also considerable symptom overlap between mTBI, PTSD, and early stage CTE.[68] An accurate diagnosis is necessary to determine the most effective course of treatment. Unfortunately, the VA system has been skewed toward a PTSD-centric focus because of its established treatment pipeline for PTSD, and nearly non-existent mTBI detection and treatment resources.[69] However, in February 2016, the Veterans Affairs and Defense Departments' Evidence-Based Practice Working Group published the second, updated version of its "Clinical Practice Guideline for the Management of Concussion-Mild Traumatic Brain Injury," first published in 2009, which may lead the way to improved services for diagnosis, assessment and treatment of mTBI.[70]

---

[66] McKee & Robinson (2014), *supra n.61.*

[67] Hoge CW, McGurk D, Thomas JL, Cox AL, Engel CC, Castro CA., *Mild traumatic brain injury in U.S. Soldiers returning from Iraq*, N Engl J Med. 2008; 358:453–63.

[68] McKee & Robinson (2014), *supra n.61.*

[69] Gordon & Glasser, *Traumatic Brain Injury, supra n.64,* at 209; Worth, *What if PTSD Is More Physical Than Psychological, supra n.63,* noting great reluctance by the military to accept that blast exposure caused physical injury: "As late as 2008, researchers at the Walter Reed Army Institute of Research published a paper suggesting that the symptoms of traumatic brain injury could be caused in large part by PTSD and brushing off 'theoretical concern' about neurological effects of the blast wave."

[70] Available at: https://www.healthquality.va.gov/guidelines/Rehab/mtbi/mTBICPGFullCPG50821816.pdf . The Guidelines do not recommend DTI imaging for diagnostic purposes, concluding its "sensitivity inadequate for routine use at this time," p.24. The extent to which that conclusion is related to the VA's lack of DTI imaging facilities is unknown.

**A. The Mechanics of mTBI.**

Shock waves from explosive blasts damage the brain much like concussive impact to the head by a solid object. This is why:

> The different layers of brain tissue have the consistency of differing layers of Jell-O. It is these different layers of densities that make the brain so exquisitely sensitive to any abnormal motion, whether from a blow to the head or a jarring blast wave from a roadside bomb or suicide bomber. These different layers of the brain with their different masses move at different speeds when set into motion. It is the different speeds at which these 'Jell-O' like layers move that generates internal shearing forces between layers and tear the bridging arteries, veins, connective tissues and nerve fibers. . . A brain set in motion by a passing [blast] wavefront is like a layer cake suddenly placed on the top of a jackhammer. . . .A more than one neurosurgeon has pointed out, the damage from that shaking of the brain can be more widespread and more neurologically disabling to a patient than a penetrating head would where the damage is only along the track of the bullet. With a shaken brain, the damage will be everywhere and anywhere.[71]

As we know from recent news accounts involving NFL players, repeated exposure to concussive forces increases the extent of brain injury. "Consider a blast injury, which can be 100 times more forceful than a hit from a 300-pound NFL lineman. Then consider that a soldier may suffer several blast injuries in a tour of duty," as well as repeated tours over the course of a few years. "The significance here is that *brain injuries are additive* and, the closer together they occur, the worse the outcome."[72] Scientific studies also suggest that brain cells functioning at the time of the blast injury are most vulnerable to damage, such that hypervigilant combat troops with their "high alert" brain functioning may exacerbate the injury. Lack of sleep, another common experience for combat troops, may also make the brain more susceptible to injuries.[73]

**B. The symptoms of combat mTBI.**

The primary causes of TBI in Veterans of Iraq and Afghanistan are blasts, blast plus motor vehicle accidents (MVA's), MVA's alone, and gunshot

---

[71] Gordon & Glasser, *Traumatic Brain Injury, supra n.64,* at 202, 204.

[72] *Id.,* at 204.

[73]*Id.,* at 205.

wounds. Exposure to blasts is unlike other causes of mTBI (mild TBI), and may produce different symptoms and natural history. For example, Veterans seem to experience the post-concussive symptoms described [below] for longer than the civilian population; some studies show most will still have residual symptoms 18-24 months after the injury. . . . However, some 10% to 15% of patients may go on to develop chronic post-concussive symptoms. These symptoms can be grouped into three categories: somatic (headache, tinnitus, insomnia, etc.), cognitive (memory, attention and concentration difficulties) and emotional/behavioral (irritability, depression, anxiety, behavioral dyscontrol). Patients who have experienced mTBI are also at increased risk for psychiatric disorders compared to the general population, including depression and PTSD. . . . [M]any Veterans have multiple medical problems. The comorbidity of PTSD, history of mild TBI, chronic pain and substance abuse is common and may complicate recovery from any single diagnosis.

 *PTSD and Brain Injury*, National Center for PTSD, Department of Veterans Affairs, available online).

Mr. Ritzheimer is service-connected for TBI. VA records indicate that he was diagnosed with a Grade III (serious) concussion from a MVA accident because of his period loss of consciousness. He also was subjected to blast forces from numerous IED exposures that "dazed" him. He also has headaches and tinnitus, which are often associated with TBI. The VA doctor conducting his 2009 disability determination noted: "At this point, since he does have a good deal of psychiatric and mood disturbances, I really cannot separate any mild cognitive dysfunction [resulting from the TBI] from any type of mood alteration of the depression he is suffering from." While Mr. Ritzheimer now feels that he has recovered from his concussion, the accuracy of this self-report is difficult to assess given that the degree of symptom overlap between PTSD and TBI is substantial.[74] Symptom overlap with PTSD consists of

---

[74] "Evaluating the TBI patient is complicated by anosognosia, the patient's inability to recognize physical or mental dysfunction." Dr. Peter Breggin, M.D., *TBI, PTSD, and Psychiatric Drugs; A Perfect Storm for Causing Abnormal Mental States and Aberrant Behavior,* Chapter 10, p. 255, Hunter & Else, Defending Veterans, *supra n.10.* As Dr. Stanulis explains, the cognitive impairments of mTBI are somewhat similar to the "brain fog" experienced from a cold or flu, and become "the new normal" when experienced as a chronic condition.

depression/anxiety, insomnia, irritability/anger, trouble concentrating, fatigue, hyperarousal and avoidance. As discussed earlier, Mr. Ritzheimer has experienced all of those symptoms.

The areas of brain that are affected by PTSD are also vulnerable to concussion and blast injuries. Numerous studies have shown that Middle East war veterans who had diagnoses of mTBI had symptoms of PTSD at much higher rates than non-TBI injured soldiers.[75] The co-occurrence of PTSD, TBI, and chronic pain that characterizes Mr. Ritzheimer's combat injuries, is common in this generation of veterans because of the frequency of concussive and blast injuries that can produce all three health issues. A recent review by the Institute of Medicine, National Academy of Science, concluded that TBI can have adverse effects on all aspects of social functioning, including employment, social relationships, independent living, functional status, and leisure activities.[76]

### C. Distinguishing mTBI from PTSD

Dr. Stanulis administered testing related to mTBI in November 2016. This included the TBI checklist from the VA. On the TBI checklist Mr. Ritzheimer's symptoms of headaches, fatigue, sleep disturbance, anxiety, and depression were self-rated as mild. He endorsed visual problems, sensitivity to light, hearing difficulty, sensitivity to noise, numbness or tingling of parts of his body, poor concentration/distractibility, and difficulty making decisions, as moderate. Symptoms of forgetfulness, feeling depressed, irritable, poor frustration tolerance, and feeling easily overwhelmed, were rated as severe. Thus, he reported some symptoms specific to mTBI: headaches, visual problems, sensitivity to light, hearing difficulty, sensitivity to noise, numbness or tingling of parts of his body. Additionally, "feeling easily overwhelmed" may be

---

[75] *Returning Home from Iraq and Afghanistan, supra n.5.* One study showed the highest rate of PTSD among veterans whose injury involved loss of consciousness.

[76] *Gulf War and Health, Volume 7: Long-Term Consequences of Traumatic Brain Injury,* Institute of Medicine, National Academy of Science (2009).

attributed to TBI, as those individuals "cannot filter stimuli well and are therefore overwhelmed by the activity at a major sports event or the selection of cereals in the aisle of a grand grocery store. Too much input is the hallmark of TBI, not PTSD."[77]

Dr. Stanulis also performed neuropsychological screening, which is now recommended by the VA's revised Clinical Treatment Guidelines for mTBI for veterans with persistent cognitive symptoms that have not resolved through other treatment modalities.[78] Neuropsychological testing includes specifically-designed tasks meant to correlate to certain areas of the brain responsible for that task or function. Mr. Ritzheimer was average to above average in his ability to do verbal abstractions. Attention and concentration, however, were markedly impaired, and also affected his memory performance. According to Dr. Stanulis, tests measuring attention and concentration are associated with frontal lobe function, the part of the brain that exercises judgment and controls impulsivity; attention and concentration are the precursors for memory, i.e., memories are only formed of events or information that is first noticed. The frontal lobe is the region most susceptible to blast mTBI. So the neuropsychological testing suggests mild injury to the frontal lobe. However, Mr. Ritzheimer's PTSD symptoms include anxiety with intrusive thoughts, that can result in similar low scores on tests for attention, concentration and memory. Overall, his performance on tests of verbal and non-verbal memory indicated that his anxiety did interfere with his performance, but that with repetition he can improve. On Verbal Fluency, Mr. Ritzheimer had no difficulty. His performance on this measure was well above average.

---

[77] Gordon & Glasser, *Traumatic Brain Injury, supra n.64,* at 210.
[78] Recommendation 17, p. 36.

Dr. Stanulis concurred with the VA diagnosis of mTBI, but because of symptom overlap with PTSD, he likewise could not determine with any certainty what percentage of Mr. Ritzheimer's difficulties are caused by mTBI as opposed to PTSD.

Mr. Ritzheimer has not undergone VA testing or treatment for mTBI that is now recommended by the VA's 2016 Clinical Guidelines. He continues to experience mTBI symptoms that do not overlap with PTSD, and has cognitive impairments that the defense neuropsychological testing suggests may be due to brain dysfunctions susceptible to treatment. Because of symptom overlap with PTSD, rehabilitative services for mTBI could be expected to lessen the severity of the shared symptoms of these disorders—which are many—and improve his prognosis.

### Combat-related Moral Injury

> [O]ne who has never been to war clearly cannot appreciate or understand what war actually is or what injuring or killing other human beings can do to a soldier or Marine who inflicts those injuries or deaths. There is a significant distinction between the thoughts and/or the fantasies of killing and the actual killing of another person, which is why the military invests significant amounts of resources specifically directed to condition the inducted service member to be able to kill another person without hesitation and without any immediate feelings of remorse. Many join the military in pursuit of a definition of self or for patriotic reasons. Ultimately, they are expected to put aside their moral values that were acquired during childhood and go to war. [79]

Clinical research on Moral Injury is in its early stages, first given a working definition for mental health research purposes in 2009, as "perpetrating, failing to prevent, bearing witness to,

---

[79] Brown, W.B., Stanulis, R., & McElroy, G., *Moral Injury as a collateral damage artifact of war in American Society: Serving in war to serving time in jail and prison*. Justice Policy Journal, 13(1), 1-41(2016), available at http://www.cjcj.org/uploads/cjcj/documents/jpj_moral_injury.pdf (referenced hereafter as Brown et al., *Moral Injury*).

or learning about acts that transgress deeply held moral beliefs and expectations."[80] Moral Injury is not the traumatic event, but the resulting loss of trust in self and others, and diminished capacity for effective living; i.e., the "disruption in an individual's confidence and expectations about their own or others' motivation to behave in a just and ethical manner," brought about by perpetrating, failing to prevent or bearing witness to the immoral act.[81]  Moral Injury has been described as "the complex effects from moral reasoning processes that gnaw the heart, and darken the soul of combat veterans."[82] Although a recent phenomenon for clinical research purposes, the notion that trauma can manifest in a soldier from transgressed ethics and morals is far from new.[83]

In veterans, "moral injuries may stem from direct participation in combat, such as killing or harming others, or indirect acts, such as witnessing death or dying, failing to prevent immoral acts of others, or giving or receiving orders that are perceived as gross moral violations."[84] According to Dr. Brown's evaluation in mid-2016, Mr. Ritzheimer acknowledged that he caused

---

[80] Litz, B.T., Stein, N., Delaney, E., Lebowitz, L., Nash, W.P., Silva, C., & Maguen, S., *Moral injury and moral repair in war veterans: A preliminary model and intervention strategy,* Clinical Psychology Review, 29, 695-706 (2009)(hereafter referred to as Litz et al.(2009)) available at https://msrc.fsu.edu/system/files/Litz%20et%20al%202009%20Moral%20injury%20and%20moral%20repair%20in%20war%20veterans--%20a%20preliminary%20model%20and%20intervention%20strategy.pdf .

[81]  Jaimie Lusk, *The Relevance and Influence of Moral Injury,* Chapter 8, p. 8-2 (citation omitted) (referred to hereafter as Lusk (2017)), published in Still at War (2017 OCDLA), *supra n.52.* She is a clinical psychologist and former Marine who deployed during Operation Iraqi Freedom; she treats Moral Injury at the VA in Portland.

[82] Jeff Zust (2015), *The Two-Mirrors of Moral Injury: A Concept for Interpreting the Effects of Moral Injury* 1, Comm. and Gen. Staff College Found., http://www.cgscfoundation.org/wp-content/uploads/2015/06/Zust-TwoMirrorModel-final.pdf .

[83] *See, e.g.,* Masick, E.D., *Moral Injury and Preventative Law: A framework for the future*, 224 Mil. L. Review 223, 225-230 (2016).

[84] *Moral Injury in the Context of War,* S. Maguen & B. Litz, National Center for PTSD (2016), available on-line.

enemy casualties, and perceived causing enemy combatant casualties as doing his job well.[85] He does not know if he participated in causing civilian casualties and is very troubled by this lack of knowledge. He denies causing children casualties and is sad that children were casualties. The combat experiences he rated as having the most significant influence on him (10 on a scale of 1 to 10), were witnessing dead and seriously injured Americans, witnessing dead bodies and human remains, and personally knowing Americans killed in combat; whereas he rated being attacked, receiving incoming fire, being in close calls where only his protective gear prevented injury, and killing the enemy, as having slightly less significant influence. Dr. Stanulis opines that these feelings and events are part of the cause of both his PTSD and Moral Injury.[86]

---

[85] A survey of Marines and soldiers in 2003 found that 32% reported being directly responsible for the death of an enemy combatant. Litz et al. (2009), *supra n.80,* at 696.

[86] For a less clinical explanation of Moral Injury, see David Wood, *Moral Injury,* (April 9, 2015) a three-part series originally published in the Huffington Post in March 2014, available at the Dart Center For Journalism & Trauma, https://dartcenter.org/content/moral-injury. Wood writes:

> "We have come back, we have had brothers die in our arms, we've picked up parts of other people," 28-year-old Marine Sgt. Sendio Martz told me. . .  He spoke haltingly, searching for words. "And you are completely angry at the situation you were put into . . . not angry because your signed up but what happened you weren't fully prepared for." . . . .The only way to absorb such experiences [Iraqi casualties], Marine Sgt. Clint Van Winkle writes, was to "make it impersonal and tell yourself you didn't give a shit one way or another, even though you really did. It would eventually catch up to you. Sooner or later you'd have to contend with those sights and sounds, the blood and the flies, but that wasn't the place for remorse. There was too much war left. We still had a lot of killing to do." . . . Marine Staff Sgt. Felipe Tremillo also is struggling with guilt. Two years after he came home from his second combat tour, Tremillo is still haunted by images of the women and children he saw suffer from the violence and destruction of war in Afghanistan. "Terrible things happened to the people we are supposed to be helping," he said. "We'd do raids, going in people's homes and people would get hurt." . . . . American soldiers had to act that way, Tremillo recognizes, "in order to stay safe." But the moral compromise, the willful casting aside of his own values, broke something inside him, changing him into someone he hardly recognizes, or admires.

Military Culture plays a key role in understanding Moral Injury. The same actions that draw praise and commendations in military culture—killing, "acquiring" (stealing) resources and using aggression as a problem-solving strategy—are considered immoral and shameful in civilian culture, creating psychological turmoil. The military also does not prepare members to cope with feelings of sadness, guilt or shame. Furthermore, military culture promotes "an unambiguous sense of right and wrong, clear rules for living, closeness with like-minded individuals, and a distinctive identity—all strong advantages at war," but which contribute to difficulties recovering from Moral Injury as veterans struggle to find who they have become.[87]

Veterans from the Vietnam area forward have engaged in a different type of warfare— that makes them particularly vulnerable to Moral Injury—characterized by "ambiguous, inconsistent or unacceptable rules of engagement, lack of clarity about the goals of the mission itself, a civilian population of combatants, and inherently contradictory experiences of the mission as both humanitarian and dangerous."[88] Dr. Brown reported Mr. Ritzheimer said his morale as well as that of others in his units during both deployments began with uncertainty about their mission or purpose, and ended with ambivalence about what they had accomplished, and anger.

Although Moral Injury is not a DSM-V diagnosis, it is increasingly recognized by mental health providers working with veterans as a substantial issue that requires specialized treatment. It was part of the in-patient PTSD program that Mr. Ritzheimer completed this year. Moral Injury is an interdisciplinary construct that has been used to identify, explain and treat

---

[87]Lusk (2017), *supra n.81,* at 8-5; see also, Brown et al., *Moral Injury*, *supra n.79,* at 15; Litz et. al. (2009), *supra n.80,* at 695-706.

[88] Lusk (2017), *supra,* at 8-4 (quoting D. Wood, What have we done: The moral injury of our longest wars (2016 Boston, Little, Brown & Company); see also, Litz et al. (2009) at 696-97.

dysfunctional behaviors in veterans.[89] "Diagnostically, post-traumatic stress disorder involves experiencing or witnessing a traumatic event. Events resulting in moral injury may fit this criteria, but more specifically involve acts of perpetration or betrayal."[90] Veterans are indoctrinated during military training that troops will be deployed to defend democracy, kill the enemy, and protect civilians in the combat area of operation. Many veterans, in the aftermath of their deployment experiences, come to believe that this was not truthful. For those veterans who have taken human life, sustained injury themselves, or witnessed injury or death of their fellow Americans—for what they come to see as a false purpose—the sense of betrayal often runs deep and lasting.[91] This collective sense of betrayal is a hallmark of Moral Injury:

> Some veterans return home only to find that the [civilian] moral values they previously set aside have become leviathans, which subsequently plague the soldier or Marine for much of the rest of their lives. The motivation for setting aside one's morals, when he or she decides to join the military, is often affiliated with the political rhetoric and ideological promotion of a just war, such as to defend against the presence of weapons of mass destruction. However, some veterans develop a sense of betrayal when they discover there were no weapons of mass destruction. It was all a lie. The war was a lie.[92]

As previously noted by Dr. Brown, Mr. Ritzheimer, post-discharge, experienced feelings of betrayal, given the sacrifices he and other Marines made, only to see the Islamic State emerge in the aftermath of the Iraq war, and engage in acts of terrorism on U.S. soil.

Before the DSM-V (2013), the PTSD diagnosis did not include guilt or shame as a symptom; with that inclusion, the overlap between PTSD and Moral Injury is greater.  PTSD is

---

[89] *See, e.g.,* Masick, E.D., *Moral Injury and Preventative Law, supra n.83,* at 225.
[90] Lusk (2017) *supra n.81*, at 8-2.
[91] *See, e.g., Moral Injury Is The 'Signature Wound' of Today's Veterans*, NPR (Nov. 11, 2014), available at  http://www.npr.org/2014/11/11/363288341/moral-injury-is-the-signature-wound-of-today-s-veterans.
[92] Brown et al., *Moral Injury, supra n.79,* at 17.

generally recognized as a fear-based response to traumatic events, whereas Moral Injury can be

seen as an anger-based response:

> Whereas Posttraumatic Stress Disorder (PTSD) is typically associated with one's
> reaction to fear, MI is best viewed as a wound resulting from the violation of
> one's code of right and wrong, which by definition, meets the eligibility
> description of an invisible wound. However, just as there is no universal soldier,
> neither is there a universal type of MI. MI can be a violation of one's core cultural
> or spiritual values. MI can also be a violation of the soul.[93]

PTSD does not "sufficiently capture the moral injury, or the shame, guilt, and self–handicapping

behaviors that often accompany moral injury." (PTSD Research Quarterly Volume 23/NO.1

2012). "Guilt is a painful and motivating cognitive and emotional experience tied to specific acts

of transgression of a personal or shared moral code or expectation." In contrast, "Shame involves

global evaluations of the self, along with behavioral tendencies to avoid and withdraw."[94]

As noted by both Dr. Brown and Stanulis, Mr. Ritzheimer he feels responsible for

causing American casualties. During a "pop-up" mission, he fell asleep while driving and drove

their Humvee into a cement wall.[95] He lost consciousness, and experienced post-concussion

headaches, dizziness, disorientation and confusion. Three other Marines were injured; they

sustained concussions and more grievous injuries. This conduct also conflicted with his core

military values to protect his buddies and complete the mission. That event thus triggered both

guilt and shame. "[Military] cultural norms and values emphasize the necessity for peak

performance and moral excellence in war. Perfection is demanded, and mistakes are

unacceptable. . . . Military members are told repeatedly, 'If you make a mistake, people die,' and

---

[93] *Id.,* at 15.

[94] *Id.*

[95] A "pop-up" mission occurs on an "as needed" basis and interrupts troops normal down time
for sleep; normal down town is generally inadequate to avoid sleep deprivation, even when
uninterrupted.

'Complacency kills.' These expectations are easily violated in the fog and friction of war."[96] Dr. Stanulis identifies this event as important causative factor in Mr. Ritzheimer's PTSD and Moral Injury.

Features of Moral Injury in veterans identified through research that are not generally associated with PTSD include moral/spiritual conflict, self-condemnation, self-sabotage, low enjoyment (Anhedonia), purposelessness (Anomie), and social alienation. Shared features include depression, emotional numbing, avoidance (including isolation, aggression, self-harm behaviors, substance abuse, somatic complaints), and loss/grief.[97]

Dr. Lusk notes many scholars believe that Moral Injury is critical in the explanation of criminal behavior by veterans. She quotes Dr. Nash, who works for the Department of Defense (DOD) and VA, as stating that "if research were available, it would reveal that moral injury underlies veteran suicide, homelessness and criminal behavior." [98] Dr. Litz is quoted as saying that "all potentially morally injurious experiences create risk for demoralization and alienation, as well as altered moral expectations (informally termed a 'broken moral compass')." Research shows that Moral Injury is also related to suicide, post-deployment risk taking, difficulty with self-forgiveness, anger and relationship problems, and increased substance abuse. Thus, Moral Injury can result in diminished capacity or unwillingness to adhere to laws or values, and can result in behavior that is simultaneously symptomatic and criminal.[99] Moral Injury is relevant to understanding Mr. Ritzheimer's confused moral compass in this case.

During his intensive in-patient PTSD treatment, Mr. Ritzheimer "reported experiences from his service that he felt violated his values and experiencing difficulties with identity, and

---

[96] Lusk (2017) *supra n.81,* at 8-4.
[97] *Id.,* at 8-3.
[98] *Id.,* at 8-6, 8-7.
[99] *Id*.

depressive symptoms as a result," and his "desire to 'accept my moral injuries.'" Early in that

program, in March 2017, as recounted by the therapist:

> He recognized he was happy when he could educate people and motivate them. . .
> . He noted feeling the urge to do something important and found others'
> complacency challenging. He recognized that much of his need to act and
> motivate [people] stems from a need to make amends with his past actions,
> particularly those during his military service. Discussed how identities change
> from our experiences and that while we cannot change the past, we can learn from
> it to better understand ourselves now. [He] was receptive to looking at his
> experiences as a soldier and processing his need to make amends.

In later sessions, Mr. Ritzheimer questioned whether his acts of killing were justified,

even though the Marines gave him commendations for that conduct: "He reported feeling guilty

about this and later regretted being a 'minion' for the government. He also reported the guilt he

felt over not deploying and feeling 'weak.' [He] reported trying to make up for these experiences

and not feel these emotions." He also reported "difficulties knowing who he is now," after

leaving the military. "He noted that he has always felt a need for a greater sense of purpose in his

life," and "struggling because the current circumstances [legal proceedings and family

responsibilities] do not allow for more freedom to involve himself in a cause."

While in this program, Mr. Ritzheimer continued to be torn between his need to be part of

a larger cause and engage in self-sacrifice—which mirror his deep-seated military values—and

his need to be fully present and participate in the lives of his family—his deeply-felt value from

civilian culture:

> He reported trying to find purpose in his life that will make his family proud. He
> directly denied that he would take his own life in an act of suicide but also did not
> feel that he would grow old, as he believed that his personal sacrifice to a cause
> may cost him his life. Discussed whether one could make a lasting sacrifice
> without losing his/her life, and [he] was uncertain. [He] noted being his family's
> "rock" and described them as his "purpose." . . . . He reported "I need to get PTSD
> symptoms under control for my family."

At discharge, he still "struggled with the dilemma to either remain present for his family or return to fighting for a cause. . . . He acknowledged the need to place his family first in his life, but struggled with the need to make amends for his actions in the military." Mr. Ritzheimer "admired those who died young for a cause they believe in and, as such, make a difference in the world," and saw that as one way to make amends for past actions and "leave a legacy" for his family. He left the program with a list of continuing problems to address in outpatient treatment, "including his identity, values, and need to mourn/honor soldiers who have died in battle."

> *The evidence for the existence of moral injury is overwhelming. Moral injury causes mental torture to the very troops whose case is entrusted to American leaders. It leads soldiers to try to drown their sorrows in alcohol or the euphoria of drugs, to be involuntarily separated from the service due to disciplinary action, or to voluntarily leave the service—or the world, by killing themselves—because they feel they cannot cope anymore.*
>  --Judge Advocate Major Erik Masick, United States Army

VA records document Mr. Ritzheimer has engaged in suicidal thinking at various times over the course of many years. According to Dr. Brown's report, Mr. Ritzheimer had never considered committing suicide before entering the military, but did consider suicide while serving in the military related to his PTSD, as well as post-discharge then directly related to his problems with re-acculturation to the civilian community. Dr. Brown noted:

> Many of the veterans I have interviewed have expressed a sense of betrayal. Many experience difficulty securing gainful employment. They find that they do not fit in a university classroom. Parades, support the troops bumper stickers, and Memorial Day picnics are not sufficient recognition for these veterans who have been deployed to combat zones. One reaction to betrayal is suicide. The most recent data indicate that at least 22 veterans commit suicide each day. That equals out to about 8,030 veterans who take their own life each year.

As previously observed, this sense of betrayal which Mr. Ritzheimer endorsed is a defining feature of Moral Injury. "Moral Injury is not just psychological, and may involve healing in a

broader sense. . . . [M]oral injury-specific treatments . . . attempt to address 'moral repair' through acceptance, making amends, forgiveness, self-compassion, and reparative behaviors."[100]

Mr. Ritzheimer to date has received only short-term, limited treatment for Moral Injury as part of his in-patient PTSD program in 2017. Although he has continued making progress during intensive out-patient PTSD treatment, he has not had the opportunity to participate in out-patient VA treatment modalities specific to Moral Injury.[101] Much healing remains to be accomplished.

### *The impact of PTSD, Moral Injury and  mTBI on Mr. Ritzheimer's Offense Behavior*

An undeniable nexus exists between Mr. Ritzheimer's military service, invisible injuries and offense conduct, demonstrated not only by the defense experts' evaluations and opinions:

First, there is the temporal nexus between Mr. Ritzheimer's undesired but honorable discharge from the Marines in July 2014 after 11 years of service, his pursuit of political activism starting less than a year later in May 2015, and participation in events leading up to the Occupation starting in December 2015. By all accounts, he had not been successful in reintegrating to civilian culture in such short time, and his military values remained strong; coupled with his invisible injuries, they dominated how he perceived and reacted to the world.

---

[100] Lusk (2017), *supra n.81,* at 8-8.

[101] Dr. Lusk notes four distinct treatments specific for Moral Injury that are available through the VA in some locations: Adaptive Disclosure; Impact of Killing in War; Trauma-Informed Guilt Reductionl and Acceptance and Commitment Therapy. *Id.*



Second, there are the striking similarities between his activities during the Occupation and his duties while in the Marines. Even the Government has characterized the Occupation as a paramilitary take-over and claimed Mr. Ritzheimer was high in the chain of command. Not only did he regularly participate in "resupply" and other "convoy" missions between the Refuge post and neighboring towns as a "motor transport" driver—his most common combat duty assignment in the Marines—he also went on night-time reconnaissance drives with fellow veteran Ryan Payne, and at times stood "security detail" for LaVoy Finicum. He functioned as a Sergeant, attempting to enlist more recruits, organizing duty rosters, trying to instill discipline, and tending to the welfare of fellow protestors. Mr. Ritzheimer explains that he took "chow to the guys that were pulling watch [that] was what I was taught to do. It's called troop welfare. Those guys were sacrificing on watch so that we could sleep. I felt obligated to take care of them as if they were my junior Marines. In the Marine Corps, the junior Marine always ate first. Troop welfare is a

must in the Marine Corps."[102] He left the Refuge to return home on his own accord, once he believed law enforcement was not going to ambush the protestors, and that their message was being heard; i.e., he completed the mission.

Third, there are physical similarities between the desert terrain, his clothing and gear, and the "base camp" set up the Refuge—including barracks, a common kitchen, and command center occupied by the Bundys—with his military life in Iraq. Those environmental similarities— coupled with stress from (false) reports of a Waco-type assault on the occupiers and the militaristic presence of law enforcement—likely influenced Mr. Ritzheimer's behavior on a visceral level. Finally, as discussed in more depth below, there is nothing else in his character or background—apart from his military service and resulting injuries—to explain his aberrant, criminal conduct in this case.

Dr. Stanulis made the following findings, also supported by psychological and cognitive testing detailed in his report, which underscore the synergistic effect of Mr. Ritzheimer's invisible injuries as causation for his offense conduct:

- Mr. Ritzheimer during the November 2016 evaluation presented with symptoms of severe PTSD and Depression, as well as Moral Injury. He also, while of at least average intelligence, showed marked symptoms of problems with attention and concentration and memory. These cognitive symptoms are consistent with both PTSD and mTBI.

- Mr. Ritzheimer's symptoms of PTSD are shaped by his indoctrination into the military culture. For example, his need to protect others—here first the Hammonds, then the Bundys and their followers—even by placing himself at risk,

---

[102] His commanding officer post-deployment when Mr. Ritzheimer served as Staff Sergeant in the reserves wrote of his dedication to troop welfare, at n.12, *supra.*

is both part of the military culture and a maladaptive means ("risk-taking behavior") to manage the depression and the anxiety that is part of PTSD: Focusing his attention on a present risk avoids reflection on past trauma.

- His conduct also served as a subconscious mechanism to address his Moral Injury, fueled by the anger and anxiety that is a part of PTSD: Doing what he perceived as the right thing, to make up for the wrong things he believes he did in service. His Moral Injury, as influenced by his military cultural values, compelled him to seek out and protect the weak, and uphold the Constitution, using the skills he acquired in the military.

- His conduct was also part of his struggle to define a legacy that his children would be proud of, necessary to ameliorate the feelings of intense guilt and shame that are symptomatic of his Moral Injury, and well as his survivor's guilt that is a symptom of both his PTSD and Moral Injury: He was subconsciously driven to make up for and psychologically undo the damage he feels responsible for when he failed to be ready (i.e. strong enough) to re-deploy in 2006 due to PTSD, and for what he did during combat.

- Mr. Ritzheimer's participation in the protest of the Hammond's sentence which for him suddenly morphed into the Occupation, were driven by his military values and were expressions of his overlapping mTBI and PTSD cognitive impairments: He reacted impulsively, without hesitation or good judgment, when called upon by Ammon Bundy to help conduct the initial sweep of the Refuge. He went into a state of "high alert," and reacted in accord with his military training and experience. Remaining for the Occupation exemplifies the mission-focus trained

62

into him through his military service. He was also driven by anxiety and the need

to not fail at completing the mission, as he feels he did after his first deployment

to Iraq.

- The need to have a weapon on his person is also symptomatic of PTSD, as well as

  an artifact of military culture: Many veterans describe having a weapon as helping

  to reduce anxiety. The severity of PTSD symptoms can be monitored by tracking

  the number and placement of guns.

- Recent treatment records indicate that Mr. Ritzheimer is acquiring the skills and

  insight to recognize these issues. However, at the time of the Malheur

  Occupation, he was easy prey for those who could tap into his strong

  psychological needs to find a morally unassailable need to protect others (the

  Hammonds), and to be part of something larger than himself that would take

  advantage of his strong but not yet re-calibrated "moral compass."

- Mr. Ritzheimer's behaviors and values during the Occupation were driven by pro-

  social motivations that can be explained and understood through the lenses of his

  military acculturation and service, his combat-related mTBI and PTSD, and Moral

  Injury, rather than simple criminal intent. The contributions of his military service

  and combat injuries to his conduct in the instant offense(s) are highly significant

  and must not be overlooked.


### C.    Mr. Ritzheimer's Offense Behavior Is Not Attributable To His Pre-Military History, Pre-Existing Conditions, Or Substance Abuse.

This strong causal link between Mr. Ritzheimer's combat-related "invisible injuries" and

his offense conduct is further established by his pre-military history. Furthermore, his post-

deployment history leading up to the Occupation is one of continuing difficulties at reintegration to civilian culture; the only identifiable source for those difficulties is his military "baggage"— ingrained behaviors and values—coupled with his invisible injuries.

Mr. Ritzheimer's only mental health issue reported prior to combat-related PTSD was Attention Deficit Disorder diagnosed in the seventh grade, for which he was prescribed Ritalin.[103] He experimented with alcohol and marijuana recreationally while in high school, without adverse consequences. Prior to entering the Marines, he only drank occasionally. After joining the Marines, his alcohol consumption increased but was never problematic during service. Post-discharge he did have periods of drinking daily and to excess, which the literature establishes is common among veterans with PTSD, but that ended in February 2015. In March 2015 he began using medical marijuana (CBD oil)[104], but prior to that had not smoked marijuana since occasional use in high school. Since his release in early 2016, he has not consumed alcohol, CBD oil nor any other drugs except as medically prescribed.

His performance in school was average, but he struggled to graduate high school following his ADD diagnosis. He excelled in sports and played soccer, baseball, basketball,

---

[103] The ADD diagnosis has never been made since he reached adulthood, notwithstanding mental health screening as part of the enlistment process and numerous mental health examinations since diagnosed with PTSD. Records reflect Mr. Ritzheimer reported the childhood diagnosis to the military and VA; i.e., it was not a diagnosis missed through omission. Dr. Stanulis advised that childhood ADD may resolve on its own by adulthood; estimates in the literature range from one-half to two-thirds of childhood ADD patients do not have persistent symptoms into adulthood.

[104] Cannabidiol oil (CBD oil), is a compound from the marijuana plant which does not produce the mind-altering "high" of THC, and has been used for pain relief, anxiety disorders including PTSD; the most common side effect is tiredness; however, there is very little long-term safety data. *See, e.g.,* Jon Johnson, *CBD oil: Uses, health benefits, and risks,* (last updated 29 April 2017) Medical News Today (on-line at www.medicalnewstoday.com/articles/317221.php ); David Kohn, *A powerful new form of medical marijuana, without the high,* (Dec. 31, 2016), The Washington Post (on-line at www.washingtonpost.com/national/health-science/a-powerful-new-form-of-medical-marijuana-without-the-high/2016/12/29/81bbf7c0-b5b2-11e6-b8df-600bd9d38a02_story.html?utm_term=.50d092d15414 )/

football, track and cross-country running. Outside of school, his hobbies were skateboarding, surfing and snowboarding. He started working in construction prior to graduating high school, and continued working for the same employer, often part-time, during periods of his enlistment and while active in the Reserves. In contrast, post-discharge in 2014, he was unable to maintain steady employment; and post-deployment, he did not resume his former hobbies.

After his second deployment and while in the reserves, he attended community college and graduated with an associate degree in communication in 2011. However, his "invisible injuries" made college life stressful, as noted earlier, so he elected to not seek a higher degree. He later pursued training for a vocation as a motorcycle mechanic. He successfully completed the course, became a certified mechanic, and found work at repair shops. But he had recurring difficulties related to his PTSD, and was unemployed at the time he traveled to Oregon in late 2015.

Mr. Ritzheimer married his wife Rachel in 2007. They have experienced some marital problems, as is common for veterans with invisible injuries—including his irritability, anger outbursts, and tendency to isolate—that they continue to work through. They have remained together, and his wife has written about how his military service changed him for the worse; and how she has watched him recover over the last 18 months through devoted participation in treatment. They have two young daughters, ages 5 and 7. By all accounts, Mr. Ritzheimer is very devoted to his family.

His father abandoned their family when Mr. Ritzheimer was very young, but he reports a good childhood reared by his mother, and no acts of abuse or neglect. He maintains a good relationship with both her and his only sibling, sister Lisa. As previously noted, he has no juvenile justice history, no military disciplinary actions, and no civilian or military criminal

history apart from the instant offense. There are no reports of him witnessing or participating in traumatic events pre-enlistment.

The defense interviewed two men who have known Mr. Ritzheimer since they were classmates together in the 7th grade. Both describe him as popular, funny, energetic, and outspoken but not a troublemaker. One recalls he would stand up for people or what was right if needed. That long-standing, pro-social character trait has remained an integral part of who Mr. Ritzheimer is to this day: It contributed to his decision to join the Marines. It continued during his military service, as many fellow service members attest. And it led to his later involvement in political activism resulting in arrest—only by then misguided by his "confused moral compass." Another friend from that period, who was a couple of years ahead of Jon in school, recalled the same traits, and also described him as having a lot of patience, and attending church regularly. He said when Jon decided to join the Marines, he was worried for him, but Jon said he felt it was the right thing to do in the aftermath of 9/11, and that he wanted to serve and do something big with his life.

## II.  Mr. Ritzheimer's Extraordinary Post-Offense Rehabilitation Efforts, Along With Other Factors, Evince A Very Low Risk Of Recidivism; His Substantial Progress In Reintegration Will Be Undermined By Incarceration.

Mr. Ritzheimer left the Refuge to return home on his own accord, once he believed law enforcement was not going to ambush the protestors, and that their message was being heard; i.e., he completed the mission. He voluntarily surrendered to authorities upon being notified of the warrant for his arrest. He remained in custody for over 60 days before being granted release. His PTSD symptoms were exacerbated by the killing of LaVoy Finicum after Mr. Ritzheimer had "left his post" to return home, and through the experience of being incarcerated. He was

released on conditions to resume treatment with the VA, but not compelled to seek intensive treatment.

Simply acknowledging invisible injuries is difficult for most veterans, much less expending the time and energy to embrace the stigma of mental health treatment. Dr. Brown explained:

> It is my understanding that Jon elected not to use his PTSD diagnosis as any form of defense in this case. He is not unlike many other veterans who continue to subscribe to the military culture's proclamation that those who claim PTSD are weak. While the military claims this is not how their culture projects PTSD, or TBI for that matter, the reality is quite different. It is not uncommon for veterans to ignore PTSD until they find themselves risking family relationships or becoming entangled in the criminal justice system. Many veterans resist allowing any form of mental health diagnosis to be conducted. Today, for example, if one looks inside the mental health section of the Veterans Hospital in Portland, Oregon, they will find veterans from the Vietnam War to the current generation of new veterans. Many waited most of their lives to come to the realization that war leaves invisible scars that are often hard to identify; and when they are identified those scars remain hard to accept. There is considerable research to validate this claim.

In addition, obtaining adequate mental health treatment from the VA has historically been difficult due to lack of culturally-competent providers and resources, as documented earlier, although more recent articles attest to additional appropriations and efforts to improve the system. A fellow Marine who deployed with Mr. Ritzheimer in Iraq and stayed in touch post-discharge, said Jon took his PTSD diagnosis seriously, and would get upset with the VA because of delays in getting treatment.[105]

---

[105] The Institute of Medicine, National Academies, *Returning Home from Iraq and Afghanistan, supra n.5*, noted "serious concerns about inadequate and untimely clinical followup and low rates of delivery of evidence-based treatments, particularly psychotherapies to treat PTSD and depression. . . . Unwarranted variability in clinical practices and deviations from the evidence base present threats to high-quality patient care. . . ." Also noted was "excessive wait time" and "poor availability and misdistribution of mental-health specializes in many parts of the United States". *Id.*

Finally, given that PTSD is an avoidance-based disorder, and most treatment involves repeated exposure and discussion of the traumatic events and resulting distress, it is common for veterans who start treatment to drop out. Studies document that of veterans who sought any psychological and/or pharmacotherapy treatment for PTSD, 24% had dropped out of care within the first 6 months, 22% had only one visit in 6 months, and only 52% had "minimally adequate care," defined as 4 or more visits in 6 months. In the largest study to date of veterans involved in the specific, intensive out-patient treatment that Mr. Ritzheimer successfully completed, "Prolonged Exposure Therapy," only 2% of participants completed the minimum number of sessions considered necessary for "adequate care."[106]

### *Mr. Ritzheimer's Post-Plea Treatment Progress*

Not long after his change of plea in August 2016, once Mr. Ritzheimer had stopped focusing on the battle of going to trial, he sought weekly PTSD counseling services at the VA; previously while on release he was only seeing the psychiatrist for periodic check-ups and medication management. He went to the closest VA counseling center, West Valley Vet Center, for intake on August 25th, and not too long after started in weekly counseling with an individual therapist; he also began seeing his psychiatrist about once every four weeks, rather than once every 6 weeks as had been standard.

As of September 2016, following his annual "Compensation and Pension" evaluation, it remained "not possible to delineate PTSD/TBI neurobehavioral symptoms due to symptom overlap." That same document reported persistent, negative alterations in cognitions and mood, and marked alterations in arousal and reactivity including irritable behavior and angry outburst,

---

[106] L. Najavits, *The problem of dropout from "gold standard" PTSD therapies,* (2015; National Library of Medicine), available on-line.

hypervigilance, exaggerated startle response, problems with concentration and sleep disturbance, consistent with moderately severe PTSD.

In his first session with his VA psychiatrist post-plea, on September 27, 2016, records reflect that Mr. Ritzheimer was in weekly individual counseling sessions, working on his relationship with his wife, and spending more time with his daughters. Those records further note: "Feels overwhelmed at times because of the legal charges pending . . . He continues to have significant PTSD symptoms. . . . Sleep is poor. . . Some ruminating thoughts." He was taking Wellbutrin for mood as prescribed. At his October 27th appointment, they discussed "residential treatment for PTSD and moral injury," and a social worker was assigned for assistance in lining up residential treatment.

The psychiatrist prepared an "interdisciplinary treatment plan" on November 17, 2016, setting goals for Mr. Ritzheimer with the objective of reducing the negative impact of PTSD has on his daily life and developing traits of resiliency and adaptability, progress to be reviewed in 12 months.  Next seen on December 23, 2016, his psychiatrist noted:

> Mood has been down a bit more lately—anniversary of when he was in Oregon. Started remodeling his kitchen to keep his mid occupied. Feels overwhelmed. Level of energy is low. Wife recently started working—he is doing more of the routine with his children (getting them to school). Some panic attacks. Feels like he does not have enough time in the day to do everything. He feels very stressed being in the city—too many people. He is at the West Valley Vet Center every week—seeing an individual therapist. He continues to have significant PTSD symptoms. . . . Motivation is improving a bit.

 Similar findings are reported at his next meeting with his psychiatrist in late January 2017. At that time, the social worker completed the pre-admission screening application for residential treatment, and in late February, received word for an admit date of March 7th.

Mr. Ritzheimer's in-patient treatment and ongoing intensive outpatient treatment as reflected in those records and discussed in Dr. Stanulis' report, are summarized as follows:

Mr. Ritzheimer was admitted to the VA American Lake PTSD program on March 7, 2017, where he actively engaged in treatment as well as being an active member of his dormitory community. He also engaged in Adaptive Disclosure treatment for Moral Injury. This was shifted to Trauma Informed Guilt Reduction work with focus on values, as Mr. Ritzheimer noted struggling most with his conflicting feelings about his military service, and his need to leave a "legacy" for his children. He completed the PTSD program on April 6, 2017, having made "moderate progress." He reported at discharge, "I've got my book of tools," and had been using them to cope with symptoms.

Mr. Ritzheimer returned home and soon commenced intensive, out-patient PTSD treatment through the VA in Phoenix. He started a course of Prolonged Exposure therapy (PE) on May 16, 2017, involving individual sessions with a psychologist and "homework," generally once a week. As documented by Dr. Stanulis, within a couple of months he had resolved his issue about leaving a legacy for his children by deciding the best legacy he can leave is through being their father and involved in their lives, rather than making a heroic sacrifice of himself for a cause. He also desired to provide for his family without dependence on disability benefits, so he opened his own motorcycle repair shop in June 2017. He said that he no longer wants to be a political activist at the forefront of a movement. He plans on channeling his energy into treatment, working, and family, rather than fighting for a larger cause.

Mr. Ritzheimer continued to experience more severe symptoms at "anniversary dates" of the deaths of Marines he knew in combat. The in vivo exercises required by his PE therapy aggravated his symptoms and he voiced concerns that "I can't stick with it," but he did. He successfully completed the nine sessions on August 14, 2017, remarking "I can move on with life," and "I have come a long way." He said he no longer felt blood on his hands, and that his

participation in the church "helped me to press through" with treatment. Near the completion of treatment he burned his combat fatigues, described in his counselor's notes as "liberating" for him. Dr. Stanulis noted, "This ritualistic burning indicates that he is making good progress in the task of leaving his combat Marine identity behind, grieving his losses from combat, and moving on into the role of civilian, father, husband, and citizen."

Meeting with his psychiatrist on August 21st, Mr. Ritzheimer reported only brief, transient periods of depression, improved sleep, and that his anxiety had been manageable. He continued to experience "some baseline PTSD symptoms including hypervigilance, intrusive thoughts, and difficulties tolerating crowds of people; some anger at times . . . no aggressive behavior." His mental status examination at that time evinced "logical and goal directed thought processes," "adequate impulse control," and "good judgment and insight." Concerns about sentencing in his criminal case remained a source of stress affecting symptom management. During a follow-up PE session on September 18th, his therapist observed Mr. Ritzheimer had maintained his gains from PE, and would like to work on his marriage now and requested couples counseling.

Dr. Stanulis noted Mr. Ritzheimer is currently progressing well in treatment. His scores on scales measuring depression and PTSD severity have declined, indicating that treatment is being successful. Treatment has addressed the fears, shame and guilt that fueled the self-destructive and suicidal ideation that are part of his PTSD and Moral Injury, and contributed substantially to his offense conduct.

Dr. Stanulis concluded, "Mr. Ritzheimer's prognosis is good. He is pro-social in orientation and has excellent self-discipline." Further, Mr. Ritzheimer's "diagnosis of Alcohol

Abuse remains in remission and he no longer feels a compulsion to drink alcohol, which is frequently a complicating factor for a favorable prognosis."

### _Mr. Ritzheimer's Strong Support Network Of Family And Friends_

Mr. Ritzheimer's support network includes family, friends, and more recently members of his church where he and his wife have been active as a couple since August 2016. According to Dr. Stanulis, as well as the literature on recidivism, "a strong support network of family and friends has a demonstrated positive influence on recovery."

The defense interviewed two members of his congregation, and both have observed positive changes in Mr. Ritzheimer's behavior over the past year that corroborate Dr. Stanulis' conclusions of a good prognosis. One is Zachary, the leader of a small bible study and prayer group that Mr. Ritzheimer started attending last August. He said at first Jon was closed and standoffish. It wasn't until around November 2016 before he saw Jon started to change and open up more: He started to talk about the things he was going through with the court, he was really concerned about the effect the case had on his marriage, and he was very concerned about the effect it would have if he went to prison.

Zachary has been working with him on how he reacts to situations. Mr. Ritzheimer had expressed that he is very frustrated by injustice, and when he sees wrong he feels he has to act on it immediately. Zachary said that he and the other members of the group have really talked to Jon about how no one likes injustice, but that a more effective approach is to stop and analyze situations, putting thought into finding the best resolution. Over the months he has worked with Mr. Ritzheimer, Zachary has seen a real change: Jon has really opened up to other ideas about how to deal with things, and he's open to discussions instead of thinking his immediate reaction is the right one.

72

Overall, Zachary said he has been very impressed with Mr. Ritzheimer and the positive changes he's made over the months, and that he has a lot of support. He was even more impressed because of Jon's military background, and believes it is difficult for people from that background to change. He remarked that a lot of military people turn to drugs or alcohol to deal with their issues, but Jon has made it a priority to participate in this church group.

Noah is in the church men's group, and met Mr. Ritzheimer last August. He also served more than 11 years as a military police officer in the U.S. Army, did tours in Iraq and Afghanistan, and was discharged 3 years ago. He said from experience that there is a difficult adjustment when someone is discharged from the military, because you are trained to take action in response to situations, especially when you think an injustice has occurred. He added that the manner you are trained to respond with is typically with force, and to take the most direct path to try and counter the injustice. When someone like him or Mr. Ritzheimer is discharged, it is hard to cope and understand that you have to suppress that desire to react, because the world doesn't see things the way you were trained to by the military.

Noah said Jon had troubles with that adjustment, and that he had directed his energies "in the wrong way." He said they have had many conversations about civilian life, adjusting to it, and how civilians aren't trained like they are to react a certain way to situations. Noah said he's been helping Jon develop coping mechanisms for his PTSD symptoms. One way that seems to be working for Mr. Ritzheimer is their religion.[107] Noah said that since Jon has started coming to church, he's been helping him learn how to live his life the way the Bible sees it. Mr. Ritzheimer

---

[107] The 2011 Pew Center study, *supra n.43*, found that for post 9/11 veterans, having high levels of religious belief, as measured by frequent attendance at religious services, "dramatically increases the odds that [the veteran] will have an easier time readjusting to civilian life."

has been learning to love people, not fight them, and Noah has observed many positive changes over this past year, including in his relationship with his wife and daughters.

Noah said that early on he heard there was a lot of information about Mr. Ritzheimer on the Internet but he waited some time to Google him. When he did, he was surprised because the person that is on the Internet and in videos isn't at all the person he interacts with today. Noah said that Mr. Ritzheimer has found a new base of beliefs to help guide him, and the changes he's observed in him have been both drastic and for the better.

### *Mr. Ritzheimer's Efforts To Become Self-Sufficient And Contribute To His Community*

Within about two months after discharge from the in-patient PTSD program, Mr. Ritzheimer launched his own motorcycle repair shop in a commercial space. Known as Gremlin Garage, the business has gotten off to a good start with Mr. Ritzheimer as the sole "employee," and income has been paying the costs of operation, although without much profit. His goal is to make sufficient income to cease dependence on VA disability benefits. How long that will take cannot be predicted, but additional incarceration will kill this component of his reintegration strategy. He had "an amazing month" in July, that enabled his shop to be a Sponsor of the Toys for Tots Ride in Arizona, and it will be one of the stops for the event. Mr. Ritzheimer was very active in the Marines Toys for Tots program while in the reserves.

### *Mr. Ritzheimer's Pre-Approval To Enter The Veteran's Program In Arizona US District Court*

The District Court in Phoenix operates the "Veteran's Program" treatment court, open to veterans on probation or supervised release for qualifying crimes. Its goals are "to honor past commitment and service, address the veteran's unique circumstances and issues, and reduce the likelihood of reoffending." The treatment program's structure and design is similar to the Re-entry Court program in Oregon, and it meets monthly under the supervision of a district court

judge. Veterans' court programs operate in various jurisdictions, state and federal, around the nation (including in some Oregon circuit courts), and are generically called "veteran treatment courts" (VTC). These programs "are one solution to the growing problem of the 'justice-involved vet,' that is, a veteran who finds him- or herself involved in the civilian criminal justice system after getting discharged from the military." VTCs recognize that veterans "are a unique subpopulation of defendants who could benefit from a specialized problem-solving court tailored to their unique needs and common culture."[108]

Ninth Circuit Judge Michael Daly Hawkins, a former U.S. Attorney and Captain in the Marine Corps, advocates for increasing access to VTCs, observing:

> The focus is on treatment, not punishment, and on getting at the root cause of anti-social behavior. For veterans, it is the cycle of their experience from civilian life, to the regimentation of military life with all its attendant support, to the intensity of life in a combat zone, then to what may be a rather swift and unsupported return to civilian life. Similarly, the veterans court concept begins with an understanding that routine criminal punishment will not address the participant's underlying problem and that early intervention and intensive supervision is essential to long-term success. The veterans concept adds an importantly tailored element: that those who have a shared experience, other veterans, offer the most easily accepted and effective "tough love" support. Then there is the very serious cost of doing nothing. Suicide rates among returning veterans are alarmingly high and increasing every year. A returning veteran's deployment experience can cause domestic difficulty to spiral into violence and minor brushes with law enforcement into deadly clashes. [109]

Mr. Ritzheimer, on his own initiative, attended the May 2017 session of the Veteran's Program at the U.S. District Court in Phoenix as an observer. Afterwards he spoke with one of the US Probation Officers who staffs the program, and was told he would be accepted if his probation or supervised release is courtesy-transferred to Arizona. He is enthusiastic about

---

[108] K. Huskey, *Reconceptualizing 'the Crime' in Veterans Treatment Courts,* Federal Sentencing Reporter (2015).

[109] Michael Daly Hawkins, *Coming Home: Accommodating The Special Needs of Military Veterans To The Criminal Justice System*, 7 Ohio St. J. Crim. L. 563, 570 (Spring, 2010)(hereafter referred to as Hawkins, *Coming Home*).

participating in the program based on what he observed. Undersigned counsel confirmed through US Probation that Mr. Ritzheimer would be accepted into the program if he elected to participate; like our Re-entry Court, he may be ordered to observe as a condition of supervision, but not ordered to participate. He will definitely participate once given the opportunity.

This program should prove very beneficial to Mr. Ritzheimer's continuing efforts to reintegrate to civilian society. Beyond the support and understanding of veteran's issues that would be expected from this program's staff, the program itself speaks to the government's recognition of veterans' service, sacrifice, and the struggles they endure upon returning home. Being granted the opportunity to participate in that program, without the grave hardship of additional incarceration, could only help lessen Mr. Ritzheimer's Moral Injury which is fueled by feelings of betrayal by his government.

### *Mr. Ritzheimer's Extraordinary Post-Offense Rehabilitation Efforts And Other Factors Establish A Low Risk Of Recidivism*

The following factors combine to demonstrate that additional incarceration is not necessary to protect the public, due to Mr. Ritzheimer's very low risk of recidivism:

- Mr. Ritzheimer has no prior nor post-offense history of law violations, nor any pre-existing mental or emotional conditions associated with criminal behavior.[110] He is engaged in treatment for his combat-related invisible injuries that are associated with law breaking, and making good progress.

---

[110] Considerable research shows a statistically low risk of recidivism for "true first offenders" like Mr. Ritzheimer. *See* U.S. Sentencing Commission, Recidivism and the "First Offender", May 2004 *available at* http://www. ussc.gov/publicat/recidivism_ firstoffender.pdf. Based on empirical research, the commission found that a defendant with no prior arrests nor criminal history has only a 6.8 percent chance of recidivism. *Id.* This was the lowest rate of recidivism of any group in the study and sharply lower than the rate of those defendants with prior arrests but no convictions (17.2 percent) or defendants with one criminal history point (22.6 percent).

- He has a brief history of alcohol abuse symptomatic of untreated PTSD, but has not abused alcohol since early 2015, and has consumed no alcohol since early 2016. He has never abused illegal drugs nor prescribed pain medication.[111] Substance abuse disorders can contribute to criminal conduct and make treatment more difficult. Mr. Ritzheimer has a clear advantage due to not being so afflicted.

- Mr. Ritzheimer has done what far too few veterans with his invisible injuries have done, by seeking and completing all treatment opportunities post-offense.[112] While his treatment needs continue, treatment is proving effective. Because of the direct correlation between his offense conduct and his military service and resulting invisible injuries, successful completion of treatment—undisrupted by incarceration—is of much greater consequence to decreased risk of recidivism than for offenders with treatment needs lacking as clear a connection to their criminal conduct.

- Mr. Ritzheimer's post-plea efforts over the past year to reintegrate into civilian culture have been substantial and successful; i.e., he is clearly on the right track. He is focused on his family, his new business, and his treatment. He is involved in church and community service activities.

---

[111] PTSD is commonly associated with substance abuse and hazardous use of alcohol. Institute of Medicine of the National Academies, *Treatment for Posttraumatic Stress Disorder in Military and Veteran Populations: Initial Assessment*, 322 (2012), available for free download at http://www.nap.edu/catalog/13364/treatment-for-posttraumatic-stress-disorder-in-military-and-veteran-populations (last accessed 4/2/17).

[112] A 2014 RAND National Defense Research Institute report, *Mental Health Stigma in the Military,* noted "Despite the efforts of both the U.S. Department of Defense and the Veterans Health Administration to enhance mental health services, many service members are not regularly seeking needed care when they have mental health symptoms or disorders," and discussing military task force recommendations for stigma-reduction efforts as "a primary strategy for DoD to increase help-seeking of service members," with the "longer-term goal of promoting quality of life and well-being among service members." Available at www.rand.org/content/dam/rand/pubs/research_reports/RR400/RR426/RAND_RR426.pdf .

- Mr. Ritzheimer's promotions in military rank recognized his increasing degrees of responsibility and teamwork in stressful situations. He has no history of violence apart from his military service. He is dependable and pro-social by history and nature. He is a trustworthy, disciplined person., as attested to in defense interviews and letters to the Court from those who have known him in all walks of life. He will comply with all terms of supervision when sentenced, just as he has done pretrial.

- Mr. Ritzheimer enlisted in the aftermath of 9/11, voluntarily heading into harm's way to defend his country. He chose a path that few of his fellow citizens chose in response to this foreign terrorist attack on America soil. He is a patriot. Post-discharge he has continued to act honorably and has accepted responsibility for his offense conduct.

Dr. Stanulis opines that incarceration would interfere with treatment, noting there are no combat-related PTSD or Moral Injury treatment programs in BOP facilities; and that treatment is the key element in assisting Mr. Ritzheimer's re-acculturation into the civilian world and preventing recidivism. "Interrupting his treatment is strongly contraindicated given his excellent progress to date."

Furthermore, both anecdotal reports and research show that incarceration exacerbates the symptoms of PTSD.[113] A veteran defendant with PTSD may request solitary confinement to avoid interaction with other inmates, knowing extended contact could trigger anger outbursts, or increased anxiety and hypervigilance resulting in greater stress and worse insomnia. However, it

---

[113] See, e.g., Quill Lawrence, NPR, "Behind Bars, Vets With PTSD Face A New War Zone, With Little Support" (11/5/2015), available at http://www.npr.org/2015/11/05/454292031/behind-bars-vets-with-ptsd-face-a-new-war-zone-with-little-support (last accessed 3/31/17); Saxon, Davis, Sloan, McKnight, McFall & Kivlahan, "Trauma, Symptoms of Posttraumatic Stress Disorder, and Associated Problems Among Incarcerated Veterans," Psychiatry Online (July 2001), available at http://ps.psychiatryonline.org/doi/abs/10.1176/appi.ps.52.7.959 (last accessed 3/31/17).

is well-established that solitary confinement can both cause mental illness, and exacerbate pre-existing mental health conditions.[114]

Thus, incarceration would likely return Mr. Ritzheimer to society far more damaged than now, with more severe PTSD and Moral Injury. His business would be lost, his wife and daughters left without his support, and his VA benefits which pay the mortgage, put food on their table, and help keep the business afloat during slow times, would terminate after the first 60 days of imprisonment. All of his successful steps towards reintegration would be severely damaged or destroyed. There are other, safer and smarter ways to hold him accountable for his criminal conduct, as discussed below.

## III.   Legal And Policy Grounds Supporting Downward Departure Or Variance.

The Supreme Court in *Porter v. McCollum, supra,* made clear that military service and combat-related injuries could mitigate culpability for sentencing purposes. When men and women of good character have risked their lives to fight as our proxies, and return home with injuries that lead them afoul of the law, there arises a moral duty to do them no more harm than is necessary to protect the public. They deserve restorative justice:

> The breadth and depth of the challenges faced by military service members and veterans who served in Iraq and Afghanistan result from the complex interaction of issues that must be addressed by primary prevention, diagnostics, treatment, rehabilitation, education and outreach, and community support programs if readjustment after combat service is to be successful.[115]

---

[114] *E.g.,* Joshua Manson, "New Report Documents Devastating Effects of Solitary Confinement on Mental Illness," Solitary Watch website (September 2016)(with links to report and related articles),   http://solitarywatch.com/2016/09/09/new-report-documents-devastating-effects-of-solitary-confinement-on-mental-illness/ (last accessed 3/31/17).

[115] *Returning Home from Iraq and Afghanistan, supra n.5.*

### _Military Service As A Departure/Variance Ground_

> _There is widespread public acceptance of the notion that military veterans should be treated differently in many respects from their civilian counterparts. As a consequence, veterans receive medical care, educational support, and employment preferences not available to their civilian counterparts. This acceptance may be attributable to a general respect for the sacrifice of members of an all-volunteer force and the knowledge that today's veteran may have been subjected, even repeatedly subjected, to life-threatening events the general public may never know._ [116]

In _Porter v. McCollum,_ the Supreme Court identified two separate bases for leniency that, depending on the individual veteran, could exist either singularly or combined: (1) our social contract with service members who have signed up to risk their lives for ours, i.e., "in recognition of their service"; and (2) the impact of military service when it makes veterans "traumatized [and] changed", "declared relevant to assessing a defendant's moral culpability" for his crime. 130 S.Ct. at 448 & 454. Although _Porter_ concerned military service as mitigation in a death penalty case, its dicta regarding military service as mitigation has been widely cited in non-capital cases. Moreover, the Guidelines Commission cited _Porter_ as its primary support for changing its view on military service as a ground for downward departure. U.S.S.G. §5H1.11, Military Service, deals specifically with only the first basis for leniency identified by _Porter_, "in recognition of their service."

The Guidelines Commission amended §5H1.11 specifically to make military service a relevant circumstance for downward departures, where it had previously been listed along with public service and similar good works as ordinarily not relevant. "The Commission determined that applying this departure standard to consideration of military service is appropriate because such service has been recognized as a traditional mitigating factor at sentencing." Historical Notes, 2010 Amendments. This policy statement provides:

---

[116] Hawkins, _Coming Home, supra n.109,_ at 569.

> Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.
>
> Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.

The defense has been unable to find case law addressing a downward departure based on military service under the amended guideline. This is likely due to courts utilizing downward variances as opposed to departures *post-Booker,* and the limited number of veteran defendants whose cases result in appeals, given that most federal cases are resolved by plea agreements and the prevalence of appellate waivers. However, this revised recognition of military service as an encouraged versus discouraged ground for departure denotes military service as an important consideration for mitigation based on the "history and characteristics of the defendant" under 18 U.S.C §3553(a).

Moreover, there is case law approving downward departures for military service—and in the absence of PTSD or other invisible injuries—prior to the 2010 amendment of §5H1.11. One district judge carefully explained the rationale in finding that a defendant's exceptional military record was a factor that warranted departure to straight probation, without any community confinement:

> This Court is of the opinion that a person's military record is a relevant factor to be considered at sentencing, because it reflects the nature and extent of that person's performance of one of the highest duties of citizenship. An exemplary military record, such as that possessed by this defendant, demonstrates that the person has displayed attributes of courage, loyalty, and personal sacrifice that others in society have not. Americans have historically held a veteran with a distinguished record of military service in high esteem. This is part of the American tradition of respect for the citizen-soldier, going back to the War of Independence.
>
> In ignoring a defendant's military service record, the Commission has done a disservice (albeit unintentional) to those ex-service men and women who have

served their country faithfully in time of war or other need, and who later find themselves brought before a federal court on criminal charges.

*United States v. Pipich,* 688 F.Supp. 191, 192-93 (D. Md. 1988)(involving theft of mail by postal employee). The Fifth Circuit upheld the district court's downward departure in an armed bank robbery case based solely on "extended, exemplary military record [including "time in a combat theater", that] reflects a positive contribution to society." *United States v. Henley*, 50 F.3d 1032, 1995 WL 1032 (5th Cir. 1995)(not selected for publication).

The Eight Circuit suggested that a downward departure for military service under the earlier policy statement required exemplary military service in combat, rather than merely commendable military service that did not demand great personal sacrifice. *United States v. Neil,* 903 F.2d 564, 566 (8th Cir. 1990)(while military service could constitute grounds for downward departure in an unusual case, military service consisting of 11 years of duty in the U.S., mainly as a recruiter, is not meaningfully distinguishable from persons holding responsible positions in the civilian work force).[117] Mr. Ritzheimer's military service would meet the Eighth Circuit's test in *Neil*, as his two tours of combat duty demanded great personal sacrifice, not only by risking his life, but also continuing sacrifice from sustaining chronic physical and psychological injuries that plague him to this day.

The Second Circuit approved a downward departure under the guidelines based on the defendant's military service along with other personal characteristics. *United States v. Canova,* 412 F.3d 331, 358-59 (2d Cir. 2005)(affirming 6-level downward departure to one year probation

---

[117] *Cf., United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming 4-level departure to probation in securities fraud and tax evasion case based on defendant's good works where defendant did not simply donate money to charity but organized and ran youth football team in depressed area and helped members attend better schools which qualified as exceptional because they entail "hands on personal sacrifices which have a dramatic and positive impact on the lives of others.").

in multi-million dollar Medicare fraud case, based on extraordinary public service and good works where defendant, more than twenty years before sentencing, served in Marine Corps' active reserves for six years, and as a volunteer firefighter, and more recently had acted as Good Samaritan demonstrating his commitment to helping persons in distress was an instinctive part of his character.).

More courts have granted downward variances in recognition of a defendant's military service. One district court judge discussed the amended §5H1.11, and found that while the defendant's exemplary military service did not support a downward departure,[118] it did support a substantial variance—from 78 to 46 months imprisonment in a child pornography case:

> While Jager does not fall outside of the heartland of cases, his military service is relevant to granting him a variance. His service, with the exception of this crime, has been superior and uniformly outstanding. In his military service, Jager appears to have been trustworthy, and dedicated, and he served with distinction. His colleagues and commanders wrote on his behalf, commenting on his integrity and good work ethic. He made a career of the military, rather than serving one or two terms. These considerations counsel the Court to vary downward. The Court realizes he has brought shame upon the military with his crime, but with the exception of his crime, he has served with honor, and the Court thinks his service justifies a considerable variance from the guideline sentence.

U.S. v. Jager, 2011 WL 831279, at *14 (D.N.M. 2011).

There is Ninth Circuit case law, as well as opinions from other circuits, recognizing a downward variance is warranted based on military service in combination with other factors— and in the absence of "invisible injuries" that would reduce moral culpability for the crime. *See, e.g., United States v. Carper*, 659 F3d 923 (9th Cir. 2011)(variance affirmed where the defendant, a Marine, violated the Arms Export Control Act; the sentencing court granted the variance based

---

[118] The court reasoned (1) that "Jager's military service, while exemplary, is not one of intense combat," (only once under fire; served in support roles); and (2) that he was like many child pornography offenders who "are outstanding members of our society, but they live a secret life." U.S. v. Jager at *11.

on Carper's military service and little to no likelihood of recidivism)[119]; *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009)(finding defendant's prior military service, advanced age and health issues, and lack of prior record could support downward variance even if it didn't support formal departure); *United States v. Baird*, 2008 WL 151258 (D. Neb. Jan. 11, 2008) (The district court considered the defendant's 15-year military career, low risk of recidivism, and lack of criminal history as factors for a variance from 63 months to 24 months prison in child pornography case).

In *United States v. Howe,* 543 F.3d 128 (3d Cir. 2008), the Court affirmed the district judge's variance from the guidelines' 18-24 month range to probation with 3-months home confinement in a wire fraud case—characterized by the Government as "a two-year campaign to cover up a six-figure fraud on the Air Force." The district court found the crime to be an "isolated mistake" in the context of Howe's entire life, which was otherwise upstanding and included 20 years of military service in the Air Force, devotion to family, community, and church. The Government appealed. The Third Circuit specifically addressed Howe's military service as a ground for variance:

> Another justification was Howe's twenty years of military service followed by honorable discharge. The Government brushes that justification aside with the conclusory averment that this factor does "not meaningfully distinguish Howe from other defendants. . . ." But the Government cites no evidence that most defendants, white-collar or otherwise, in fact have lengthy and positive records of past military service, whereas it is the Government as appellant whose burden it is to establish that a sentencing factor is unreasonable. Further, the argument that any military service must be "exceptional" is not suitable to our review of a district court's analysis under §3553(a).
> Indeed, the Supreme Court included military service as a reason to affirm the district court's below-Guidelines sentence in *Kimbrough v. United States,* 128

---

[119] The Ninth Circuit's decision does not recite all of these facts, which are taken from *Case Annotations and Resources: Military Service USSG §5H1.11 Departures and Booker Variances,* prepared by The Office of General Counsel, U.S. Sentencing Commission (Jan. 2012), (hereafter referred to as *Case Annotations §5H1.11*), available on-line.

S.Ct. 558, 575, 169 L.Ed.2d 481 (2007) ("he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps, and that he had a steady history of employment"). While this consideration alone might not be enough to warrant the downward variance to probation in this case, *Kimbrough* makes clear that it may be considered as one of the factors.

543 F.3d at 139.

Although courts must give consideration to military service when called upon to do so, either for downward departure or, as in Mr. Ritzheimer's case, for purposes of downward variance, imposing a lower sentence on that ground remains discretionary. As demonstrated by case law cited above, courts have substantially reduced sentences below the advisory guideline range—going from prison to probation—when the defendant was convicted of a non-violent offense and had demonstrated exemplary military service. *Pipich, supra; Canova, supra; Cooper, supra; Howe, supra.* Mr. Ritzheimer's case falls squarely in that category. Most commonly, courts have declined to reduce sentence when the defendant was convicted of a crime of violence or other serious offense, had prior criminal history, or had not served courageously in combat.[120]

Thus, Mr. Ritzheimer's exemplary military service at great personal sacrifice should serve to substantially reduce his sentence from the advisory guideline range, regardless of whether his combat-related injuries also contributed to his criminal conduct. Simply put: his distinguished service, especially his 14 months on the ground in combat zones with much of that time spent "outside the wire"[121], warrants leniency in recognition of his personal sacrifice on

---

[120] See *Case Annotations §5H1.11, supra.*

[121] Iraq combat veterans, including Mr. Ritzheimer, experienced "130 degree temperatures, unrelenting noise, lack of privacy, and the constant threat of being attacked by mortar rounds, rocket propelled grenades, or biological and chemical agents," blinding sand storms and other unsanitary living conditions. *Id.,* at 4.

behalf of us all, *Porter v. McCollum, supra,* particularly given the absence of aggravating factors

that have led courts to not grant leniency for such service.

### Mental And Emotional Conditions As A Departure/Variance Ground

> *To deny the frequent connection between combat trauma and subsequent criminal*
> *behavior is to deny one of the direct societal costs of war and to discard another*
> *generation of troubled heroes.*
> *                *           *           *           *
> *For soldiers, mental trauma and debilitating stress are part of the job description.*
> *When veterans go astray, they deserve every reasonable effort to get them back*
> *where they began: clean, sober and on the right side of the law.*[122]

"'PTSD is the only [mental] illness [that has] a clear etiologic[al] relationship to military

service' and it has been demonstrated that being exposed to war-zone stress can lead to life-

lasting impairment."[123] No doubt those facts have contributed to the courts' increasing

receptiveness to combat-related trauma for mitigation of sentence.[124] Senior U.S. District Judge

John L. Kane, who has encouraged reforms to confront the problem of sentencing veterans with

untreated mental conditions, noted: "We dump all kinds of money to get soldiers over there and

train them to kill, but we don't do anything to reintegrate them into our society."[125] When

returning veterans with no prior criminal history run afoul of the law, federal judges have the

---

[122] National District Attorney's Association Resolution 26b (2010), *available at* http://www.nadcp.org/sites/default/files/nadcp/NDAA%20Endorsement_0.pdf . The first paragraph of this bi-part quotation are words of a defense attorney, excerpted from another article.

[123] Robert Rosenheck & Alan Fontana, *Changing Patterns of Care for War-Related Post-Traumatic Stress Disorder at Department of Veterans Affairs Medical Centers: The Use of Performance Data to Guide Program Development*, 164 MILITARY MED. 795, 795 (1999).

[124] *See, e.g.,* F. Don Nidiffer & Spencer Leach, *To Hell and Back: Evolution of Combat-Related Post Traumatic Stress Disorder*, 29 Dev. Mental Health L. 1, 16 (2010) ("[The] legal system has begun to view combat-related PTSD as an important mitigating factor when assessing culpability, as well as the growing acceptance within the legal system and society of this diagnosis and its impact."); Amir Efrati, *Judges Consider a New Factor at Sentencing: Military Service*, Wall St. J. (Dec. 31, 2009) at A14; Debra Cassens Weiss, *Judges Cite Wartime Stress in Granting Leniency to Veterans*, A.B.A.J. (Mar. 17, 2010), ww.abajournal.com/news/article/judges_cite_wartime_stress_in_granting_leniency_to_veterans.

[125] Amir Efrati, , *supra n.124.*

power pursuant to 18 U.S.C. §3553(a) to structure sentences that facilitate rehabilitation and reintegration. *E.g., United States v. Brownfield,* Case No. 08-cr-00452-JLK (D. CO.)(Memorandum Opinion and Order on Sentencing, Dec. 18, 2009)(Kane, J., noting "this case involves issues the Sentencing Guidelines do not address regarding the criminal justice system's treatment of returning veterans who have served in Afghanistan and Iraq.").[126]

More than a decade earlier, the Ninth Circuit held that combat-related PTSD was the type of "mental condition" that would qualify a defendant for a downward departure for "diminished capacity" under U.S.S.G. §5K2.13. *United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993).[127] "The court's inquiry into the defendant's mental condition and the circumstances of the offense must be undertaken 'with a view to lenity, as section 5K2.13 implicitly recommends.'" *Id.,* at 1511 (citation omitted). "Lenity is appropriate because the purpose of §5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime." *Id.; accord, Porter v. McCullum, supra.* That Mr. Ritzheimer did not pursue a mental defense to the charges related to his invisible injuries does not decide the issue of whether his criminal conduct would not have occurred in the absence of his service-connected disabilities. His PTSD, mTBI and Moral Injury unquestionably cause problems in maintaining self-control

---

[126] Judge Kane varied downward from a jointly-recommended prison sentence to probation for a veteran with PTSD due to events witnessed in combat zones, explained in his 30-page opinion. The opinion is available at http://graphics8.nytimes.com/packages/pdf/us/20100303brownfield-opinion-order.pdf .

[127] *Cantu* continues to be cited by courts and secondary sources to support downward departures and variances based on PTSD. *E.g.*, *United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006)(in embezzlement case, finding no abuse of discretion in district court's downward departure of 8 levels to probation under §5K2.13 in part due to defendant's (civilian-based)PTSD, where psychologist's testimony was not rebutted, other than by the prosecutor's arguments); Natalie Hinton, Comment, *Curing the BOP Plague with* Booker*: Addressing Inadequate Medical Treatment in the Bureau of Prisons*, 41 J. MARSHALL L. REV. 219, 228 (2007).

and impair cognitive functions; Moral Injury, in particular, is described as creating a "broken

moral compass" that diminishes capacity to understand the wrongfulness of one's conduct.

The Ninth Circuit had little difficulty concluding that PTSD is a qualifying disorder for

"diminished capacity":

> Cantu's post-traumatic stress disorder is a grave affliction. Its effect on his mental
> processes is undisputed. He has flashbacks to scenes of combat. He suffers
> nightmares, "intrusive thoughts[,] and intrusive images." He is anxious,
> depressed, full of rage, "markedly paranoid," and "explosive at times." . . . . [The
> psychologist's] report shows that Cantu's condition interfered substantially with
> his ability to make reasoned decisions, causing him to fixate on weapons and rely
> on them for feelings of personal safety and security. Cantu's impairment is more
> than sufficient to make him eligible for a reduction in sentence under §5K2.13.[128]

12 F.3d at 1513. The Court went on to explain that "the disorder need be only a contributing

cause, not a but-for cause or a sole cause of the offense." *Id.* at 1515. This policy statement, since

amended, now requires the disorder "substantially contribute" to defendant's commission of the

offense. §5K2.13 provides:

> A downward departure may be warranted if (1) the defendant committed the
> offense while suffering from a significantly reduced mental capacity; and (2) the
> significantly reduced mental capacity contributed substantially to the commission
> of the offense. Similarly, if a departure is warranted under this policy statement,
> the extent of the departure should reflect the extent to which the reduced mental
> capacity contributed to the commission of the offense.

> However, the court may not depart below the applicable guideline range if (1) the
> significantly reduced mental capacity was caused by the voluntary use of drugs or
> other intoxicants; (2) the facts and circumstances of the defendant's offense
> indicate a need to protect the public because the offense involved actual violence
> or a serious threat of violence; (3) the defendant's criminal history indicates a
> need to incarcerate the defendant to protect the public; or (4) the defendant has
> been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18,
> United States Code.

---

[128] Other courts have reached the same conclusion. See, e.g., *United States v. Eric Shawn Perry*,
1995 WL 137294 (D. Neb. March 27, 1995)(PTSD and related sleep disorders significantly
reduce the ability to reason; "[i]t does not require a degree in psychiatry or psychology to
conclude that chronic intentional sleep deprivation, to avoid remembering the horrors of war,
will significantly impair the ability to reason.").

There is only one Application Note, which defines "significantly reduced mental capacity" to mean "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." These two alternatives have been characterized as the "cognitive prong," and the "separate volitional capacity prong," i.e., "the power to control [one's] behavior or conform it to law," as discussed at length by Judge Ferguson in his concurring opinion in *United States v. Schneider*, 429 F.3d 888, 891-94 (9th Cir. 2005)(criticizing the district court for ignoring the volitional prong once determining the defendant's conduct demonstrated he knew "exactly what he [was] doing" and acted out of greed; and noting the Government had not offered any expert opinion contrary to the defense expert's).

According to Dr. Stanulis, Mr. Ritzheimer's PTSD, mTBI, and Moral Injury—all of which have overlapping cognitive and behavioral symptoms—significantly reduced his capacity under both the cognitive and volitional prongs, as explained previously in this memorandum and detailed in Dr. Stanulis' report. Mr. Ritzheimer has worked with VA therapists to gain insights regarding his involvement in political activism, culminating with the Occupation, as a coping mechanism to "make amends" for his "failures" while in the military. His conduct, first in the Hammonds' protest and the later Occupation, was driven by those psychological needs arising from his PTSD, mTBI and Moral Injury. Those invisible injuries significantly impaired his capacity to understand that what he was doing was anything but "the right thing," as well as his volitional capacity to do anything different. His risk-taking behavior manifested by his involvement in the instant offense is a product of his combat-related PTSD, Moral injury, and

history of TBI, and not related to "criminal thinking".[129] His motivation for participating in the Occupation of Malheur Refuge was to "make amends" for his service-related guilt, and not for self-gain or personal gratification. In addition, he has no other signs suggestive of criminality. He has no juvenile history, or adult criminal history or military disciplinary actions; he is married and a good father to his children; he has no history of substance abuse; and he is active in his church and community.

Mr. Ritzheimer's offense conduct falls within a pattern of conduct well-established as resulting from combat-related PTSD:

> A veteran who is compelled to seek danger and heightened sensation may engage in activities that are both risky and have criminal consequences. . . [T]his sensation seeking may compel veterans to repeatedly engage in quasi-military, sensation-fraught criminal conduct. A self-destructive, survivor guilt response, for example, may explain the apparent tendency of some veterans to undertake criminal activity that has little chance of success.[130]

In late January 2017, the Hon. Robert E. Jones heard testimony from psychologist Suzanne Best that a former Army Ranger and highly-decorated Iraq War veteran with PTSD engaged in criminal conduct driven by the symptom of survivor's guilt, when he was involved in an armed standoff with police.[131] *United States v. Jonathan Courtney*, Case No. 3:15-CR-00360-1-JO. According to the Government's sentencing memorandum, Mr. Courtney became intoxicated and fired shots inside his home. When police responded, Courtney pointed a loaded,

---

[129] "PTSD may explain nonviolent criminal behavior because the veteran either seeks the sensations of combat or is acting out of guilt [by engaging in risk-taking behavior]," and this "lack of control defense" has been used successfully to support an insanity defense in *United States v. Tindall,* No. 79-376-T 07 (D. Mass. 1980). There, the defendant who was charged with drug smuggling by helicopter, contended he was seeking the sensation of danger he felt as a helicopter pilot in Vietnam, because the horrors of war had left him dependent on stressful situations to cope with his PTSD. Hunter & Else, *Defending Veterans, supra n.10,* at 418-419.

[130] *Id.,* at 419 (citations omitted).

[131] Facts are as reported by news articles and Best (2017)*, supra n.52,* at 7-6 through 7-8, and court records available through PACER.

semiautomatic Glock 9 mm. pistol straight at the police chief and began counting down from three as if to shoot him; when the chief ran, Courtney went back inside his house. Several minutes later he emerged again with the gun, and responded to another officer's command to put the gun down by assuming a ready-to-shoot stance and aiming straight at that officer. Over the course of the 7-hour standoff, Courtney went in and out of his house more than a few times, waiving the gun around, pointing it toward the officers and yelling at the police to shoot him. At one point he fired a shot in the general direction of the police from his front porch, and his neighbor tried to wrestle the gun away; the neighbor was shot in the leg during the struggle, and then was dragged inside by Courtney. Once the neighbor notified police that Courtney had passed out, he was captured by an FBI SWAT team.

Pursuant to negotiations, Courtney pled guilty to 2 counts of Assault on a Federal Officer, crimes with a maximum of 20 years imprisonment. His advisory guideline range was 51 to 63 months, but the Government agreed to recommend an 8-level downward variance, resulting in a 21-month prison sentence. In its sentencing memorandum, the Government explained the 8-level variance was due to Courtney's exemplary military service as a decorated combat veteran; that the standoff reflected "an aberration from the law-abiding conduct that has characterized most of his life"; his post-military employment characterized as service to his community; that his "offense conduct also appears to have been fueled by alcoholism and untreated PTSD," and military experiences that caused him to suffer from survivor's guilt; and his "exceptional post-offense rehabilitation" including VA in-patient treatment and subsequently maintaining steady employment.

Courtney's defense counsel sought a variance down to probation, presenting testimony by Dr. Best that Courtney's offense conduct in 2015 was driven by his PTSD, and that his

symptoms—under control by time of sentencing in 2017—would be exacerbated by imprisonment. Judge Jones agreed that the isolation and inactivity of prison would jeopardize Courtney's recovery from PTSD, and imposed a 5-year probationary sentence. The circumstances in Courtney's case are quite similar to those in Mr. Ritzheimer's case—except that his is not a crime of violence and he never threatened to shoot law enforcement officers, much less pointed a loaded firearm at anyone during his involvement in the Occupation.[132] Yet, the Government has thus far been resistant to seeking much less than a 30-month prison sentence for Mr. Ritzheimer.

§5K2.13 currently does not define or illustrate what "contributed *substantially* to the commission of the offense" means, nor has the defense found case law interpreting that provision to provide a standard. However, the guideline further notes that, if a departure is warranted, "the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." This suggests that "substantial" in this context means a non-illusory and more than negligible contribution, but need not be a major nor the primary cause. The preceding pages of this memorandum have summarized defense evidence and numerous authorities demonstrating strong causation between Mr. Ritzheimer's diminished capacity and offense conduct. The guideline also specifies factors that disqualify defendants from a departure for diminished capacity, but none of those apply to Mr. Ritzheimer.

However, this Court need not wade into uncharted territory on the meaning of "contributed substantially," as Mr. Ritzheimer does not move for a downward departure but

---

[132] It is worth noting that none of the Occupiers were alleged to have pointed firearms directly at anyone, and that the only shots fired at people were by law enforcement executing an ambush as the FBI's chosen means to end the political protest at the Refuge. Only one co-defendant, Sean Anderson, was reported to have fired shots anywhere other than during target practice. Discovery noted Anderson had fired shots at surveillance aircraft. The government resolved his case for misdemeanor trespass and probation.

rather argues that a commensurate downward variance is warranted for the significant role played by his PTSD, mTBI and Moral Injury in his commission of the offense, particularly in combination with the other factors asserted in this memorandum. In the *Courtney* case, Judge Jones would have had to vary downward an additional 8 levels from the 21-month prison sentence sought by the Government (after its recommended 8-level variance), to impose the straight sentence of probation set forth in the judgment.

Based on similar factors, the Court in *United States v. Oldani,* 2009 WL 1770116 (S.D.W.Va. 2009), varied downward from a guideline range of 30-37 months to a sentence of five months imprisonment followed by eight months community confinement. Oldani served honorably in the Marines and was diagnosed with PTSD after his first tour of combat duty to Iraq in 2005. He sought and received an honorable discharge in 2007. He was also diagnosed with mTBI. He was engaged in treatment with the VA. Over the course of many months, Oldani sold night-vision rifle scopes, stolen by his brother from Marine Corps barracks, on E-bay, and took "a large share in the more than $50,000 of profits he helped generate." *Id.,* at *1-*2. The Court based its variance on Oldani's exemplary military history, and corresponding low risk of recidivism; combat-related PTSD and mTBI that caused him to "exhibit poor judgment," and which the VA was effectively treating, unlike the less-satisfactory care he would receive from the BOP; and his progress at reintegrating, including pursuing a degree, becoming engaged, and "strong support from his church and his family." *Id.,* at *6-*8.

In 2010 the Guidelines Commission also amended U.S.S.G. §5H1.3, Mental and Emotional Conditions, noting such conditions "may be relevant in determining whether a departure is warranted" either "individually or in combination with other offender characteristics," where previously these conditions were "not ordinarily relevant." The 2010

Amendment also added a cross reference to §5C1.1, Application Note 6, stating "In certain cases a downward departure may be relevant to accomplish a specific treatment purpose." §5H1.3 provides:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).
>
> In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. See § 5C1.1, Application Note 6.
>
> Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§ 5B1.3(d)(5) and 5D1.3(d)(5)).

*United States v. Ferguson*, 942 F.Supp.2d 1186, 1191-92 (M.D. Ala. 2013) traced the history of these amendments:

> In 2010, the Sentencing Commission amended its recommendations for sentencing mentally ill defendants in response to the Commission's "multi-year study of alternatives to incarceration." As part of the study, it "reviewed federal sentencing data, public comment and testimony, recent scholarly literature, current federal and state practices, and feedback in various forms from federal judges." The resulting amendment . . . includes an application note that, for the first time, authorizes departure from "Zone C" of the sentencing table (which requires prison for at least half the minimum term) to "Zone B" (which does not require prison) in order to achieve a "specific treatment purpose." (codified at USSG § 5C1.1, comment. (n.6)). Such a departure is appropriate in cases where the defendant "suffers from a significant mental illness, and the defendant's criminality is related to [that illness]," though courts must additionally consider the likelihood that treatment will address the defendant's mental illness as well as the risk to the public absent incarceration.
>
> Also in 2010, the Sentencing Commission amended the status of mental and emotional conditions from a specific offender characteristic that is "not ordinarily relevant" to one that "may be relevant." . . . A specific offender characteristic identified in Chapter Five, Part H as "not ordinarily relevant" must be present to an "exceptional degree" to warrant departure. USSG § 5K2.0(a)(4). As amended, the . . . policy statement instructs that mental and emotional conditions may be relevant in setting a lower sentence where the conditions are "present to an unusual degree" that "distinguish[es] the case from the typical cases covered by the guidelines." This is a less demanding standard than the "exceptional" standard.

94

*Ferguson* reasoned that while the amended policy statement speaks only to downward departures, it reflects careful study and empirical evidence of factors that would also warrant a downward variance. 942 F.Supp.2d at 1194. The court noted the amended guidelines reflect the principle that "punishment should be directly related to the personal culpability of the criminal defendant," *id.*, at 1192; and "the growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society," *id.*, at 1193.

When mental or emotional disorders are shown to be a factor that reduces a defendant's moral culpability for his crime, a downward variance or departure is justified. *See, United States v. Schneider*, 429 F.3d 888, 891-94 (9th Cir. 2005)(Ferguson, J., concurring); *United States v. Stange,* 225 Fed. Appx. 618 (9th Cir. 2007)(Court agreed with defendant that post-service PTSD could support a shorter sentence, but affirmed within-range sentence for armed bank robbery, in deference to district court's discretion); *United States v. Risse,* 83 F.3d 212 (8th Cir. 1996)(in a case involving drug trafficking and firearm possession, court affirmed a downward departure from 57-71 months to 18 months based on the defendant's service-related PTSD and overstated criminal history score); *Cantu, supra; United States v. Courtney, supra; United States v. Brownfield, supra; United States v. Perry, supra.* Mr. Ritzheimer has made that showing.

### *Extraordinary Post-Offense Rehabilitation*

As discussed earlier in this memorandum, Mr. Ritzheimer has accomplished what far too few veterans with the same invisible injuries have done—sought and successfully completed intensive treatment—and remains invested in on-going treatment through the VA. To do so, he had to overcome the stigma attached to acknowledging these disorders, particularly within the

military culture but present as well in civilian culture;[133] and to relive his traumas during in-patient therapy and out-patient Prolonged Exposure Therapy. Dr. Stanulis noted, "It requires a great deal of discipline and courage to confront these traumas."[134]

Through treatment, Mr. Ritzheimer resolved his psychological need to "leave a legacy" for his family through pursuing extreme political activism that could result in him dying young, or some other dangerously maladaptive means, by redefining this military value as being met by being a good father and husband, and a return to work. Dr. Stanulis concluded: "A critical part of Mr. Ritzheimer's treatment is his return to work as this not only normalizes his life, but effectively distracts him from re-living his trauma. He is self-employed through the start-up of his own business". Mr. Ritzheimer also has broken through the isolation of his disorders to become active, with his wife, in their church; and he is sponsoring the local "Toys for Tots" drive through his business. "The health and fitness of warriors is influenced by social factors like jobs and family, that give meaning to their lives and get them through hard times. . . . [T]he best help that we can give may be sticking to the basics for a productive and gratifying life 'at home.'"[135]

---

[133] *See, e.g.,* Michael Friedman, *The Stigma of Mental Illness Is Making Us Sicker,* Psychology Today (May 13, 2014)(discussing negative attitudes of the majority of people in research studies hold towards people with mental illness, as well as self-stigma) available at www.psychologytoday.com/blog/brick-brick/201405/the-stigma-mental-illness-is-making-us-sicker .

[134] "Iraq and Afghanistan veterans have higher levels of acute PTSD symptoms and anger-related problems than veterans from other eras at time of admission to residential programs (Fontana & Rosenheck, 2008). In addition, they have shorter lengths of stay in and lower treatment satisfaction as well as lower levels of treatment engagement and adherence in treatment generally (Erbes, Curry & Leskela, 2009). These problems are likely in part derivatives of the distinct characteristics of these most recent military conflicts (e.g., extended tours, multiple deployments, increased likelihood of redeployment) (Hoge et al., 2004)." Joan Cook et. al., *Iraq and Afghanistan Veteran: National Findings from VA Residential Treatment Programs,* Psychiatry (2013 Spring); 76(1): 18-31.

[135] Xenakis, *Combat Trauma*, Hunter & Else Defending Veterans, *supra.*

96

The Ninth Circuit has recognized that post-offense rehabilitation efforts may support a departure. *See, United States v. Green,* 152 F.3d 1202, 1207-08 (9th Cir. 1998); *United States v. Thompson,* 315 F.3d 1071, 1077-78 (9th Cir.2002)(Berzon, J., concurring)("Post-offense rehabilitation—as distinguished from post-sentencing rehabilitation—can be a basis for downward departure. . . . A relevant consideration under the rubric of post-offense rehabilitation is continuity of needed treatment"). It can also support a variance without necessarily reaching the level of "extraordinary." *E.g., United States v. Courtney, supra; see, United States v. Howe, supra* (noting military service need not be extraordinary to support a variance under §3553(a)). Mr. Ritzheimer's steps toward successful reintegration during the last year have been extraordinary in light of his mental and emotional impediments symptomatic of combat-related invisible injuries, and of his perseverance in seeking and completing intensive treatment.

### *Departure Or Variance To Provide Effective Rehabilitation*

As previously noted, §5C1.1, Application Note 6, authorizes a downward departure from Zone C (split sentence) to Zone (B) probation, when "appropriate to accomplish a specific treatment objective." This guideline embraces a policy of imposing a non-prison sentence, in lieu of a relatively short prison sentence, for the pragmatic purpose of rehabilitative treatment, signifying the same rationale is a reasonable ground for a downward variance. Probation is a statutory sentencing option for Mr. Ritzheimer's conspiracy offense; community supervision could likewise be achieved through a term of supervised release without additional imprisonment.

In *United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) the district court relied on the need for the sentence imposed to provide the defendant with rehabilitative treatment in the most effective manner, 18 USC §3553(a)2)(D), as one ground for its variance from prison to a

97

probationary sentence. On appeal, the government contended reliance on that factor was erroneous, because the defendant could have been ordered to undergo treatment in prison. The Ninth Circuit noted the district court's finding that incarceration would likely create "a much more disruptive situation and, actually, could be more damaging" than ordering mental health and other appropriate treatment as conditions of probation, in upholding the variance. 555 F.3d at 876-77. The Court went on to note that "'imprisonment is not an appropriate means of promoting correction and rehabilitation' ." *Id.,* at 877 (citation omitted).

When it comes to the invisible injuries of war, district court judges have repeatedly recognized that treatment available through the VA is superior to anything available in the BOP, and the government has taken no appeal from those sentencing decisions. In *United States v. Oldani, supra,* the court found:

> The BOP is not uniquely situated, as is the VA, to treat the signature injuries from the United States's current military engagements. Counselors at the BOP would be less likely to have received specific training to treat veterans and deal, for example, with the type of events that brought on a soldier's PTSD. Finally, group sessions conducted by the BOP would likely be available to the entire prison population (at least those subject to a specific disability) rather than being limited to veterans.

2009 WL 1770116, at *7; *accord, United States v. Courtney, supra.*

Judge Kane, in his *Brownfield* opinion, *supra* at p. 27, determined:

> Given the paucity of prison programs available to those serving one year or less and the relative lack of expertise compared with the Veterans Administration in treating war-zone related illnesses, corrective treatment will be more readily realized by a lengthy sentence to probation rather than a comparatively abbreviated one to prison. In the circumstances of this case I find that a sentence to prison is inappropriate for achieving Section 3553(a)'s purposes.

In *United States v. Kevin John Erickson,* Case No. 3:10-CR-006 (E.D. VA., Richmond Division), the district court varied downward from an advisory guideline range of 46-57 months, to a probationary sentence due to lack of veteran-specific treatment from the BOP. Erickson had

found employment post-discharge with the BOP as a prison guard, and was convicted of smuggling contraband as well as soliciting a crime of violence—a course of conduct that took place over several years, according to court filings. In the course of sentencing proceedings, the court received testimony from the head of psychiatry for the Bureau of Prisons concerning the availability of psychotropic medications as well as therapy for combat-veteran defendants with PTSD. The April 1, 2011, sentencing transcript (p. 125), available through PACER, contains the Government's acknowledgment that "the record forecloses a finding that [the defendant's] going to receive veteran-specific posttraumatic stress disorder treatment; however, he's not going to go wholly without treatment." The court, in support of its downward variance to probation, found:

> "[T]here's nothing in the record that the Bureau of Prisons has any way of treating posttraumatic stress syndrome of veterans, and the fact of the matter is, when people make sacrifices for this county and when they experience what is now recognized as very real consequences, then it's up to the country, even when they commit crimes, and that's evidence by section 3553(a) and the last factor, to make sure they get the treatment that they're required to get," *id.,* at p. 135.

Given the reported information concerning Judge Jones' reasons for variance in *Courtney* this year, as well as all other information the defense has been able to find, nothing has changed at the BOP since *Erickson* was decided in 2011, and 2017. If anything, the provision of health care, including mental health services, at the BOP may well have declined.[136]

---

[136] A recent DOJ study concluded the BOP systemically lacks sufficient numbers of medical professionals to provide all inmates with medically necessary healthcare, resulting in limited access to medical care. OIG, U.S. Department of Justice, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Executive Summary (March 2016)(available on-line). Staffing at some prisons was described as "crisis level." Id., at n.9. At the same time, BOP's institutions remained 16 percent above rated inmate capacity, and grappled with the need to control spending while meeting increasing resource needs of inmates. Reducing inmate medical costs is a priority. OIG, Top Management and Performance Challenges Facing the Department of Justice—2016, III-12. The federal inmate population is expected to increase by more than 4000 next year under the Trump administration, according to a recent Wall Street Journal article.

Ongoing VA treatment for Mr. Ritzheimer is vital to his continuing rehabilitation. As explained by Dr. Stanulis, and consistent with authorities cited earlier in this memorandum, PTSD is a chronic disorder that requires constant attention to manage and keep symptoms under control: One way to think about PTSD is to see it as analogous to diabetes. If one adopts the proper life style, nutrition and treatment regimen with diabetes, the symptoms can be managed well. If, however, one does not maintain the treatment regimen on a daily basis, it can again spiral out of control. This is true also of PTSD.

> One noteworthy problem associated with PTSD is the fact that it is often like a light switch. At times it seems as though the veteran is well on the way to resolving her or his problem, but a single incident or event can take the individual back to the point of origin. . . . Current Images and reports from Afghanistan and Iraq serves as a trigger for many older veterans (WWII, Korea, Vietnam, Gulf War I) to experience recurring PTSD symptoms from their own combat experiences (Brown 2005; Schroder and Dawe 2007). Shad Meshad, Executive Director of the National Veterans Foundation (NVF) in Los Angeles, California, indicates that veterans from past wars are experiencing significant increases in stress as images and information of the ongoing wars in Afghanistan and Iraq is injected into mainstream America. Following the release of the film "Saving Private Ryan," telephone calls from World War II veterans flooded the suicide toll-free phone banks at the NVF, revealing that the first few minutes of the film brought back horrific memories of their previous combat experiences (Shad Meshad interview 2008). [137]

Dr. Stanulis concludes that a prison sentence not only places Mr. Ritzheimer at risk of relapse by interrupting his treatment regimen, but would also increase the severity of his symptoms as occurred when he was incarcerated pretrial for about two months. Exacerbation of mental disorders, including PTSD, for anyone being sent to prison for the first time is documented in the literature.[138] Prison is particularly difficult for combat-veteran defendants:

---

[137] William B. Brown, *Another Emerging "Storm": Iraq and Afghanistan Veterans with PTSD in the Criminal Justice System*, 5 Just. Pol'y J.. 1, 12 (2008)

[138] Not only is "being sent to prison" considered a traumatic event, the magnitude of this trauma is comparable to "rape," "acts of terrorism," and "being held hostage." Diana Sullivan Everstine & Louis Everstine, Strategic Interventions for People in Crisis, Trauma, and Disaster, at xiv

However, when a veteran is sent to prison, he finds himself in a setting that creates a "survivor mode" environment that might exacerbate PTSD symptoms. The initial traumatic experience(s) that caused the veteran's PTSD may be relived by the social stimuli found in prison, and the veteran may revert back to "combat mode" to handle prison life.[139]

A non-prison sentence would also expedite Mr. Ritzheimer's participation in the Arizona federal veteran's treatment court, which as previously described, is uniquely designed to rehabilitate veterans, and thereby protect society.

Judge Wendy Lindley poses this question, "Are we safer as a community if we simply process these human beings through the system and send them off to prison and have them come back into our community? Because they will come back to our community, and if they come back and their PTSD has not been treated, what is the likelihood that they're going to have another violent act in our community?" *The Situation Room* (CNN television broadcast Oct. 28, 2010).[140]

## IV. A Sentence Of Continued Community Supervision Is "Sufficient But Not Greater Than Necessary" To Achieve Justice In Mr. Ritzheimer's Case.

*"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487–88 (2011)(citations omitted).*

As this Court well knows, 18 U.S.C. §3553(a) provides the framework that guides its sentencing discretion. Section 3553(a) lists seven factors that a sentencing court must consider.

The first factor is a broad command to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553(a)(1). This memorandum has

---

(2006 rev. ed.). *See also* H. Richard Lamb, *Reversing Criminalization*, 166 Am. J. Psychiatry 8, 8 (2009) (observing that "[i]ncarceration poses a number of important problems and obstacles to treatment and rehabilitation" for the mentally ill).

[139] Beth Totman, *Seeing the Justice System Through A Soldier's Eyes*, 16 J. Health Care L. & Pol'y 431, 444-45(2013)(citing Chester Sigafoos, *A PTSD Treatment Program for Combat (Vietnam) Veterans in Prison*, 38 Int. J. Offender Therapy & Comp. Criminology 117, 118 & 121 (1994).

[140] Major Evan R. Seamone, *Reclaiming The Rehabilitative Ethic in Military Justice*, 208 Mil. L. Rev. 1, 212, n. 83.

fully addressed all of those.[141] The second factor requires the consideration of the general purposes of sentencing, including:

> "the need for the sentence imposed—
> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> "(B) to afford adequate deterrence to criminal conduct;
> "(C) to protect the public from further crimes of the defendant; and
> "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."
> 18 U.S.C. §3553(a)(2).

Stated in summary fashion as (A) retribution, (B) deterrence, (C) incapacitation, and (D) rehabilitation, those issues will be further briefed below.

The third factor pertains to "the kinds of sentences available," §3553(a)(3); the fourth to the Sentencing Guidelines; the fifth to any relevant policy statement issued by the Sentencing Commission; the sixth to "the need to avoid unwarranted sentence disparities," §3553(a)(6); and the seventh to "the need to provide restitution to any victim," §3553(a)(7). Preceding this list is the general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. §3553(a). Factors 3 through 7 will be briefly discussed, prior to focusing on how the purposes of sentencing under the second factor can be met without the need to send Mr. Ritzheimer to prison.

### *The Kinds Of Sentences Available*

Congress has authorized judges to impose probation for most offenses, i.e., any offense with a statutory maximum below 25 years (excluding only Class A and B felonies), unless expressly precluded for the offense. See 18 U.S.C. §3561(a), §3559(a). Mr. Ritzheimer is

---

[141] The Supreme Court has recognized the vital need for the depth of information presented in this memorandum: "[W]e have emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' *Pepper, supra,* 562 US at 488.

convicted by plea of a Class D felony, carrying a maximum term of 6-years prison, followed by up to a 3-year term of supervised release, and is eligible for a sentence of up to 5-years probation. 18 U.S.C. §3561(c)(1). His advisory guideline range if calculated as agreed to by the parties is 30-37 months prison, prior to any downward departures or variances. Thus, the Court has the option as recommended by the defense to grant a downward variance under the §3553(a) statutory sentencing scheme, and sentence him to time served (62 days), followed by a 3-year term of community supervision. Another option consistent with the defense recommendation would be for the Court to impose up to 5-years probation, if it determines that a more punitive sanction is required, or that a longer period of community supervision would serve other purposes of sentencing apart from "just punishment" for his conduct. In arriving at the appropriate length of community supervision, the defense asks the Court to consider Mr. Ritzheimer has been supervised successfully in the community by Pretrial Services for now approaching two years.

Community service is a punitive condition, i.e., one through which a defendant may make retribution, that is an available option as a condition of community supervision. A period of house arrest is also available as a punitive condition of either probation or supervised release. Mr. Ritzheimer has served nearly five months on house arrest (73 days in home detention, followed by 67 days on GPS monitoring with curfew) while on pretrial release, but the Court need not credit him with that as part of a sentence.

Finally, a much less-favored, punitive condition of either probation or supervised release would be a period of community confinement at a Residential Rentry Center (RRC). Undersigned counsel has confirmed with U.S. Probation in Arizona, where courtesy supervision would occur, that Mr. Ritzheimer would be allowed to do community confinement in his home

state; however, the RRC closest to him in Phoenix, AZ, has declined community supervision-type placements based on limited capacity due to the number of BOP placements, and the nearest RRC would be about two hours drive from Phoenix. Thus, while RRC confinement would allow Mr. Ritzheimer continued access to VA treatment, it would unlikely be through his current providers; and the distance would also foreclose him from continuing to work at his business.

The United States Sentencing Commission has recognized:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration. Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.[142]

A sentence of community supervision without additional incarceration at an RRC would be most effective in continuing his rehabilitation, as well as his business which, as Dr. Stanulis noted, is an important treatment component. His business is also the most promising source for him to pay restitution.

### *The Advisory Sentencing Guidelines Range*

Mr. Ritzheimer has agreed to his advisory guideline range as part of his negotiated resolution of this case. However, his plea agreement does not limit his ability to make arguments regarding the amount of deference this Court should give to this §3553(a)(4) factor. There are strong arguments that the Guidelines in general, as well as those at play in his case, deserve less weight in determining the sentence for first offenders convicted of non-violent crimes, like Mr. Ritzheimer.

In enacting the Sentencing Reform Act of 1984, Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who

---

[142] USSC, *Alternative Sentencing in the Federal Criminal Justice System*, at 20 (Jan. 2009).

pose the most dangerous threat to society," and that "in cases of  nonviolent and nonserious offenders, the interests of society as a whole as well as  individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."[143] Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," 28 U.S.C. §994(j). Congress indicated its view of a crime of violence for which prison would be warranted as one "that results in serious bodily injury." 28 U.S.C. §994(j).

Congress also intended that probation and intermediate sanctions would be used more often than they had been before the guidelines,[144] when about 38% of offenders were sentenced to probation.[145] However, the Commission has acknowledged that the first offender directive in §994(j) was not implemented,[146] and that the guidelines' requirement of prison in nearly every case was still being followed by many courts, despite more recent guideline reforms to increase the availability of community supervision and split sentences for lower level offenders.[147] Thus, it is important to consider the congressional directive of §994(j), and the admitted failure of the guidelines to implement that directive, in determining the weight to give this fourth factor in sentencing Mr. Ritzheimer.

---

[143] See Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987, 2039 (1984).
[144] See S. Rep. No. 98-225, at 67, 172-76 & nn.531-32 (1983).
[145] U.S. Sentencing Commission (U.S.S.C.), *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 43 (2004).
[146] U.S.S.C., *Recidivism and the First Offender*, at 3 (May 2004)
[147] U.S.S.C., *Alternative Sentencing in the Federal Criminal Justice System,* at 1-2 (2015).

Further consideration is due to the method used by the Government in arriving at Mr. Ritzheimer's advisory guideline range. A review and comparison of co-defendants plea agreements in this case shows that, for those defendants who entered negotiated guilty pleas to the conspiracy count, the Government built its view of offender culpability into the individual defendant's advisory guideline range. The Government did so through the mechanisms of role adjustment, and the much lesser-used Application Note 4 to the Terrorism guideline, U.S.S.G. §3A1.4. Note 4 states an upward departure to the guideline range is warranted for crimes that are not "federal crimes of terrorism," so long as "the offense was calculated to influence or affect to conduct of government by intimidation or coercion, or to retaliate against government conduct."

The Government applied a "sliding scale" of its own invention in determining the number of levels for the "terrorism enhancement" under Note 4, ranging from 3-levels for what it considered lower-level offenders to 10-levels for Ryan Payne, and 9 for Mr. Ritzheimer. To be perfectly clear, Mr. Ritzheimer agreed to the role adjustment and Note 4 enhancements for purposes of the advisory guideline calculations in his case, and is not suggesting the Court is free to disregard them. However, he did not forfeit the right to assert that his advisory guideline range, driven substantially by this *ad hoc* application of Note 4—rather than any empirical data, research or studies by the Guidelines Commission as to what types of conduct warrant, for example, a 3-level versus a 9-level enhancement under Note 4; or whether the enhancement should be applied with disparity to participants in the same offense—is deserving of less weight in the §3553(a) calculus. Without the Note 4 enhancement, the advisory guideline range would be as reflected in the PSR: 12 to 18 months prison, and in a Zone C, split sentence range.

***Relevant Policy Statements By The Guidelines Commission***

This memorandum has previously discussed relevant Policy Statements by the Guidelines Commission concerning downward departures for Military Service, Mental and Emotional Conditions, and limited departures to accomplish a specific treatment purpose; and asserted the Commission's studied recognition of those factors as mitigating would support a downward variance without necessitating a determination of whether any factor is "present to an unusual degree," and makes the case atypical. One additional Policy Statement, U.S.S.G. §5H114 (Physical Condition) mirrors the language in §5H1.3 (Mental and Emotional Conditions). As noted earlier, mTBI is an "invisible" physical (organic) condition that manifests in cognitive as well as emotional and volitional impairments. Also, Mr. Ritzheimer continues to suffer from combat-related physical conditions, some or most of which are unlikely to be adequately treated by the BOP, resulting in increased suffering.

***The Need To Avoid Unwarranted Sentence Disparities***

Section 3553(a)(6) requires the judge to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Defendants with similar records convicted of similar conduct vary widely in their culpability, risk of recidivism, dangerousness, and rehabilitation needs. Judges must now take account of these variations, and uniformity for its own sake is no longer the goal of the sentencing system. *See United States v. Kimbrough*, 128 S. Ct. 558, 574(2007) ("some departures from uniformity were a necessary cost of the remedy we adopted."). "Perfect parity among the sentences imposed on the various members of a criminal conspiracy is no doubt impossible to achieve, given the complexity of the task." *United States v. Lazenby,* 439 F. 928, 934 (8th Cir. 2006).  However,

extreme disparity of sentences for co-defendants "suggests an arbitrary level of decision-making that fails to 'promote respect for the law,'" *id.*

Disparities in the penal consequences bestowed upon co-defendants in this case thus far have been stark and wide—but not due to the exercise of judicial discretion. Nonetheless, extreme disparities regardless of cause may yet fail to promote public respect for the law. Therefore, a brief summary of leniency bestowed through jury verdicts and prosecutorial discretion follows: First, there was the acquittal of Ammon and Ryan Bundy, the undisputed leaders of the conspiracy, along with five of the less-involved co-conspirators, Shawna Cox, Jeff Banta, Kenneth Medenback, David Lee Fry and Neil Wampler, resulting in no sentence being imposed. The Government dismissed charges against Pete Santilli—who engaged in many more public broadcasts calling for aid for the occupiers than Mr. Ritzheimer—prior to trial. Following the first trial, the Government agreed to dismiss conspiracy charges altogether against co-defendants Sean Anderson, Sandra Anderson, Dylan Anderson and Darryl Thorn, in exchange for guilty pleas to misdemeanor trespass and one-year probation sentences; Thorn ultimately rejected the offer and stood trial.

At the second trial, the jury returned a split verdict, convicting Thorn and Jason Patrick of the conspiracy count, but acquitting Duane Elmer and Jake Ryan; they were convicted of depredation of government property. All four defendants from the second trial are pending sentencing. All other co-defendants, including Mr. Ritzheimer, plead guilty to felony conspiracy charges before the first trial commenced. The Government's plea agreements with Ryan Payne and Joseph O'Shaughnessy provided their sentences would be fully concurrent with any sentence imposed in their Nevada prosecutions; i.e., bestowing virtually no likelihood that they would face any additional penal consequences for their involvement in the Occupation.

To date, six defendants convicted of the conspiracy count have been sentenced: Corey Lequeiu, sentenced to an agreed term of 30 months (who otherwise faced a much higher guideline range as a convicted felon on a dismissed count); Brian Cavalier, sentenced to nine months (time served) and supervised release; and Geoffrey Stanek, Erik Flores, Travis Cox, and Jason Blomgren, all sentenced to two-years probation, and all except Blomgren with a condition of several months of house arrest. Thus, the vast majority of Mr. Ritzheimer's co-defendants whose cases have resolved so far have either been acquitted, given misdemeanors, sentenced to probation or time served, or are highly unlikely to face any additional imprisonment related to their Oregon conduct.

### *The Need To Provide Restitution To Any Victim*

Mr. Ritzheimer has stipulated to pay restitution in the sum of $10,000, and the Court has agreed to impose that amount. Although the conspiracy count does not fall within the scope of mandatory restitution, the purpose served by the restitution to be ordered in this case remains part of the punitive sanctions that promote the goals of sentencing. *See, Paroline v. United States,* 134 S.Ct. 1710, 1726 (2014)(noting the primary goal is remedial, but restitution also serves "to mete out appropriate criminal punishment")(citation omitted).

The best means for ensuring Mr. Ritzheimer pays his restitution is through a sentence of continued community supervision where he can continue to grow his motorcycle repair business into a profit-making venture. As noted, he is well on his way. If incarcerated, his business will be lost and he will be saddled with the debt he undertook to get it started, further impeding his ability to pay restitution. He will also return more damaged from disruption of treatment, which would not be conducive to finding employment.

### *The Goals Of Sentencing*

A sentence that continues Mr. Ritzheimer on community supervision with special conditions, including payment of restitution, will serve the purposes of sentencing identified in §3553(a), making prison as proposed by the Government a "greater than necessary" alternative.

#### A. Retribution

It is necessary to impose a punishment that adequately reflects the seriousness of Mr. Ritzheimer's crime. As noted by Judge Kane, "Imprisonment, however, is not the only means of punishment, and, throughout the history of civilization, punishment has been curtailed because of the frailty of the defendant and his or her need for treatment." *Brownfield, supra,* at 24. As *Brownfield* and other cases cited earlier in this memo illustrate, courts have found sentences of community supervision to adequately reflect the seriousness of crimes committed by traumatized combat veterans in need of treatment—and in cases involving crimes arguably more serious than Mr. Ritzheimer's offense, e.g., assaulting federal officers with a firearm (*Courtney*); selling stolen military equipment sought by hostile foreign forces for use against US troops, on e-bay (*Oldani*); smuggling contraband in a federal prison that threatened institutional security (*Brownfield*); soliciting aggravated assault to cover up other crimes (*Erickson*).

The Supreme Court has recognized probation is punishment with significant penal aspects:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly

110

> to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States,* 552 U.S. 38, 48–49 (2007). The Court referenced the Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13–14 (1957) ("Probation is not granted out of a spirit of leniency . . . . As the Wickersham Commission said, probation is not merely 'letting an offender off easily' "). *Id.,* at 49, n.4. Home detention may also be imposed as a condition of community supervision, as a substitute for imprisonment. U.S.S.G. §5F1.2.

In addition, evidence-based practices suggest that superior and cost-effective results can be achieved by sentencing low-risk individuals to probation, and that imprisonment would be wasteful and counterproductive. See, Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 485, 505 (2011)("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions.").

The principle of retribution, also discussed in terms of blameworthiness or "just desert" for the offender, is related to an assessment of the individual's moral culpability, such that less harsh sentences are "just" for offenders who have, e.g., acted under compulsion or duress not constituting a defense, or from unselfish motives, or as recognized by the Ninth Circuit in *Cantu, supra,* have a reduced mental capacity related to their criminal conduct: "Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act out of viciousness or greed." 12 F3d at 1506. By all available evidence, Mr. Ritzheimer clearly falls within this class of defendants.

111

**B. Deterrence**

Two of the four purposes of sentencing, deterrence and incapacitation to protect the public, that could otherwise justify a prison sentence, are counterbalanced by evidence of low risk of recidivism. A defendant who has been successfully rehabilitated does not need imprisonment to be deterred from re-offending, nor locked up to protect the public. Furthermore, the Ninth Circuit has held that the Section 3553(a) goal of general deterrence need not "be met through a period of incarceration," rather than community supervision. *United States v. Edwards*, 595 F.3d 1004, 1016 & n.16 (9th Cir. 2010). In addition, studies have shown "confinement or increased length of incarceration serve[s] the crime control purpose of incapacitation, but ha[s] little or no effect as a 'treatment' with rehabilitative or specific deterrent effects."[148] A 20-year study of 962 felony offenders found "no evidence to justify the belief that the addition of jail time to a probation sentence has a specific deterrent effect."[149]

Mr. Ritzheimer's post offense rehabilitation also evidences that prison is not necessary as a specific deterrent. *Gall,* 552 U.S., at 59, 128 S.Ct. 586 ("Gall's self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" (citing §§ 3553(a)(2)(B)-(C))).

Judge Kane reflected, "The driving force of general deterrence is certainty, not severity or length, of punishment." *Brownfield, supra* at 26.

> The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," i.e., whether any particular

---

[148] Don M. Gottfredson, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases, Research in Brief* (1999), at 8, available at http://www.ncjrs.gov/pdffiles1/nij/178889.pdf).
[149] *Id.*, at 8-9.

quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.[150]

The likelihood of any defendant's sentence in the instant conspiracy case having general deterrent value is negligible. First, the well-publicized jury verdicts—both in Oregon and Nevada—involving these defendants and other Bundy followers—send the message that there is no certainty of being punished by engaging in criminal acts of political protest. Second, given the acquittals of many defendants who stood trial in this prosecution, and particularly its leaders, the only certainty of punishment existed for those who elected to plead guilty rather than stand trial. Sending the message that protestors who abandon the cause, accept responsibility, and plead guilty are the most likely to be punished cannot rationally further general deterrence.

### C. Incapacitation

Of all of the purposes of sentencing, the need to protect the public from further crimes of the defendant is the one of greatest practical concern, and also the most capable of being measured. Many facts demonstrating that Mr. Ritzheimer has a low risk of recidivism, that will be further lowered through continued VA treatment and community supervision, have been discussed at length earlier in this memorandum. See Section II, *supra.* The defense does not anticipate the Government will argue that a prison sentence is needed to protect the public from Mr. Ritzheimer, so long as he stays on his current course of successful reintegration.

---

[150] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

### D. Rehabilitation

The Supreme Court has noted that post-offense conduct "may be taken as the most accurate indicator of "his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Pepper v. United States, supra,* at 1242-43. The Court held that evidence of post-offense rehabilitation, including post-sentencing rehabilitation, "bears directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing. §3553(a)." *Id.* Mr. Ritzheimer's post-offense rehabilitation has been discussed at length in this memorandum, see, e.g., Section II, *supra.* There is ample evidence—apart from his VA treatment records and Dr. Stanulis' opinions—from the statements of individuals who have witnessed his transformation and who interact with him on a routine basis, as well as his actions in launching a business, becoming active in his community and church, and maintaining compliance with pretrial supervision, to demonstrate he is a much-changed man.

The case law discussed in support of downward variance based on Military Service and Mental and Emotional Conditions, section III, *supra*, relied heavily on this last purpose of sentencing: "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2). Those courts found that veteran defendants suffering from combat-related PTSD could best and most effectively be provided treatment through the VA in a community setting, and that prison would be counter-productive to protecting society as well as injurious to the defendant. *E.g., Courtney, supra; Brownfield, supra; Oldani, supra.* Mr. Ritzheimer has tendered the same evidence through this memorandum. He also has medical needs unlikely to be met in a prison setting.

Finally, the findings of the Charles Colson Task Force on Federal Corrections (2016) underscore the importance of alternative sentences that foster rehabilitation as a goal of sentencing, in bringing about needed criminal justice reforms:

> After decades of unbridled growth in its prison population, the United States faces a defining moment. There is broad, bipartisan agreement that the costs of incarceration have far outweighed the benefits, and that our country has largely failed to meet the goals of a well-functioning justice system: to enhance public safety, to prevent future victimization, and to rehabilitate those who have engaged in criminal acts. Indeed, a growing body of evidence suggests that our over-reliance on incarceration may in fact undermine efforts to keep the public safe. Momentum is strong for a new direction, for a criminal justice system guided by proven, cost-effective strategies that reduce crime and restore lives. But translating this impulse for reform into lasting change is no small challenge.[151]

### Conclusion

*[Exacerbating] the problems confronting young veterans today is the absence of a comprehensive understanding of the impact of war on those who have served in war zones. This lack of understanding seems to exist throughout much of America—even though we have volumes of research and personal accountings in the aftermath of the Vietnam War. This is particularly true in the case of the American criminal justice system. American history seems to be positioning itself for a replication of the imprudent responses to veterans' experiences and needs practiced for at least the past several decades.[152]*

The defense has sought throughout this memorandum to provide the Court with the necessary comprehensive understanding of military culture and combat-related invisible injuries, to fully make sense of Mr. Ritzheimer's mitigating evidence. That evidence, and the legal framework for determining sentence, unite in support of the defense recommendation for a sentence other than prison. In addition to however many more years of active supervision, and

---

[151] "Transforming Prisons, Restoring Lives: Final Recommendations of the Charles Colson Task Force on Federal Corrections," p. ix (January 2016) (last accessed 10-25-2016 at http://www.urban.org/sites/default/files/alfresco/publication-pdfs/2000589-Transforming-Prisons-Restoring-Lives.pdf ).

[152] William B. Brown, *Another Emerging "Storm": Iraq and Afghanistan Veterans with PTSD in the Criminal Justice System*, 5 Just. Pol'y J.. 1, 11 (2008).

such restrictive conditions as the Court deems necessary to impose, Mr. Ritzheimer will sustain the punitive impacts of a life-long felony conviction, a debt of $10,000 restitution, permanent loss of Second Amendment rights, and his designation to the Terrorist Watch List.

In the winter of 2016, in the high desert terrain of Eastern Oregon, decked out in military garb and slinging a rifle, Jon Ritzheimer was a wounded warrior, still at war. He has since fought a different but very hard battle—one caused by his combat experiences, and deeply imbedded within himself—to find his way home. May this Court, as a representative of the judicial branch of his government, find its way to welcome him back.

RESPECTFULLY SUBMITTED this 3rd  day of November, 2017.

/s/ Terri Wood

Terri Wood, OSB 883325
Attorney for Ritzheimer